UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMILIO GARCIA, an Individual,<br><br>                     Plaintiff,<br><br>     -against-<br><br>ROC NATION LLC, a Delaware Business Organization; HOT GIRL TOURING, LLC, a Delaware Business Organization, MEGAN THEE STALLION ENTERTAINMENT, INC., a Delaware Business Organization, MEGAN THEE STALLION, an Individual, and DOES 1 through 10, inclusive<br><br>                     Defendants. | Civil Action No.: 1:24-cv-07587-GHW<br><br>**SECOND AMENDED COMPLAINT**<br><br>Jury Trial Demanded |

Plaintiff, Emilio Garcia ("Plaintiff" or "Garcia"), by and through his attorneys, Valiant Law and West Coast Trial Lawyers, APLC, complains about Defendants Roc Nation LLC, Hot Girl Touring LLC, Megan Thee Stallion Entertainment, Inc. (together, the "Company"), Megan Thee Stallion a/k/a Megan Pete ("Pete" or "Stallion"), and Does 1 through 10, inclusive (all Defendants herein, "Defendants"), and alleges, as follows:

## PRELIMINARY STATEMENT

*Ayy, two red bones kissin' in the back seat*
*Girl, don't stop, keep goin' and relax me*
*You want me to join in? Then ask me*
*I like girls that like girls, that attract me*

- Megan Thee Stallion "Best Friend"

1.     Plaintiff was employed as Pete's personal cameraman. Unfortunately, the hypersexualized and graphic lyrics pervasive throughout Pete's music blended into the working relationship between Pete and her employees, as she subjected Plaintiff to unlawful discrimination, harassment, and retaliation on numerous occasions.

2.      One such instance of unlawful sexual harassment involves Pete forcing Plaintiff to witness her perform group sex with her "best friends" as alluded to in the lyrics from her song bearing the same name.

3.      Plaintiff tried to ignore the harassment and other unlawful acts detailed herein, but Defendants' treatment of him grew worse until Defendants unlawfully terminated his employment. Cruelly, Defendants' retaliation stems beyond the period of Plaintiff's employ as, upon information and belief, Plaintiff was "black balled" by Pete because he was uncomfortable being subject to sexual harassment and opposed unlawful wage practices.

4.      Plaintiff complains pursuant to the New York State Human Rights Law, NYS Executive Law §§ 296 *et seq.* ("NYSHRL"), the New York City Human Rights Law, New York City Administrative Code §§ 8-107 *et seq.* ("NYCHRL"), New York Labor Law ("NYLL"), California Fair Employment and Housing Act ("FEHA"), Government Code, § 12926(d), California Labor Code, among other laws as set forth below.

## PARTIES

5.      Plaintiff is an individual who, at all relevant times, resides in the County of Harris, State of Texas.

6.      Defendant ROC NATION LLC., is and at all times herein mentioned has been a Delaware business organization with the capacity to sue and to be sued, and doing business, with a principal place of business located at 953 N. Sycamore Ave, Los Angeles, CA 90038.

7.      Defendant HOT GIRL TOURING, LLC, (HGT) is and at all times herein mentioned has been a Delaware business organization with the capacity to sue and to be sued, and doing business in Los Angeles, California, with a principal place of business located at 1450 Brickell Avenue, 18th Floor Miami, FL 33131.

8.     Defendant MEGAN THEE STALLION ENTERTAINMENT, INC., is and at all times herein mentioned has been a Delaware business organization with the capacity to sue and to be sued, and doing business in Los Angeles, with a principal place of business located at 1450 Brickell Avenue, 18th Floor Miami, FL 33131.

9.     Defendant MEGAN THEE STALLION ("THEE STALLION" or "PETE") is and at all times herein mentioned has been an Individual with the capacity to sue and be sued in the county of Los Angeles, and is an owner and principal of HOT GIRL TOURING, LLC and MEGAN THEE STALLION ENTERTAINMENT, INC. and had authority to direct the manner in which Plaintiff carried out his duties and did, in fact, exercise that authority.

10.     Defendants were in charge of and had control over Defendants' policies and procedures with respect to its unlawful policies, acts and practices alleged herein, including but not limited to, payroll, timekeeping, scheduling and otherwise running the business.   The Defendants share a common commercial business purpose, address and location.

11.     Although Defendants may be separate and distinct business entities and individuals, they engage in related activities.  Defendants shared Plaintiff, as well as other employees, acted in the interest of each other with respect to employees, paid their employees by the same method, shared control over their employees, hired and fired employees, administered disciplinary procedures, used the same Human Resources employees, supervised employee, maintained payroll, provided insurance, controlled the terms and conditions of employees' employment, employed the individuals who committed the unlawful acts alleged herein, and are themselves under common control and management.

12.     The corporations and/or entities are owned, operated, and controlled by the same owner, or owner group, operating as a unified operation and, upon information and belief, each

provides mutually supportive services to the substantial advantage of the other, such that each entity may be treated as agents of each other, independent contractors, subcontractors, a single enterprise and/or joint employers.

13.    Upon information and belief, Defendants were Plaintiff's employers, at all times relevant.  Further, at all times relevant, the Defendant entities were and now are related to or form an organization, the entities' holding, parent, sister and/or subsidiary corporation and/or alter egos of each other and Weiner.  Further, upon information and belief, some, or all of the Defendant entities are mere shell and sham entities without capital or assets and were conceived, intended and were used by Weiner and the entities as a device to avoid liability and for the purposes of substituting a financially insolvent corporation, entity or related subsidiary or parent company.

14.    Plaintiff further alleges, upon information and belief, the Defendant entities, at all relevant times, were the alter egos of each other and Pete and there exists, and at all relevant times has existed, a unity of ownership between the Defendants such that any separateness has ceased to exist in that the entities, owners, members, and Pete used and continued to use, comingle, or restrict the assets for their own use, without adequate consideration and have withdrawn funds from these entities for its parent organizations and Pete's use and/or collusion, and at all times herein mentioned were, controlled, dominated, and operated by Defendant entities, their owners and Pete, as their individual business and alter ego, in that the activities and business of Defendants were and are carried out without the holding of proper directors or shareholders meetings, comingled funds and accounts, improper insurance, no records or minutes of any material corporate proceedings were maintained, and Defendants entered into misrepresented and sham transactions.

15.     At all relevant times, Defendants knowingly and willfully failed to pay Plaintiff lawfully earned overtime wages in contravention of the New York Labor Law and California Labor Code.

16.     At all relevant times, Defendants knowingly and willfully failed to pay Plaintiff lawfully earned "spread of hours" premiums in contravention of the New York Labor Law.

17.     At all relevant times, Plaintiff was an "Employee" of Defendants including, but not limited to, the definition of the term under the NYSHRL, NYCHRL, NYLL, FEHA, California Labor Code, and other applicable laws below.

18.     At all relevant times, Defendants were an "Employer" and supervisors of Plaintiff, including, but not limited to, the definition of the term under the NYSHRL, NYCHRL, NYLL FEHA, California Labor Code, and other applicable laws below.

## JURISDICTION & VENUE

19.     The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a) as Defendants and Plaintiff are citizens of different states and the amount in controversy exceeds $75,000, exclusive of interests and costs.

20.     Venue is proper in this District pursuant to 28 U.S.C. § 1391 because a substantial part of the events and/or omissions giving rise to this action, occurred in this district.

## PREREQUISITES

21.     Any and all other prerequisites to the filing of this suit have been met.

## STATEMENT OF FACTS

### Plaintiff's Employment with Defendants

22.     Plaintiff was hired in 2019 to serve as Pete's personal cameraman.

23.     As part of Defendants' practices, Plaintiff was required to not only take photos,

videos, and edits content – which was all done under the strict control and direct supervision of Pete – but also to accompany Pete almost anywhere she went as part of her "entourage."

24.     This entourage included Pete, Plaintiff, dancers, makeup artists, nail techs, and others who were unable to spend their time for their own benefit, as Pete was always looming, micromanaging and otherwise trying to cultivate a "vibe."

25.     Indeed, this "vibe" was one where Pete was perceived as the leader and all others subservient – present only to attend to the needs and demands of Pete.

26.     By way of example, whenever Pete was dieting – which was frequently – she would forbid anyone from eating around her.

27.     As a result, Plaintiff, and other employees, who were working sometimes 16+ hours a day, were forced to eat in secret.  Indeed, even when there was catering, Pete would explicitly forbid people from eating in her presence.  If she saw Plaintiff or anyone eating, Pete would launch into a temper tantrum, ridiculing anyone who brought food into her vicinity.

28.     Plaintiff, who was open with Pete about his eating disorders and struggles with weight, felt targeted, ashamed, and humiliated by Pete's ridicule.

29.     Sometimes when Pete ate, she would immediately go to the bathroom and induce vomiting to prevent herself from gaining any weight.

30.     Pete held Plaintiff, and others, to her unreasonable and illegal standard of beauty and targeted those, including Plaintiff, who failed to conform.

31.     By way of further example, Plaintiff, as part of Pete's entourage, was required to attend strip clubs, night clubs, and other excursions wherein Pete would consume copious amounts of alcohol.

32.     The more Pete became inebriated, the more demanding and bossier she would become.  Plaintiff was afraid that Pete would retaliate against him if he refused to acquiesce to her every demand – fears that would unfortunately come to fruition.

### The Birthday Strip-Club Excursion in New York City

33.     Plaintiff had to travel with Pete and her entourage as part of his duties.  Other than when they were in California, Plaintiff spent most of his working time for Defendants in New York.  On average, Plaintiff was in New York at least once per month, and sometimes remained in New York for weeks at a time. Plaintiff spent a substantial amount of time in both California and New York and suffered the unlawful acts detailed herein in these districts.

34.     For example, on or around February 15, 2022, Plaintiff and the entourage were required to accompany Pete to a New York City strip club in celebration of her 27th birthday.

35.     Plaintiff, who is a gay man and not attracted to women, only went with Pete because she required him to.

36.     In fact, Pete had a proclivity for going to strip clubs and compelled Plaintiff to go on dozens of trips to strip clubs in New York, California, Atlanta, Georgia, and overseas.  Plaintiff attended strictly out of his duties to his employer, not for his own pleasure or benefit.

37.     On this particular birthday strip club trip, Pete took a liking to one of the female dancers.

38.     Pete began physically touching the dancer in a sexually provocative manner which made Plaintiff feel extremely uncomfortable, embarrassed, and disgusted, as he was present only because he was Pete's employee and she made him attend.  Plaintiff tried to avoid the sensual contact he was witnessing his boss take part in, but was unable to leave.

39.     Another member of Pete's entourage, in earshot of both Pete and Plaintiff, noticed Pete was taking a liking to the dancer and asked the what her real name was.

40.     The stripper responded with her name; her surname happened to be the same as Plaintiff's (and is a surname shared by hundreds of thousands of Americans).

41.     Naturally, everyone who heard this, including Pete, looked at Plaintiff to see his response.

42.     With dozens of eyes on him, Plaintiff felt obliged to respond, acknowledging they shared a surname by joking, "*hey cousin!*"

43.     In response, Pete immediately shot Plaintiff a sinister look, a look so malignant that he had never seen Pete express before.

44.     The entourage and Pete resumed partying, but it was clear to everyone that Plaintiff's innocuous comment had flipped a switch in Pete, who refused to acknowledge Plaintiff the rest of the night.

45.     As a result of this treatment, combined with being forced to watch his boss, Pete, engage with a stripper, Plaintiff began to feel even more uncomfortable and ashamed, even though he had done nothing wrong.  As a result of Pete's acts and omissions, Plaintiff removed himself from the situation and proceeded to leave the strip club and wait in one of the SUVs in the convoy waiting for Pete and the entourage.

46.     Plaintiff waited in the SUV rather than going to the hotel because he still felt compelled to remain on the premises as part of his duties as a member of Pete's entourage.

47.     Unfortunately, this incident would set the tone of the deterioration in the Parties' working relationship predicated on Pete fostering a hostile work environment.

***Pete Forced Plaintiff to Watch as She Engaged in Group Sex During Their Trip to Spain***

48.    In or about June 2022, Plaintiff traveled with Pete to Ibiza, Spain, as part of her summer 2022 tour.

49.    As was Defendants' practice, Plaintiff was required to join Pete and the entourage to a nightclub in Ibiza.

50.    When Pete was through partying, she and the entourage filed out of the nightclub into a caravan of SUVs waiting in front.

51.    Plaintiff got into one SUV along with Pete, and three of her **best friends**, "DK," "QJ," and "Jayla" (together herein, the "Best Friends"). The SUV had a driver and an unknown passenger sitting in the front seats.

52.    This SUV had a large passenger compartment.  The front bench seat, positioned directly behind the driver and front passenger seats, faced the rear of the vehicle.  The rear of the SUV had a forward-facing bench seat.  As such, the driver and front passenger were separated from the passenger compartment, which had two bench seats that allowed the passengers to face each other.

53.    Plaintiff sat in the seat with its back up against the driver's seat.   Plaintiff was on the left side of the vehicle and facing the rear.  To the left of Plaintiff, in the middle of the front bench seat, was Jayla.

54.    Across from Plaintiff and Jayla sat the three-remaining passengers: QJ, on the left side of the vehicle, facing forward and directly across from Plaintiff; Pete in the middle of the rear bench seat, facing forward and directly across from Jayla; and DK, to Pete's right, on the right side of the vehicle, facing forward, with an open seat in front of her.

55.     The SUV departed the night club, and Plaintiff began to play music from his phone.

56.     At first, Pete and the Best Friends were dancing to the music and generally continued to party.

57.     Suddenly, Pete, who was upon information and belief intoxicated, began to put her hands on her Best Friends' faces, breasts, and buttocks.

58.     Soon, Pete was kissing her Best Friends.  This made Plaintiff feel uncomfortable as he was in an SUV in a foreign country at night with his boss, who was acting inappropriately. Unlike the harassment that occurred at the New York strip club, Plaintiff was unable to remove himself from the situation and began to become very distressed.

59.     Pete continued to escalate the sexual acts in which she and her Best Friends were engaging.

60.     Next, Pete got out of her seat and moved forward towards Jayla, whom she was sitting across from.  Pete removed Jayla's undergarments exposing her vagina.  Pete then proceeded to take her fingers and insert them into Jayla's vagina – otherwise known as "fingering." Pete stimulated Jayla with her index and middle fingers on her right hand.

61.     DK commented that Pete had "long ass nails."

62.     The next morning, Jayla complained that her vagina was in pain due to the long fingernails which Pete was wearing at the time of her sex act.

63.     Taking Pete's lead, the other Best Friends began to perform sex on one another and Pete.

64.     When Pete finished fingering Jayla, she moved on to DK.  DK then removed Pete's undergarments and began to perform cunnilingus on Pete.

65.     The group sex which was taking place in front of Plaintiff made him feel extremely

uncomfortable, disgusted, and in disbelief.   Plaintiff was not Pete's Best Friend nor was he a friend at all – rather, Plaintiff was only present in the SUV do perform his duties as Pete's employee.

66.    Plaintiff was in the middle of Spain, a country in which he was unfamiliar, and it was the middle of the night making it impossible to remove himself from the situation.   As such, Plaintiff continued to play music on his phone, looked out the window and otherwise tried to ignore the orgy in which Pete was participating and forced Plaintiff to witness.

67.    Upon information and belief, Pete did not forget this incident – rather she relishes in it.  In October 2024, Pete released her most recent studio album, *Megan: Act II*.  The fifth track of the album is the song titled, "***Best Friend***."   The first verse of "Best Friend" clearly memorializes the sexual harassment to which Plaintiff was subjected in the SUV when Pete had sex with her Best Friends:

> *Ayy, two red bones kissin' in the back seat*
> *Girl, don't stop, keep goin' and relax me*
> *You want me to join in? Then ask me*
> *I like girls that like girls, that attract me*

68.    Eventually, the SUV reached the residence where he, Pete, the Best Friends, and other employees of Defendants were staying.

69.    Wanting to continue to "party," Pete led the entourage to a basement room of the residence which was set up to be like a night club.

70.    In the nightclub, another employee, "Alex" took over the duties of DJing.

71.    Apparently, Pete did not like the music Alex was playing.  Rather than ask Alex to change the music, Pete approached Alex from behind and yanked Alex's hair back, screaming "***fucking change this shit!***"

72.     About ten minutes later, Pete's personal chef announced that dinner was served. Everyone was seated at an outdoor dining table, including Plaintiff, Alex, Pete, her Best Friends, and others.

73.     The chef prepared a vegan dish for Pete, who was dieting at the time.   Everyone else was served grilled sea bass over a kale salad.

74.     Plaintiff was still extremely uncomfortable being around Pete, but tried to proceed as normal as the entire entourage was present, but only he, Pete, and the Best Friends knew about the group sex incident.

75.     Suddenly, Plaintiff felt Pete was giving him a dirty look once again.   The last time Plaintiff felt Pete look at him like this was during the February 2022 incident in the New York City strip club.

76.     Pete shouted at Plaintiff, so everyone could here, "***Are you really eating that you fucking fat bitch?  Spit that shit out!***" This was consistent with Pete's anger towards those who ate in her presence while she was dieting, but this time, Pete directed her rage at Plaintiff and Alex.

77.     Plaintiff responded politely – albeit confused – as he was eating a healthy meal prepared by Pete's chef, and everyone else was eating the same dinner.

78.     Pete continued, "***why are you still chewing? Spit that shit out***!" Then, Pete grabbed the food off Alex's plate – who was sitting closer to Pete than Plaintiff was – and threw the food over her shoulder.

79.     Plaintiff was humiliated and ashamed.  He got up, nervously laughed, excused himself, and proceeded to go to sleep for the night.

80.     The next morning, Plaintiff woke up early and went to the residence's kitchen to find some breakfast.  There, he encountered Pete and the personal chef.

81.    Pete made eye contact with Plaintiff and said, "***were you in the car with us [her Best Friends] last night?***" Plaintiff responded truthfully that he had.

82.    Suddenly, the color drained from Pete's face, and she immediately changed her tone, threatening Plaintiff, "***don't you ever speak about what happened in the car***."

### After Subjecting Plaintiff to Sexual Harassment and Fatphobic Comments, Defendants Retaliated Against Him

83.    As soon as Plaintiff returned from Ibiza, he noticed a clear shift in the terms and conditions of his employment with Defendants.

84.    By way of example, prior to this trip, Plaintiff was booked regularly, frequently every week and sometimes worked seven days per week.  Indeed, Plaintiff was part of Pete's traveling posse.

85.    However, after Pete subjected Plaintiff to the harassment detailed herein, Defendants began to request fewer services of Plaintiff in favor of other photographers.

86.    Due to the pay structure in place, this had a direct impact on Plaintiff's compensation, and failure to book Plaintiff certainly negatively impacted the terms and conditions of his employment.

87.    However, Pete continued to forbid Plaintiff from working with any other celebrities – or anyone else for that matter.  Indeed, Pete remained possessive over Plaintiff and prevented him from working elsewhere, but deliberately failed to give him work.  This was by design and retaliation against Plaintiff.

88.    When Pete did call Plaintiff to work and reassimilate into her entourage, Pete made clear she held disdain for Plaintiff.

89.    By way of example, in August 2022, Plaintiff was with Pete in a hotel room in Portugal with Alex and others.  Plaintiff was tired but forbidden from leaving the entourage as Pete wanted to keep him close and under her direct control.

90.    Plaintiff sat down in a chair and placed his head on a pillow, while Pete and the others continued to dance, drink, and party.

91.    Suddenly, Plaintiff was jolted to his feet when an object, which upon information and belief was a TV remote, was thrown at him and hit his head.

92.    Plaintiff looked, saw Pete standing where the remote had come from, and asked who threw the remote at his head.

93.    However, everyone was silent, as they were all afraid to truthfully say that Pete threw the remote.

94.    Initially, Pete denied throwing it, but then in a raised voice shouted, "*so what if I did throw it, then what?  What are you going to do about it?*" or words to that effect.  Clearly, Pete was both physically and mentally intimidating Plaintiff in an effort to keep him silence about what took place in Ibiza, Spain, amongst other unlawful acts detailed herein.

95.    Around this time, also in August 2022, Defendants further altered the terms and conditions of Plaintiff's employment.  Now, Defendants altered Plaintiff's compensation structure from a monthly rate to a pay-per-task system for each assignment.   Despite this change, Plaintiff remained accountable and was expected to provide the same level of service to Pete.

96.    As 2022 turned into 2023, Plaintiff's work assignments continued to taper off.  He was becoming unable to pay his bills yet was forbidden by Pete from working for anyone else. Plaintiff was terrified but stuck with the impossible choice of remaining silent and being unable to

make ends meet, or complaining to Defendants, who had demonstrated time and time again that you do not oppose, complain or otherwise say "no" to Pete.

97.     Lacking a Human Resources representative to whom he could complain, and bound by a non-disclosure agreement, Plaintiff felt alone and powerless.

98.     In 2023, he confided in Alex about Pete's unlawful pay practices and acts of retaliation – unlawful acts to which Alex herself had experienced and witnessed.

***Defendants Terminated Plaintiff's Employment***

99.     In June 2023, Pete was on tour in Europe with Alex and others.    As part of Defendants' retaliation campaign against Plaintiff, he was excluded from this trip, was not compensated, yet was prohibited from working elsewhere.

100.     On a Sunday night, Plaintiff received a FaceTime call from Alex, the employee whom Plaintiff had confided in about Defendants' unlawful practices.  It was about 10:00 PM in Houston, Texas, where Plaintiff was located when he answered the call.

101.     Instead of Alex, Pete was on the other side.  Plaintiff heard shouting and commotion and saw the same, angry look in Pete's face that he recognized from the New York City strip club, Ibiza, Spain, and other times.

102.     Pete lashed out: "***Bitch! You want to fucking quit on me, hoe? You want to quit on me, bitch?!***"

103.     Plaintiff was caught off guard and confused about these accusations, as Plaintiff did not want to quit – rather, he wanted to work in a respectful environment and be paid all of the wages owed.   Plaintiff explained this, engaging in protected activity as he bravely opposed Defendants' unlawful wage practices to Pete's face.

104.    In response, Pete continued to yell at Plaintiff, called him "bitch" and "hoe" and repeated, "***I can't believe you'd do me like this.***" Pete continued to blame Plaintiff's relationship with his boyfriend saying, "***ever since you got with [Plaintiff's ex-boyfriend], he made you a lazy bitch!***"

105.    Plaintiff politely explained this is not true and further complained about Defendants' retaliatory acts of reducing his hours.

106.    Pete blamed the corporate Defendants – who are based in New York – saying it was Roc Nation who books her people, not Pete.   Upon information and belief, Pete and the corporate Defendants aided and abetted in the unlawful acts detailed herein, and ratified the unlawful acts of one another.

107.    Overwhelmed and intimidated by Pete's demeanor, Plaintiff broke down in tears.

108.    In response, with cold indifference, Pete quipped "***don't confide in Alex***" and hung up the phone.

109.    Little did Plaintiff know that this would be the last time he spoke with Pete.

110.    Shortly thereafter, representative of Defendants contacted Plaintiff to inform him his services were no longer required under purported "change in creative direction."

***Defendants Retaliation Continues After the Termination of Plaintiff's Employment***

111.    Plaintiff was devastated by the unlawful termination of his employment.

112.    However, now that Defendants had terminated him, he was finally free to seek work elsewhere as Defendants explicitly prohibited this before.

113.    In August 2023, one of Plaintiff's friends who was a photographer in the industry, reached out as there was a three-day photoshoot in Los Angeles and photographers were needed.

114.    Initially, Plaintiff was hired for this gig and excited about the prospect of getting back on his feet.

115.    Unfortunately, the day before the shoot was scheduled, the production company contacted Plaintiff and said he was off the job without explanation.

116.    Subsequently, Plaintiff learned the shoot was for the music video of "Bongos" a song by Cardi B featuring Pete.

117.    Upon information and belief, Pete interfered with Plaintiff's contract in further retaliation.  Further, upon information and belief, Pete has "blackballed" Plaintiff amongst celebrities and performers to make it impossible for him to work in the entertainment industry every again.

118.    Indeed, Plaintiff has been unable to secure comparable employment like he had with Defendants, and unfortunately, probably never will as a result of Defendants' influence in the tightknit entertainment industry.

119.    In the end, and while these are just some of the examples of the discrimination, harassment and retaliation Plaintiff endured, Defendants' actions were intended to, and did, create a hostile work environment, replete with discrimination, retaliation and disparate treatment that no reasonable person should or would tolerate.

120.    As result of Defendants' actions, Plaintiff suffered unbearable humiliation and degradation.  Plaintiff was harassed, demeaned, and suffered severe emotional harm.

121.    As a result of Defendants' discriminatory and intolerable treatment of Plaintiff, she suffered and continues to suffer severe emotional and physical distress.

122.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer the loss of income, the loss of a salary, bonuses, benefits and other

compensation which such employment entails, and Plaintiff has also suffered future pecuniary losses, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses.

123.    As Defendants' conduct has been malicious, willful, outrageous, and conducted with full knowledge of the law, Plaintiff demands punitive damages.

### *Wage and Hour Violations*

124.    From the inception of his employment, PLAINTIFF GARCIA was misclassified as an Independent Contractor while working as a Personal Cameraman to DEFENDANT STALLION. PLAINTIFF has been treated as independent contractor by ROC NATION and STALLION ENTERTAINMENT so that he was effectively denied any of the protections an employee would have under California law.

125.    In April 2018, the California Supreme Court, in the now-infamous *Dynamex* decision, ruled that companies must successfully meet the three prong "ABC" test in order to lawfully classify someone as an independent contractor for purposes of Wage Order claims. (*Dynamex Operations West v. Sup. Ct.,* (2018) 4 Cal. 5th 903; *see also Garcia v. Border Transp. Group, LLC*, (2018) 28 Cal. App. 5th 558.) The ABC test requires an employer to prove the following to justify "independent contractor" classification: (A) the worker is free from the control and direction of the hiring entity in the performance of the work, both under the contract for the performance of the work and in fact; (B) the worker performs work that is outside the usual course of the hiring entity's business; and (C) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity. *See Dynamex*, at 958-963.

126.    On September 18, 2019, California Governor Gavin Newsom signed Assembly Bill 5 ("AB5"), commonly referred to as the "gig worker law." AB5 codified Dynamex's ABC Test under the soon-to-be-added Labor Code § 2750.3, creating a rebuttable presumption that a worker is an employee unless the test is met, and explicitly exempted certain trades and professions. Neither the Plaintiff or Defendants were exempted under AB5.1.

127.    On or around July 2018, PLAINTIFF GARCIA, supported DEFENDANT STALLION as a Personal Cameraman. On or around September 2019, PLAINTIFF GARCIA, quit his full-time job and began his employment with DEFENDANT STALLION as a full-time Personal Cameraman.

128.    For all relevant times, STALLION controls and directs the work performed by PLAINTIFF.

129.    For all relevant times, STALLION controls and dictates PLAINTIFF's work environment

130.    For all relevant times, STALLION controls and directs work performance of PLAINTIFF who managed no people.

131.    For all relevant times, Plaintiff essentially worked during all waking hours of a day. He was always answering calls and running other tasks under STALLION's direction.

132.    PLAINTIFF used his personal device to stay updated on his schedule which intensified blurred the lines between work and personal time for PLAINTIFF. More than once, STALLION interrupted PLAINTIFF during dinner and demanded that he immediately shift his focus to assist with her TikTok creative ideas – i.e., Plaintiff stepped away from dinner and worked on the phone in a quiet space of a given restaurant.

133.    As a Personal Cameraman, PLAINTIFF was forced to take on a myriad of duties and work much longer hours. Specifically, PLAINTIFF worked in excess of fifty (50) hours under the close scrutiny and explicit discretion of STALLION who continuously contacted PLAINTIFF at all hours, directing him to brainstorm TikTok videos, to edit content that PLAINTIFF had not captured, and complete various assignments.

134.    For all relevant times, STALLION controls and directs the performance of PLAINTIFF's work who does not provide Personal Cameraman services "independently" of his relationship with STALLION. STALLION specifically told Plaintiff he was not allowed to service any other client other than herself on more than one occasion.

135.    Initially, PLAINTIFF was paid a monthly flat rate of $4,000 while working for ROC NATION and STALLION ENTERTAINMENT.

136.    However, on or around August 2022, Desiree Perez, ("PEREZ"), the Chief Executive Officer of ROC NATION, personally contacted Plaintiff to alter Plaintiff's compensation structure from a monthly rate to a pay-per-task system invoiced for each assignment. Despite this "change," the time expectation of the Plaintiff remained the same as before ROC NATION's demand to change Plaintiff's pay. However, the new invoicing system resulted in Plaintiff earning significantly less, as the invoiced amounts did not accurately reflect the true time and effort dedicated to working for her.

137.    On multiple occasions, STALLION explicitly directed PLAINTIFF not to engage with other clients, expressing possessiveness over the PLAINTIFF's services as her Personal Cameraman.

138.    For all relevant times, STALLION controls and directs PLAINTIFF's work performance, requiring his constant availability by phone for work-related issues, thereby causing severe emotional distress and anxiety for PLAINTIFF.

139.    During his travels with STALLION, PLAINTIFF was required to stay at the hotel and be on standby at all times. Any attempt to use the hotel's amenities would prompt STALLION to reach out and request his immediate return.

140.    As a result of the misclassification, PLAINTIFF was denied a meal break or rest break. In addition, PLAINTIFF was not paid meal or rest break premiums during his entire employment.

141.    For all relevant times, STALLION controls and directs the performance of PLAINTIFF's duties did not qualify him exempt for purposes of overtime law.

142.    During the entirety of his employment with STALLION, PLAINTIFF was denied overtime pay at an overtime rate. PLAINTIFF was not paid for hours worked in excess of eight (8) hours in a day.

143.    For all relevant times, PLAINTIFF was not paid time and half for any overtime he worked or paid after the paycheck was thus underpaid for all hours worked to the extent the pay did not meet Labor Code requirements.

144.    For all relevant times, PLAINTIFF was not paid time and half for all overtime hours worked on those periods he received wages late.

145.    During the entirety of his employment with STALLION, PLAINTIFF's hours of employment were not properly recorded due to purposeful misclassification of PLAINTIFF as an independent contractor and inaccurate work records controlled by Defendants.

146.    Moreover, during the entirety of his employment with STALLION, PLAINTIFF was denied his meal and rest breaks and compensation for overtime hours worked, subjected to inaccurate timekeeping by STALLION which resulted in inaccurate wage statements.

147.    STALLION's misclassification of his employment status left him without basic insurance coverage, depriving him of essential health care. PLAINTIFF grapples with mounting anxiety, depression, and physical distress stemming from the toxic work environment, compounded by the trauma of unpaid work.

## AS A FIRST CAUSE OF ACTION AGAINST ALL DEFENDANTS
## DISCRIMINATION UNDER THE NYSHRL

148.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

149.    New York State Executive Law § 296 provides:

It shall be an unlawful discriminatory practice: (a) For an employer or licensing agency, because of an individual's . . . *sex* [or] *disability*. . . to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment. (emphasis added).

150.    Defendants violated the section cited herein by creating and maintaining discriminatory working conditions, a hostile work environment, and otherwise discriminating against Plaintiff because of his sex and disability. This culminated in the wrongful and retaliatory termination of Plaintiff's employment.

## AS A SECOND CAUSE OF ACTION AGAINST ALL DEFENDANTS
## RETALIATION UNDER THE NYSHRL

151.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

152.    New York State Executive Law § 296(7) provides that it shall be an unlawful discriminatory practice: "for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article."

153.    By complaining to Defendants of harassment, discrimination, and retaliation, Plaintiff engaged in protected activities.

154.    In response to Plaintiff's complaints, Defendants subjected Plaintiff to adverse employment actions, including, but not limited to, termination of his employment.

155.    Accordingly, Defendants engaged in unlawful retaliatory practices by retaliating against Plaintiff because of his opposition to the unlawful employment practices.

### AS A THIRD CAUSE OF ACTION AGAINST ALL DEFENDANTS
### DISCRIMINATION IN VIOLATION OF NYCHRL

156.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

157.    The New York City Administrative Code § 8-107(1) provides that:

it shall be an unlawful discriminatory practice: (a) for an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, *gender*, *disability*, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service or immigration or citizenship status…of any person, to refuse to hire or employ or to bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions or privileges of employment. (Emphasis added).

158.    Defendants engaged in an unlawful discriminatory practice in violation of the New York City Administrative Code § 8-107(1)(a) by creating a hostile work environment, subjecting

Plaintiff to inferior terms, conditions, and privileges of employment, and engaging in disparate treatment against Plaintiff because of his gender, weight, and disability.

### AS A FOURTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### RETALIATION IN VIOLATION OF THE NYCHRL

159.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

160.    The New York City Administrative Code § 8-107(7) provides that it shall be an unlawful discriminatory practice "for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has . . . opposed any practice forbidden under this chapter…"

161.    Plaintiff engaged in protected activities by opposing Defendants' discriminatory and harassing conduct toward Plaintiff and other employees.

162.    Defendants violated this section by retaliating against Plaintiff for his protected activities as set forth above.

### AS A FIFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### WHISTLEBLOWER RETALIATION IN VIOLATION OF NYLL § 740

163.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

164.    The New York Labor Law § 740 prohibits an employer from taking any retaliatory action against an employee, because such employee discloses or threatens to disclose to a supervisor or public agency a practice of the employer that the employee reasonably believes is in violation of a law, rule or regulation NYLL § 740(2)(a).

165.    At all relevant times, Defendants were "employers" and Plaintiff was an "employee under NYLL.

166.    Plaintiff reasonably believed Defendants actions, policies, and/or practices were violations of the law, rule and/or regulations.

167.    Plaintiff disclosed such actions and practices to Defendants. For example, Plaintiff complained about Defendant's unlawful discrimination and retaliation per the NYSHRL.

168.    Defendants violated the section cited herein by retaliating against Plaintiff for his protected activities and complaints of Defendants' conduct which Plaintiff reasonably believed violated New York State Laws, Federal Laws, and/or regulations.

### AS AN SIXTH CAUSE OF ACTION AGAINST ALL DEFENDANTS RETALIATION IN VIOLATION OF NYLL § 215

169.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

170.    NYLL § 215(1)(a) provides, in pertinent part:

> No employer or his or her agent, or the officer or agent of any corporation, partnership, or limited liability company, or any other person, shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint…that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of this chapter…

171.    As set forth herein, Plaintiff made several complaints regarding wage violations and retaliation, which he reasonable believed to be in violation of the NYLL.

172.    Moreover, Plaintiff objected to Defendants' unlawful withholding of his wages compensation which Plaintiff reasonably believed he was entitled to receive. Plaintiff reasonably believed Defendants' refusal to pay him properly be a violation of the NYLL. NYLL § 190(1) which defines "wages" as "the earning of an employee for labor or services rendered, regardless of whether the amount of earnings is determined on a time, piece, or other basis." NYLL § 193 prohibits an employer from making an unlawful deduction of wages from an employee. As detailed

herein, Plaintiff complained about Defendants' withholding of his full wages on numerous occasions, constituting protected activity under the law.

173.   Defendants retaliated against Plaintiff due to his protected activities, which culminated in the wrongful termination of his employment. Accordingly, Defendants have violated this

174.   As such, Plaintiff is entitled to all appropriate relief, including but not limited to, lost compensation, back pay, front pay, liquidated damages, compensatory damages, pain and suffering, costs and attorneys' fees.

### AS AN SEVENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FAILURE TO PAY PROPER WAGES AND OVERTIME UNDER NYLL

175.   Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

176.   NYLL § 198(1)-(a) expressly provides that "any employee paid less than the wage to which he or she is entitled under the provisions of this article" is entitled to recover his or her "full wages."

177.   Plaintiff was entitled to be paid at the statutory rate of time and one-half for all hours worked in excess of forty (40) per workweek.

178.   Defendants failed to pay Plaintiff for all hours worked in excess of forty (40) per week, and failed to provide him with proper days off, in direct contravention of the New York Labor Law.

179.   At all relevant times, Defendants had and continue to have a policy and practice of refusing to pay minimum wages for all hours worked and overtime compensation at the statutory rate of time and one-half to for all hours worked in excess of forty (40) hours per work week, which violated and continues to violate the New York Labor Law.

180.    Throughout Plaintiff's employment with Defendants, Defendants knowingly and willfully misclassified Plaintiff as an independent contractor rather than as an employee under New York Labor Law and/or common law.  Plaintiff was unable to work for his own convenience, nor was he free to engage in other employment.  Every aspect of Plaintiff's work was controlled, directed by, supervised by and approved by Defendants.  Plaintiff was unable to exercise any independent discretion or judgment in the discharge of his duties.  Further, Plaintiff received fringe benefits in connection with his employment with Defendants, was on Defendants' pay roll, and worked on a schedule set up Defendants or their agents.

181.    Defendants knowingly and willfully disregarded the provisions of the New York Labor Law as evidenced by their failure to compensate Plaintiff, at the statutory minimum wage and overtime rate of time and one-half for all hours worked in excess of forty (40) hours per week when they knew or should have known such was due and that non-payment of overtime compensation would financially injure Plaintiff.

182.    Further, Plaintiff frequently worked for Defendants in excess of forty (40) hours in a given week, in New York, and elsewhere.  By way of example, while physically located in New York, Plaintiff worked approximately fifty (50) hours or more in connection with his employment with Defendants during the week of May 1, 2022, through May 7, 2022.   Specifically:

    i.    On May 2nd, Plaintiff worked from 10 a.m. until around 4:10 a.m. the following morning;

    ii.    On May 3rd, Plaintiff worked from 1:30 p.m. until around 12:40 a.m. the following morning;

    iii.    On May 4th, Plaintiff worked for approximately one and a half hours;

    iv.    On May 5th, Plaintiff worked from around 2:00 p.m. until around 11:05 p.m.; and

v.    On May 7th, Plaintiff worked from around 4:00 p.m. until around 2:35 a.m. the following morning.

183.    Further, Plaintiff was required to perform work for Defendants in the form of editing photographs, videos, posting content for Pete's social media. This amounted to approximately two to four hours per day, for a total of approximately 28_ hours during the above week.

184.    Additionally, Plaintiff was required as part of his duties for Defendants to travel to and from New York, which constituted several additional hours of work for which he should have been compensated.

185.    Plaintiff was not paid owed overtime for this identified week, or any other week in which his hours exceeded forty (40) for the week.

186.    Due to the Defendants' New York Labor Law violations, Plaintiff is entitled to recover from Defendants his unpaid minimum wage and overtime compensation, liquidated damages, reasonable attorneys' fees, and costs and disbursements of this action, pursuant to New York Labor Law § 663(1) et al. and § 198.

### AS A EIGHTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### FAILURE TO PROVIDE WAGE NOTICE AND PAY STATEMENTS UNDER NYLL

187.    Plaintiff repeats and re-alleges each and every allegation and statement contained in all preceding paragraphs of this Complaint as if fully set forth herein.

188.    Plaintiff was not provided with a proper, written wage notice, and not provided with annual wage notices, as required by law. NYLL § 195(1).

189.    The New York State Wage Theft Prevention Act requires every employer to notify its employees, in writing, with every payment of wages, of the dates of work covered, the rate of pay and basis thereof, hours worked, gross wages, deductions, allowances, and net wages.

190.    Defendants' failure to provide an accurate annual wage notice entitles Plaintiff to statutory damages of fifty dollars ($50.00) per week for each work week the violation continued to occur, to a maximum of five thousand dollars ($5,000). New York Labor Law § 198(1-b).

191.    Defendants failed to furnish Plaintiff with an accurate statement with every payment of wages listing gross wages, deductions and net wages, in contravention of New York Labor Law § 195(3) and 12 NYCRR § 142-2.7.

192.    Defendants failed to keep true and accurate records of hours worked by each employee covered by an hourly minimum wage rate, the wages paid to all employees, and other similar information in contravention of New York Labor Law § 661.

193.    Defendants failed to establish, maintain, and preserve for not less than six (6) years payroll records accurately showing the hours worked, gross wages, deductions, and net wages for each employee, in contravention of the New York Labor Law § 194(4), and 12 NYCRR § 142-2.7.

194.    Defendants failed to comply with the notice and record keeping requirements of the New York State Wage Theft Prevention Act, and as such, are liable for civil penalties, attorneys' fees, and costs.

195.    Further, under the Wage Theft Prevention Act, employers must "furnish each employee with a statement with every payment of wages," which lists: "the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages." NYLL § 195(3).

196.    An employer who fails to provide a wage statement to an employee along with his or her wages, as required by the above provision, is subject to liability of $250 per workday, not to exceed $5,000. NYLL § 198(1-d).

197.    Defendants failed to provide Plaintiff with the statutorily mandated accurate wage statements each time they paid her, or at any other time she was entitled to be paid timely. Plaintiff is accordingly entitled to recover $250 for each day she worked for Defendants in statutory penalties, the total amount of which must be determined at trial.

198.    Plaintiff is also entitled to be compensated for reasonable costs, disbursements, and attorney's fees.

### AS AN NINTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### HOSTILE WORK ENVIRONMENT HARASSMENT IN VIOLATION OF FEHA

199.    Plaintiff repeats and re-alleges each and every allegation and statement contained in all preceding paragraphs of this Complaint as if fully set forth herein.

200.    At all times mentioned in this complaint, Defendants regularly employed five or more persons, bringing Defendants within the provisions of California Fair Employment and Housing Act ("FEHA"), Government Code, § 12926(d).

201.    Defendant Pete employed Plaintiff to perform services for wages within the state of California. Plaintiff performed approximately 75% of his work for Defendant Pete within the state of California.

202.    Defendant Pete's conduct created a hostile work environment for Plaintiff, making the conditions of his employment intolerable in direct contravention of various statutes and state law decisions, including but not limited to California Government Code § 12940(h) and (j).

203.    Plaintiff, as part of Pete's entourage, was required to attend strip clubs (*including Club 305*), night clubs, and other excursions within California wherein Pete would consume

copious amounts of alcohol and expected or required Plaintiff to do the same. Further, in these strip clubs and night clubs, Plaintiff was required to witness acts such as sexually provocative dancing, naked women, groping, twerking, and touching.. Pete herself participated in such conduct.

204.    Plaintiff believes and asserts that Pete's requiring of Plaintiff to attend this sexually explicit outings was based upon his sexual orientation. No member of Pete's entourage was a heterosexual male. Plaintiff asserts that his sexuality was the primary motivating reason for Pete's creation of the hostile work environment to which he was subjected.

205.    On or around July 2018, Plaintiff, began his employment with Pete as a Personal Cameraman.

206.    On or around June 2022, Plaintiff was traveling on tour with Pete in Ibiza, Spain. After a night out, Plaintiff, Pete, and three other women were riding in a SUV together. Suddenly, Pete and one of the other women start having sex right beside Plaintiff.

207.    Plaintiff believes and asserts that Defendant Pete engaged in the above sexually explicit conduct in front of Plaintiff as a direct result of Plaintiff's sexual orientation. Had Plaintiff been a heterosexual male, Pete would not have subjected him to the same conduct rising to the level of a hostile work environment.

208.    The following day, Pete inquired whether Plaintiff was in the SUV the previous night. Plaintiff confirmed that he was in the SUV. Subsequently, Pete instructed, "Don't ever discuss what you saw."

209.    During the same trip, Pete berated and directed her fat-shaming comments towards Plaintiff such as "Fat Bitch," "Spit your food out," and that "You don't need to be eating." 49. Following Ibiza, on around August 2022, PEREZ altered Plaintiff's compensation structure from

a monthly rate to a pay-per-task system invoiced for each assignment. Despite this change, Plaintiff remained accountable and was expected to provide the same level of service to Pete. Moreover, Plaintiff noticed a change in how he was treated and saw a decrease in the number of bookings he received from Pete. Close to other creatives on Pete's team, Plaintiff confided in Pete's former Makeup Artist about considering leaving because Pete had started to hire another Cameraman.

210.    Again, Plaintiff believes and asserts that Pete's conduct was substantially motivated by Plaintiff's sexual orientation. Had Plaintiff been a heterosexual male, he would not have been subjected to the same harassing behavior by Pete.

211.    Such harassment was so severe or pervasive that it altered the terms and conditions of Plaintiff's employment, creating a hostile, abusive work environment and making his working conditions intolerable. Said harassment was sufficiently extreme to amount to a change in the terms and conditions of Plaintiff's employment.

212.    As a direct and legal result of Defendants' conduct, and each of them, Plaintiff has suffered and continues to suffer general, consequential, and special damages, including but not limited to substantial losses in earnings, other employment benefits, physical injuries, physical sickness, as well as emotional distress, plus medical expenses, future medical expenses, and attorneys' fees, all to her damages in the amount according to proof. During the entirety of his employment with Pete, Plaintiff endured a barrage of relentless sexual and fat-shaming comments plunging him into profound emotional distress. Pete's misclassification left her without basic insurance coverage, depriving him of essential mental and physical health care. Plaintiff grapples with mounting anxiety, depression, and physical distress stemming from the toxic work environment.

213.    Said actions justify the imposition of punitive damages in that Defendants committed the acts herein maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiff, from an improper and evil motives amount to malice, and in conscious disregard of Plaintiff's rights.

214.    Based upon the foregoing, Plaintiff is entitled to recover punitive damages from Defendants, and each of them, in an amount according to proof. As the result of Defendants discriminatory acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided by FEHA, Gov. Code § 12965(b).

**AS AN TENTH CAUSE OF ACTION AGAINST**
**ROC NATION, HGT, STALLION ENTERTAINMENT, and DOES 1-10**
**FAILURE TO PREVENT AND REMEDY HARASSMENT IN VIOLATION OF FEHA**

215.    Plaintiff repeats and re-alleges each and every allegation and statement contained in all preceding paragraphs of this Complaint as if fully set forth herein.

216.    At all times mentioned in this complaint, Defendants Roc Nation and Stallion Entertainment regularly employed five or more persons, bringing Defendants within the provisions of the FEHA, Gov. Code, § 12926(d).

217.    Plaintiff was subject to harassment based on sex by Defendant Pete, as alleged in more detail above. Such conduct is prohibited by FEHA, Cal. Gov. Code § 12940, subdivisions (j) and (k).

218.    Under FEHA, an employer is strictly liable for the harassing conduct of its agents and supervisors. (*Fisher v. San Pedro Peninsula Hospital* (1989) 214 Cal.App.3d 590). FEHA also requires employers to take all reasonable steps necessary to prevent unlawful harassment from occurring. (Cal. Gov. Code § 12940(j)(k)).

219.    On or around June 2022, Plaintiff was traveling on tour with Pete in Ibiza, Spain. After a night out, Plaintiff, Pete, and three other women were riding in a SUV together. Suddenly, Pete and one of the other women start having sex right beside Plaintiff.

220.    The following day, Pete inquired whether Plaintiff was in the SUV the previous night. Plaintiff confirmed that he was in the SUV. Subsequently, Pete instructed, "Don't ever discuss what you saw."

221.    During the same trip, Pete berated and directed her fat-shaming comments towards Plaintiff such as "Fat Bitch," "Spit your food out," and that "You don't need to be eating."

222.    Following Ibiza, on around August 2022, Defendants altered Plaintiff's compensation structure from a monthly rate to a pay-per-task system invoiced for each assignment. Despite this change, Plaintiff remained accountable and was expected to provide the same level of service to Pete. Moreover, Plaintiff noticed a change in how he was treated and saw a decrease in the number of bookings he received from Pete. Close to other creatives on Pete's team, Plaintiff confided in Pete's former Makeup Artist about considering leaving because Pete had started to hire another Cameraman.

223.    After confiding in the Makeup Artist, Pete learned of the Plaintiff's contemplation of quitting due to a lack of bookings. Later on a Sunday night, Pete drunkenly FaceTimed the Plaintiff and they reached an understanding, with Pete affirming, "We're good." Despite the conversation, Plaintiff remained scheduled for Pete's upcoming gig the following Friday.

224.    Nevertheless, on or around June 2023, Roc Nation unexpectedly reached out to Plaintiff the night before the scheduled Friday gig and informed him that his services would no longer be required.

225.    As a proximate result of the aforesaid acts of Defendants, and each of them, Plaintiff has suffered actual, consequential and incidental financial losses, including without limitation, loss of salary and benefits, and the intangible loss of employment-related opportunities in his field and damage to his professional reputation, all in an amount subject to proof at the time of trial. Plaintiff claims such amounts as damages pursuant to Civil Code § 3287 and/or § 3288 and/or any other provision of law providing for prejudgment interest.

226.    As a proximate result of the wrongful acts of Defendants, and each of them, Plaintiff has suffered and continues to suffer emotional distress, humiliation, mental anguish and embarrassment, all to Plaintiff's damage in in an amount according to proof.

227.    The above-cited conduct of Defendants was done with malice, fraud and oppression, and in reckless disregard of Plaintiff's rights under the FEHA. Defendants consciously, intentionally and in conscious disregard of his rights discriminated against Plaintiff by discriminating based on her sex. As a result of Defendants discriminatory acts as alleged herein, Plaintiff is entitled to reasonable attorneys' fees and costs of suit as provided by California Government Code section 12965(b).

### AS A TWELFTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### FAILURE TO PROVIDE MEAL AND REST PERIODS
### IN VIOLATION OF LABOR CODE §§ 226.7 and 512

228.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

229.    Plaintiff is informed and believes, and thereon alleges that California Labor Code §§ 226.7 and 512 were in full force and effect and binding on Defendants during all times

mentioned in this Complaint. Said section requires employers to comply with all Industrial Welfare Commission Wage Orders governing meal and rest periods.

230.    Plaintiff is informed and believes, and thereon alleges, that the IWC Wage Orders were in full force and effect and govern when employers, including Defendants, must give employee breaks for meal and rest periods. The Wage Orders state in pertinent part that employers must provide at least thirty minutes of meal periods for every five hours of work and another thirty-minute period if the work period is ten hours or more. Furthermore, the IWC Wage Orders state in pertinent part that employees must be given at least a ten-minute rest period for every four (4) hours or major fraction thereof.

231.    During the entirety of his employment with Pete, Plaintiff's hours of employment were not properly recorded due to purposeful misclassification of Plaintiff as an Independent Contractor and inaccurate work records controlled by Pete.

232.    As a result of misclassification, Plaintiff was not permitted to take rest and meal breaks. Many times, Plaintiff worked over five consecutive hours without a thirty-minute meal break.

233.    Plaintiff was not paid meal or rest break premiums. These actions by Defendants were in violation of IWC Wage Orders and California Labor Code §§ 226.7 and 512.

234.    Plaintiff is informed and believes, and thereon alleges, that The Wage Orders and the California Labor Code mandate that Defendants must pay Plaintiff an hour of pay at Plaintiff's regular rate of pay for every missed meal and rest period. Plaintiff is thereby entitled to these penalties in an amount to be proven at trial, and also pray for all other remedies available under the law.

235.    Plaintiff's claims for rest break violations, waiting time penalties, and failure to issue accurate itemized wage statements are "claims for nonpayment of wages" entitle a prevailing plaintiff to an award of attorney fees under California Labor Code § 218.5. *Betancourt v. OS Rest. Servs.*, LLC, 83 Cal. App. 5th 132, 140, 298 Cal. Rptr. 3d 612 (2022).

236.    Moreover, Defendant Pete is personally liable for violations mentioned herein under Labor Code § 558.1, as she was the "natural person who is an owner, director, officer, or managing agent of the employer" acting on the employer's behalf for said violation of Plaintiff's rights.

### AS A THIRTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS FAILURE TO PAY OVERTIME IN VIOLATION OF LABOR CODE §§ 510-515, 1194 & 1198

237.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

238.    California Labor Code § 510 provides that employees in California shall not be employed more than eight hours in any workday or 40 hours in a workweek unless they receive additional compensation beyond their regular wages in amounts specified by law.

239.    California Labor Code §§ 1194 and 1198 provide that employees in California shall not be employed more than eight hours in any workday unless they receive additional compensation beyond their regular wages in amounts specified by law. Additionally, California Labor Code § 1198 states that the employment of an employee for longer hours than those fixed by the Industrial Welfare Commission is unlawful. The governing Wage Order of the Industrial Welfare Commission requires, among other things, payment of a premium wage rate for all hours worked in excess of 8 hours per day or 40 hours per week.

240.    On or around July 2018, Plaintiff began his employment with Pete as a Personal Cameraman.

241.    For all relevant times, Pete controls and directs the performance of Plaintiff duties did not qualify them exempt for purposes of overtime law.

242.    Plaintiff used his personal device to stay updated on his schedule which intensified blurred the lines between work and personal time for Plaintiff. More than once, Pete demanded Plaintiff during dinner and demanded that he immediately shift his focus to assist with her TikTok creative ideas.

243.    As a Personal Cameraman, Plaintiff was forced to take on a myriad of duties and work much longer hours. Specifically, Plaintiff worked in excess of fifty (50) hours under the close scrutiny and explicit discretion of Pete who continuously contacted Plaintiff at all hours, directing him to brainstorm TikTok videos, to edit content that Plaintiff had not captured, and complete various assignments.

244.    For all relevant times, Pete controls and directs the performance of Plaintiff's work who does not provide Personal Cameraman services "independently" of his relationship with Pete. Afterall, how could he when he was constantly working to satisfy the demands of the job he performed for Pete.

245.    Initially, Plaintiff was paid a monthly flat rate of $4,000 while working for Roc Nation and Stallion Entertainment. However, on or around August 2022, PEREZ altered Plaintiff's compensation structure from a monthly rate to a pay-per-task system invoiced for each assignment. Despite this change, Plaintiff remained accountable and was expected to provide the same level of service to Pete. However, the new invoicing system resulted in Plaintiff earning significantly less,

as the invoiced amounts did not accurately reflect the true time and effort dedicated to working for her.

246.    On multiple occasions, Pete explicitly directed Plaintiff not to engage with other clients, expressing possessiveness over the Plaintiff's services as her Personal Cameraman. This exclusivity requirement meant that Plaintiff was unable to offer his filming services to any other clients while working with Pete.

247.    For all relevant times, Pete controls and directs Plaintiff's work performance, requiring his constant availability by phone for work-related issues, thereby causing severe emotional distress and anxiety for Plaintiff.

248.    During his travels with Pete, Plaintiff was required to stay at the hotel and be on standby at all times. Any attempt to use the hotel's amenities would prompt Pete to reach out and request his immediate return.

249.    During the entirety of his employment with Pete, Plaintiff's hours of employment were not properly recorded due to purposeful misclassification of Plaintiff as an Independent Contractor and inaccurate work records controlled by Pete.

250.    Plaintiff worked at least one day in California where his hours exceeded eight (8) hours in one day. By way of example, on April 21, 2022, Plaintiff worked approximately 15 hours.

251.    Plaintiff worked at least one full week in California where his hours for the week exceeded forty (40). By way of example, during the week of April 16, 2022, through April 23, 2022, Plaintiff worked approximately 91 hours. Specifically:

   i.    On April 16th Plaintiff worked from 8:00 A.M. until around 3:08 A.M. the following morning,

   ii.    On April 17th, Plaintiff worked from 9:30 a.m. until around 11:44 p.m.,

iii.    On April 18th, Plaintiff worked from 8:00 a.m. until around 3:28 p.m.

iv.    On April 19th, Plaintiff worked from 8:00 a.m. until around 6:00 p.m.

v.    On April 20th, Plaintiff worked from around 9:00 a.m. until around 6:00 p.m.

vi.    On April 21st , Plaintiff worked from around 6:45 a.m. until around 11:07 p.m.

vii.    On April 22nd Plaintiff worked from around 8:00 a.m. until around 9:14 p.m., and

viii.    On April 20th, Plaintiff worked from around 9:30 a.m. until around 2:30 a.m. the following morning.

252.    Moreover, during the entirety of his employment with Pete, Plaintiff was denied his meal and rest breaks and compensation for overtime hours worked, subjected to inaccurate timekeeping by Pete which resulted in inaccurate wage statements.

253.    During the entirety of his employment with Defendants, Defendants failed to compensate Plaintiff for all overtime hours he worked in excess of eight hours per day and/or 40 hours per week as required by Labor Code §§ 510 and 1194. Plaintiff was denied overtime pay at an overtime rate.

254.    At all times relevant hereto, Defendants failed to pay Plaintiff overtime compensation for the hours he worked in excess of the maximum hours permissible by law as required by California Labor Code § 510 and 1198. Plaintiff was required to work overtime hours without receiving overtime pay. During the course of Plaintiff's employment, he worked overtime hours for the exclusive benefit of and under the control of Pete.

255.    At all times relevant hereto, Defendants failed to pay Plaintiff overtime compensation for the hours he worked in excess of the maximum hours permissible by law as required by California Labor Code § 510 and 1198. Plaintiff was required to work overtime hours without receiving overtime pay.

256.    By virtue of Defendants' unlawful failure to pay additional, premium rate compensation to Plaintiff for overtime hours worked, Plaintiff suffered, and will continue to suffer, damages in amounts which are presently unknown to him and which will be ascertained according to proof at trial.

257.    Moreover, Plaintiff's claims for rest break violations, waiting time penalties, and failure to issue accurate itemized wage statements are "claims for nonpayment of wages" entitle a prevailing plaintiff to an award of attorney fees under California Labor Code § 218.5. *Betancourt v. OS Rest. Servs., LLC*, 83 Cal. App. 5th 132, 140, 298 Cal. Rptr. 3d 612 (2022).

258.    Plaintiff requests recovery of overtime compensation according to proof, interest, attorney's fees and costs pursuant to California Labor Code § 1194(a), as well as the assessment of any statutory penalties against Defendants, in a sum as provided by the California Labor Code and/or other statutes. Further, Plaintiff is entitled to seek and recover reasonable attorneys' fees and costs pursuant to California Labor Code § 1194.

259.    Moreover, Defendant Pete is personally liable for violations mentioned herein under Labor Code § 558.1, as she was the "natural person who is an owner, director, officer, or managing agent of the employer" acting on the employer's behalf for said violation of Plaintiff's rights.

**AS A FOURTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS**
**INACCURATE WAGE STATEMENTS IN VIOLATION OF LABOR CODE § 226(A)**

260.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

261.    At all material times set forth herein, California Labor Code § 226(a) provides that every employer shall furnish each of his or her employees an accurate itemized wage statement in writing showing nine pieces of information, including: (1) gross wages earned, (2) total hours

41

worked by the employee, (3) the number of piece-rate units earned and any applicable piece rate if the employee is paid on a piece-rate basis, (4) all deductions, provided that all deductions made on written orders of the employee may be aggregated and shown as one item, (5) net wages earned, (6) the inclusive dates of the period for which the employee is paid, (7) the name of the employee and the last four digits of his or her social security number or an employee identification number other than a social security number, (8) the name and address of the legal entity that is the employer, and (9) all applicable hourly rates in effect during the pay period and the corresponding number of hours worked at each hourly rate by the employee.

262.     On or around July 2018, Plaintiff began his employment with Pete as a Personal Cameraman.

263.     For all relevant times, Pete controls and directs the work performed by Plaintiff.

264.     For all relevant times, Pete controls and dictates Plaintiff's work environment.

265.     During his employment with Pete, Plaintiff spent the majority of his working time – approximately 75% - within California.

266.     Additionally, Pete's Malibu rental home served as a definite base of operations for Plaintiff's work in California. By way of example, Plaintiff was expected to present himself at Pete's Malibu home each day in California to film and edit content for Pete's "Hottie Bootcamp" Videos.

267.     For all relevant times, Pete controls and directs work performance of Plaintiff who managed no people. 130.During the entirety of his employment with Pete, Plaintiff's hours of employment were not properly recorded due to purposeful misclassification of Plaintiff as an Independent Contractor and inaccurate work records controlled by Pete.

268.   Moreover, during the entirety of his employment with Pete, Plaintiff was denied his meal and rest breaks and was reimbursed for overtime hours worked, subjected to inaccurate timekeeping by Pete which resulted in inaccurate wage statements.

269.   Defendants intentionally and willfully failed to provide Plaintiff with complete and accurate wage statements. The deficiencies include, among other things, the failure to include the gross wages earned, total number of hours worked by Plaintiff, and the failure to accurately list all applicable rates as Plaintiff was not allowed to take rest breaks and late or no lunch breaks when the law required same.

270.   As a result of Defendants' violation of California Labor Code section 226(a), Plaintiff suffered injury and damage to their statutorily protected rights.

271.   Specifically, Plaintiff was injured by Defendants' intentional violation of California Labor Code section 226(a) because he was denied both their legal right to receive, and his protected interest in receiving, accurate, itemized wage statements under California Labor Code section 226(a).

272.   Plaintiff was also injured as a result of having to bring this action to attempt to obtain correct wage information following Defendants' refusal to comply with many of the mandates of California's Labor Code and related laws and regulations.

273.   Under California Labor Code section 226(e), Plaintiff is entitled to recover from Defendants the greater of their actual damages caused by Defendants' failure to comply with California Labor Code section 226(a) in an amount to be proven at trial.

274.   Furthermore, Plaintiff's claims for rest break violations, waiting time penalties, and failure to issue accurate itemized wage statements are "claims for nonpayment of wages" entitle a

prevailing plaintiff to an award of attorney fees under California Labor Code § 218.5. *Betancourt v. OS Rest. Servs., LLC*, 83 Cal. App. 5th 132, 140, 298 Cal. Rptr. 3d 612 (2022).

275.    Moreover, Defendant Pete is personally liable for violations mentioned herein under Labor Code § 558.1, as she was the "natural person who is an owner, director, officer, or managing agent of the employer" acting on the employer's behalf for said violation of Plaintiff's rights.

### AS A FIFTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### WAITING TIME PENALTIES IN VIOLATION OF LABOR CODE §§ 200-204

276.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

277.    At all times herein set forth, California Labor Code §§ 200 through 204 provide that if an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately, and that if an employee voluntarily leaves his or her employment, his or her wages shall become due and payable not later than 72 hours thereafter, unless the employee has given 72 hours previous notice of his or her intention to quit, in which case the employee is entitled to his or her wages at the time of quitting.

278.    Defendants' failure to pay Plaintiff's wages earned and unpaid is in violation of California Labor Code §§ 200 through 204.

279.    California Labor Code § 203 provides that if an employer willfully fails to pay wages owed, in accordance with sections 201 and 202, then the wages of the employee shall continue as a penalty from the due date, and at the same rate until paid or until an action is commenced; but the wages shall not continue for more than 30 days.

280.    Plaintiff's paychecks did not include all wages owed to Plaintiff as Defendants failed to pay for meal and rest break premiums as well as overtime pay that Plaintiff was entitled to.

281.    Plaintiff is entitled to recover from Defendants additionally accruing wages for each day not paid, at the regular daily rate of pay, up to 30 days maximum pursuant to California Labor Code § 203.

282.    Moreover, Plaintiff's claims for rest break violations, waiting time penalties, and failure to issue accurate itemized wage statements are "claims for nonpayment of wages" entitle a prevailing plaintiff to an award of attorney fees under California Labor Code § 218.5. Betancourt v. OS Rest. Servs., LLC, 83 Cal. App. 5th 132, 140, 298 Cal. Rptr. 3d 612 (2022).

283.    Moreover, Defendant Pete is personally liable for violations mentioned herein under Labor Code § 558.1, as she was the "natural person who is an owner, director, officer, or managing agent of the employer" acting on the employer's behalf for said violation of Plaintiff's rights.

### AS AN SIXTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
### VIOLATION OF LABOR CODE §§98.6 and 1102.5

284.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

285.    At all times herein mentioned in this complaint, California Labor Code §§ 98.6 and 1102.5 were in full force and effect and were binding on the Defendants and the Defendants were subject to its terms, and therefore Defendant was required to refrain retaliatory actions against Plaintiff on account of his complaints regarding Defendants' wage and hour violations.

286.    On or around July 2018, Plaintiff GARCIA, began his employment with Pete as a Personal Cameraman. Plaintiff has been treated as Independent Contractor by Roc Nation and

Stallion Entertainment so that he was effectively denied any of the protections an employee would have under California law.

287.    As a Personal Cameraman, Plaintiff was forced to take on a myriad of duties and work much longer hours. Specifically, Plaintiff worked in excess of fifty (50) hours under the close scrutiny and explicit discretion of Pete who continuously contacted the Plaintiff at all hours, directing him to brainstorm TikTok videos, to edit content that Plaintiff had not captured, and complete various assignments.

288.    For all relevant times, Pete controls and directs the performance of Plaintiff's work who does not provide Personal Cameraman services "independently" of his relationship Deadline with Pete. Afterall, how could he when he was constantly working to satisfy the demands of the job he performed for Pete.

289.    Initially, Plaintiff was paid a monthly flat rate of $4,000 while working for Roc Nation and Stallion Entertainment. However, on or around August 2022, Defendants altered Plaintiff's compensation structure from a monthly rate to a pay-per-task system invoiced for each assignment. Despite this change, Plaintiff remained accountable and was expected to provide the same level of service to Pete. However, the new invoicing system resulted in Plaintiff earning significantly less, as the invoiced amounts did not accurately reflect the true time and effort dedicated to working for her.

290.    On multiple occasions, Pete explicitly directed the Plaintiff not to engage with other clients, expressing possessiveness over Plaintiff's services as her Personal Cameraman. This exclusivity requirement meant that Plaintiff was unable to offer his filming services to any other clients while working with Pete.

291.    For all relevant times, Pete controls and directs Plaintiff's work performance, requiring his constant availability by phone for work-related issues, thereby causing severe emotional distress and anxiety for Plaintiff.

292.    During his travels with Pete, Plaintiff was required to stay at the hotel and be on standby at all times. Any attempt to use the hotel's amenities would prompt Pete to reach out and request his immediate return.

293.    On or around June 2022, Plaintiff was traveling on tour with Pete in Ibiza, Spain. After a night out, Plaintiff, Pete, and three other women were riding in a SUV together. Suddenly, Pete and one of the other women start having sex right beside Plaintiff.

294.    The following day, Pete inquired whether Plaintiff was in the SUV the previous night. Plaintiff confirmed that he was in the SUV. Subsequently, Pete instructed, "Don't ever discuss what you saw."

295.    Following Ibiza, on around August 2022, Defendants altered Plaintiff's compensation structure from a monthly rate to a pay-per-task system invoiced for each assignment. Despite this change, Plaintiff remained accountable and was expected to provide the same level of service to Pete. Moreover, Plaintiff noticed a change in how he was treated and saw a decrease in the number of bookings he received from Pete. Close to other creatives on Pete's team, Plaintiff confided in Pete's former Makeup Artist about considering leaving because Pete had started to hire another Cameraman.

296.    After confiding in the Makeup Artist, Pete learned of the Plaintiff's contemplation of quitting due to a lack of bookings. Later on a Sunday night, Pete drunkenly FaceTimed Plaintiff and they reached an understanding, with Pete affirming, "We're good." Despite the conversation, Plaintiff remained scheduled for Pete's upcoming gig the following Friday.

297.    Nevertheless, on or around June 2023, Roc Nation unexpectedly reached out to Plaintiff the night before the scheduled Friday gig and informed him that his services would no longer be required.

298.    By terminating Plaintiff in a pretextual manner, in retaliation for his complaints of wage and hour violations, Defendants' above-described conduct is in violation of Labor Code §§ 98.6 & 1102.5.

299.    As a direct and legal result of Defendants' retaliatory actions against Plaintiff, Plaintiff has suffered and continues to suffer general, consequential and special damages including but not limited to substantial losses in earnings, other employment benefits, physical injuries, physical sickness, as well as emotional distress, plus medical expenses, future medical expenses, and attorneys' fees, all to her damage in an amount according to proof.

300.    Said termination was wrongful and justifies the imposition of punitive damages since the suspension was against public policy. Defendants intentionally terminated Plaintiff on with the intent of punishing him for engaging in a protected activity, and in doing so, Defendants acted maliciously, fraudulently and oppressively, with the wrongful intention of injuring Plaintiff. Based upon the foregoing, Plaintiff is entitled to recover punitive damages from Defendants and each of them, in an amount according to proof.


## AS AN SEVENTEENTH CAUSE OF ACTION AGAINST ALL DEFENDANTS
## VIOLATION OF CALIFORNIA BUSINESS & PROFESSIONS CODE §§ 17200, ET SEQ

301.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if more fully set forth herein at length.

302.    Defendants' conduct, as alleged herein, has been, and continues to be, unfair, unlawful, and harmful to Plaintiff, other employees, and to the general public. Plaintiff seeks to enforce important rights affecting the public interest within the meaning of Code of Civil Procedure section 1021.5.

303.    Defendants' activities, as alleged herein, are violations of California law, and constitute unlawful business acts and practices in violation of California Business & Professions Code sections 17200, *et seq*.

304.    A violation of California Business & Professions Code § 17200, *et seq*. may be predicated on the violation of any state or federal law. All of the acts described herein as violations of, among other things, California Labor Code and Industrial Welfare Commission Wage Orders, are unlawful and in violation of public policy; and in addition are immoral, unethical, oppressive, fraudulent and unscrupulous, and thereby constitute unfair, unlawful and/or fraudulent business practices in violation of California Business and Professions Code § 17200, *et seq*.

305.    Defendants' hostile work environment harassment in violation of FEHA, as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

306.    Defendants' failure to prevent and remedy harassment in violation of FEHA, as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

307.    Defendants' retaliation against Plaintiff in violation of FEHA, as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

308.    Defendants' denial of meal and rest breaks in violation of Labor Code §§ 226.7 & 512, as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

309.    Defendants' denial of unpaid overtime in violation of Labor Code §§ 510-515, 1194 & 1198, as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

310.    Defendants' failure to provide accurate wage statements in violation of Labor Code § 226(A), as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

311.    Defendants' misclassification is in violation of Labor Code § 226.8, as alleged in detail above, constitutes unlawful and/or unfair activity prohibited by Business and Professions Code § 17200, *et seq*.

312.    Pursuant to California Business & Professions Code § 17200, *et seq*., Plaintiff is entitled to restitution, including but not limited to, of wages withheld and retained by Defendants during a period from four years prior to the filing of this complaint and for employer payroll taxes; a permanent injunction requiring Defendants to pay all outstanding wages due to Plaintiff; an award of attorneys' fees pursuant to California Code of Civil Procedure § 1021.5 and other applicable laws; and an award of costs.

## JURY DEMAND

313.    Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests a judgment against Defendants as follows:

A.    Declaring that the Defendants engaged in unlawful employment practices

prohibited by the NYSHRL, NYCHRL, NYLL, FEHA, California Labor Code, and common law in that the Defendants injured, harassed, discriminated, and retaliated against Plaintiff;

B.      An injunction and order permanently restraining Defendants and their partners, officers, owners, agents, successors, employees and/or representatives, and any and all persons acting in concert with them, from engaging in any such further unlawful conduct, including the policies and practices complained of herein;

C.      Awarding damages to the Plaintiff for any lost wages and benefits, past and future, back pay and front pay, liquidated damages, and interest, resulting from Defendants' unlawful employment practices, against Plaintiff, or any jointly or severally liable entity or person;

D.      Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering and injury to reputation against Defendants, or any jointly or severally liable entity or person;

E.      Awarding Plaintiff civil penalties and liquidated damages pursuant to New York Labor Law and/or California Labor Code.

F.      Awarding Plaintiff all damages sustained as a direct and proximate result of Defendants' breaches of any agreements and/or otherwise unlawful conduct alleged herein;

G.      Awarding Plaintiff Punitive Damages;

H.      Awarding Plaintiff all interest, attorneys' fees, costs, and expenses incurred in the prosecution of the action; and

I.      Awarding Plaintiff such other and further relief as the Court may deem equitable. just and proper.

Dated:  August 1, 2025
        White Plains, New York

Respectfully submitted,

VALIANT LAW

By:    /s/ Joseph Jeziorkowski, Esq.
       _____
       Joseph Jeziorkowski, Esq.
       Daniel Folchetti, Esq.
       William Knight, Esq.
       *Attorneys for Plaintiff*
       *Emilio Garcia*
       2 Westchester Park Drive, Suite 205
       White Plains, NY 10604
       914-730-2422
       jjj@valiantlaw.com
       dcf@valiantlaw.com
       wfk@valiantlaw.com


WEST COAST TRIAL LAWYERS, APLC

By:    /s/ Ronald L. Zambrano, Esq.
       _____
       Ronald L. Zambrano, Esq. (*pro hac vice*)
       Crystal F. Mohsin, Esq. *(pro hac vice)*
       *Attorneys for Plaintiff*
       *Emilio Garcia*
       1147 South Hope Street
       Los Angeles, CA 90015
       213-927-3700
       ron@westcoasttriallawyers.com

CERTIFICATE OF SERVICE

I am over the age of 18 and am not a party to the above-captioned matter.

On July 14, 2025, I served the documents listed below on the Defendant by automatic electronic transmission via the Court's Case Management and Electronic Case Filing practice as follows:

**Counsel for Defendant, Roc Nation, LLC ("Roc Nation")**

Michael R. Kleinmann, Esq.

mkleinmann@reedsmith.com

Charlyn Jones

charlyn.jones@reedsmith.com

Corrie Buck

cbuck@reedsmith.com

REED SMITH LLP

355 South Grand Avenue, Suite 2900

Los Angeles, California 90071

Jordan W. Siev, Esq. (pro hac vice)

jsiev@reedsmith.com

REED SMITH LLP

599 Lexington Avenue

New York, New York, 10022

//

//

-1-

PROOF OF SERVICE

**Counsel for Defendants, Hot Girl Touring LLC ("HGT"), Megan Thee Stallion**

**Entertainment and Megan Pete, aka Megan thee Stallion ("Ms. Pete")**

Mari F. Henderson, Esq.

marihenderson@quinnemanuel.com

Julian T. Schoen, Esq.

julianschoen@quinnemanuel.com

Gabby Trevino

gabbytrevino@quinnemanuel.com

Joanna Menillo

joannamenillo@quinnemanuel.com

Miriam George

miriamgeorge@quinnemanuel.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

865 South Figueroa Street, 10th Floor

Los Angeles, California 90017


Alex B. Spiro, Esq. (pro hac vice)

alexspiro@quinnemanuel.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP

51 Madison Avenue, 22nd Floor

New York, New York 10010-1601

//

//

PROOF OF SERVICE

The documents served on August 1, 2025 are:


**SECOND AMENDED COMPLAINT; JURY TRIAL DEMANDED**


Dated:  August 1, 2025                WEST COAST TRIAL LAWYERS, APLC


By _____
   Ronald L. Zambrano, Esq. *(pro hac vice)*
   Attorney for Plaintiff,
   EMILIO GARCIA

-1-

PROOF OF SERVICE