UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| EMILIO GARCIA,<br><br>        Plaintiff,<br><br>   -against-<br><br>ROC NATION LLC, a Delaware business organization; HOT GIRL TOURING, LLC, a Delaware business organization; MEGAN THEE STALLION ENTERTAINMENT, a Delaware business organization; MEGAN THEE STALLION, an individual; and DOES 1 through 10, inclusive.<br><br>        Defendants. | Civil Action No. 1:24-cv-07587-GHW |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS MEGAN THEE STALLION, HOT GIRL TOURING, LLC, AND MEGAN THEE STALLION ENTERTAINMENT, INC.'S MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTUAL SUMMARY .................................................................................................. 2

III.    LEGAL STANDARD FOR SUMMARY JUDGMENT ................................................. 5

IV.     LEGAL ARGUMENT ..................................................................................................... 6

    A.    Plaintiff was Misclassified as an Independent Contractor Under California Law ............. 6

        i.    Plaintiff was Not Free From Control and Direction ......................................................... 7

        ii.   Plaintiff Performed Work Within the Usual Course of the Pete Defendants' Business 11

        iii.  Plaintiff was Not Engaged in an Independently Established Trade ........................... 13

    B.    Plaintiff was Misclassified as an Independent Contractor Under New York Law ........... 16

        i.    Plaintiff Did Not Work at His Own Convenience ......................................................... 16

        ii.   Plaintiff Was Not Free to Engage in Other Employment ............................................. 17

        iii.  Fringe Benefits and Payroll Inclusion........................................................................ 18

        iv.   Plaintiff was on a Fixed Schedule ............................................................................... 18

    C.    Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Claims Under California Labor Code Sections 1102.5 and 98.6. ....................................................................... 19

    D.    Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Failure to Prevent Claim under FEHA ..................................................................................................................... 21

    E.    Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Unfair Business Practices Claim ........................................................................................................................... 21

    F.    Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Discrimination Claims under the NYSHRL and NYCHRL ................................................................................ 22

        i.    Plaintiff Proffered Evidence the Discriminatory Conduct Impacted Him Within New York City and New York State ................................................................................................... 22

        ii.   Plaintiff's Claims Need Not Be Limited to Conduct Occurring Within New York State or New York City ...................................................................................................................... 24

    G.    Genuine Disputes of Material Fact with Respect to Plaintiff's Retaliation Claims Under the NYSHRL, NYCHRL, and NYLL .......................................................................................... 24

        i.    Plaintiff Engaged in Protected Activity and the Pete Defendants were Aware of the Protected Activity ........................................................................................................................ 24

        ii.   The Pete Defendants Engaged in Conduct that Deterred Plaintiff from Engaging in Protected Activity ........................................................................................................................ 25

        iii.  ii. Plaintiff was Terminated as a Result of his Engagement in Protected Activity ... 25

V.      CONCLUSION ............................................................................................................. 26

# TABLE OF AUTHORITIES

**Cases**                                                                                                   **Page(s)**

*Albunio v. City of New York*, 16 N.Y.3d 472 (2011) ................................................................... 28

*Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981 (9th Cir. 2014) .......................... 10

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ..................................................................... 6, 12

*Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238 (N.Y. App. Div. 2d Dept. 2021) ... 27

*Bright v. Dennis Garberg & Assocs.*, No. CV1007933AHMJCX, 2011 WL 13085923 (C.D. Cal.

    May 13, 2011)................................................................................................................................ 8

*Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 802 N.E.2d 1090, 770 N.Y.S.2d 692 (2003).......... 18

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................................. 24

City *Cab Co. of Orlando, Inc. v. NLRB*, 628 F.2d 261 (D.C.Cir.1980) ...................................... 11

*Cunningham v. Lyft, Inc.*, No. 1:19-CV-11974-IT, 2020 WL 2616302 (D. Mass. May 22, 2020)

    ...................................................................................................................................................... 13

*Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903 (2018) .................................... 8, 9, 12, 15

*Garcia v. ROC Nation LLC*, No. 1:24-CV-7587-GHW, 2025 WL 1865965 (S.D.N.Y. July 2,

    2025)..................................................................................................................................... 25, 27

*Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131 (2019).......................................... 12

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013) .............................. 18, 21

*Hoffman v. Parade Publications*, 15 N.Y.3d 285 (2010) .............................................................. 25

*Hunt v. Cromartie*, 119 S. Ct. 1545 (1999) .................................................................................... 7

*Landaeta v. New York & Presbyterian Hosp., Inc.*, No. 12 CIV. 4462 JMF, 2014 WL 836991

    (S.D.N.Y. Mar. 4, 2014) ........................................................................................................ 19, 21

*Linton v. Desoto Cab Company, Inc.*, 15 Cal.App.5th 1208 (2017)................................................ 8

*Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404 (S.D.N.Y. 2017)................................. 21

*Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102.................................................... 28

*N.L.R.B. v. Friendly Cab Co.*, 512 F.3d 1090 (9th Cir. 2008)....................................................... 11

*N.S. v. Kan. City Bd. of Police Comm'rs*, 143 S. Ct. 2422............................................................. 6

*Parada v. E. Coast Transp. Inc.*, 62 Cal. App. 5th 692 (2021) ...................................................... 8

*People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266 (2020)............................................................. 8

*Pinder v. Emp. Dev. Dep't*, 227 F. Supp. 3d 1123 (E.D. Cal. 2017) ........................................... 22

*Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962).................................................................. 7

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982)......................................................................... 7

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133................................................................ 6, 7

*Ronen v. FlipCX, Inc.*, No. 21-CV-2732 (RPK) (RML), 2025 WL 2590393 (E.D.N.Y. Sept. 8, 2025) ............................................................................................................................................. 26

*Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093 (9th Cir. 2014) .................................................. 17

*Salinas v. Cornwell Quality Tools Co.*, 635 F. Supp. 3d 954 (C.D. Cal. 2022) ................... 8, 9, 12

*Sellers v. Royal Bank of Canada*, 2014 WL 104682 (S.D.N.Y. Jan. 8, 2014) ............................ 19

*Shiber v. Centerview Partners, LLC*, No. 21 CIV. 3649 (ER), 2024 WL 3274420 (S.D.N.Y. July 2, 2024)........................................................................................................................................ 26

*Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446 (2024).......................................................................... 25

*Tolan v. Cotton*, 572 U.S. 650 ...................................................................................................... 6

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106 (9th Cir. 2021) ..........................Passim

*Woodman v. Haemonetics Corp.*, 51 F.3d 1087 (1st Cir. 1995)..................................................... 7

*Yanowitz v. L'Oreal USC, Inc.*, 36 Cal. 4th 1028 (2005)........................................................ 22, 23

*Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288 (1991)............ 11

**Statutes**                                                                                      **Page(s)**

Cal. Lab Code §98.6 ...................................................................................................................... 22

California Labor Code Sections 1102.5 and 98.6...................................................................... 22, 23

California Labor Code § 2775 .................................................................................................. 8, 9, 12

subdivision (a) of Section 1102.5 .................................................................................................. 22

**Other Authorities**                                                                             **Page(s)**

Tr. at 69 ........................................................................................................................................... 3

Tr. at 125......................................................................................................................................... 4

## I.    INTRODUCTION

This case arises of out Plaintiff Emilio Garcia's (hereinafter "Mr. Garcia") work with the Pete Defendants and Roc Nation.  Mr. Garcia worked for Megan the Stallion (Hereinafter "Ms. Pete" or "Defendant Pete") as a photographer beginning in 2018 and worked for her continuously for many years.  He captured footage of her behind the scenes, for endorsements on social media, for a web series, and more.  In 2019, Defendant Pete had Mr. Garcia quit his full time job to work for her.  In March of 2020, Mr. Garcia signed a contract that declared him an independent contractor for Defendant Pete.  However, Defendant Pete would go on to severely limit his ability to practice photography, as she made it clear that she did not want her team working with other artists in the industry and wanted others to know that they could not hire her team.  This limitation under threat of termination by no longer booking the team members.  Thus, Mr. Garcia was only permitted to work non-industry, local gigs that lined up with Defendant Pete's schedule or occurred while she was on hiatus.

In September of 2019, Defendant Pete signed an artist management agreement with Roc Nation, pursuant to which Roc Nation managed aspects of her business and brand deals.  Under the agreement, Roc Nation did not make money unless Defendant Pete made money, so they did anything necessary to support her.  Roc Nation eventually began exercising control over Mr. Garcia.  In August of 2022, Roc Nation determined that the business processing Defendant Pete's invoices was overwhelmed and decided to help.  At that time, Mr. Garcia began having difficulty getting paid. Contrary to Mr. Garcia's prior payment arrangement, Roc Nation determined that he should not get paid for hours that he was remote and on call but not physically present, he should receive a different rate of pay when he edited versus being physically present, and determined his per diem.  They would also tell him things needed to be done and direct him to do it immediately. Things began to get tense, and Roc Nation eventually described Mr. Garcia as a "problem."

In June of 2023, Defendant Pete discovered text messages between Mr. Garcia and her makeup artists that she deemed offensive.  She called Mr. Garcia on Facetime, yelled at him, called him a "lazy bitch" and finished the conversation by yelling, "we're good."  Although Defendant

1

Pete states that she did not tell Roc Nation she no longer wanted to work with Mr. Garcia, Roc Nation sent a text to Mr. Garcia retracting a previous offer to work at Essence Festival. He then received word that he was terminated and now brings this suit arising out of misclassification, discrimination, and violation of labor laws.

## II.    FACTUAL SUMMARY

Megan Pete is an artist from Houston, Texas, who performs under the stage name Megan Thee Stallion. PRUMF No. 1. Defendant Pete is the owner of MTS Ent. And the sole member of HGT. PRUMF No. 2-3. One of the ways Ms. Pete earns revenue is through engaging in brand deals. Def. SSUMF No. 1. Plaintiff Emilio Garcia began working for Defendant Pete as a photographer in 2018. Over the course of Mr. Garcia's employment with the Defendants, Mr. Garcia worked about fifty (50%) to sixty percent (60%) of the time in Los Angeles, California, forty (40%) to 50% in New York, and the remaining five (5%) to ten percent (10%) traveling in other locations with Defendant Pete. Garcia Declaration at 4.

Defendant Pete initially expected Mr. Garcia to record her performances and take pictures. PRUMF No. 79. Over the years, Mr. Garcia captured photos and video footage of Defendant Pete behind the scenes, during performances, shooting for endorsements, and web series, amongst other things. PRUMF No. 79. Defendant Pete's social media accounts constitute pictures of her, behind the scene footage, videos of her performances, and music videos. Defendant Pete has endorsements and advertisements that run on her social media, and the content includes footage captured by Mr. Garcia. PRUMF No. 79.

Defendant Pete asked Pl. Garcia to stop working his full-time job with the City of Houston in July of 2019. PRUMF No. 53. On March 1, 2020, Mr. Garcia signed an agreement with HGT that named him an independent contractor. Def. SSUMF No. 18. However, according to what Defendant Pete would tell Pl. Garcia, Pl. Garcia believed Defendant Pete to be his boss and him to be Defendant Pete's employee. PRUMF No. 53. In 2021 and part of 2022, Pl. Garcia sent the same invoice "as if it were salary," regardless of the number of hours he was working or if he was at home. PRUMF No. 53. Defendant Pete conveyed to her team, including Pl. Garcia and

2

Alejandra Garcia, that she wanted her team to be solid and exclusive, meaning that other artists know they cannot hire them. It was understood that, if they worked with an artist of which Defendant Pete did not approve, they would not be booked again. When asked if she ever told Pl. Garcia that she did not want him to provide services to other artists, Defendant Pete responded:

> I will say this:· Me and Emilio were very close, so he knew that me, as a female rapper, a lot of us have our own teams that we work with frequently.· We don't really like to share a lot of hairstylists, makeup artists, like your close personal team.· Like, you don't really like for other girls to look the way you look. So obviously female rapping is very competitive.· I don't feel like there couldn't have been a time where I told -- where I said ·something like, I don't want other girls to look like me.· I don't want other girls to have what I have.· I can't say that I didn't say those things, but I never told him you can't work with other artists.· But I wouldn't like it if he worked with other female rappers because you work so closely with me every day, and I don't want other girls to have my look.· But if he went -- he shot one of my friends that's a female rapper.· I didn't have a problem with that.· She just didn't like his pictures.· So I don't know if girls weren't using him because they didn't want to or if we just all have that female code of that's your team, those are your people.

PRUMF No. 53. Defendant Pete also made it clear to Mr. Garcia that she was to be his priority, and she was only okay with him taking gigs if the schedule lined up and he happened to coincidentally be free. Ex. A (Pl. Garcia Tr. at 69:23-24). Thus, while Mr. Garcia had established a stage name of Emilio Coochie, which he used both for photography and for performing as a performance artist, Mr. Garcia was not able to freely solicit photography work, and was limited to only non-industry, local gigs that did coincided with Defendant Pete's schedule or occurred when she took a hiatus. PRUMF No. 56. At some point, Pl. Garcia began talking about quitting. Ex. B (Pete Tr. at 125:17-25).

Around September of 2019, Roc Nation entered into an artist management contract with Defendant Pete. Def. SSUMF No. 6. In its role for Defendant Pete, Roc Nation manages the business aspect of Defendant Pete's career, including brand deals. Def. SSUMF No. 6. Roc Nation does not make money unless Defendant Pete makes money, so Roc Nation supports Defendant Pete in any way it can. PRUMF No. 6. Defendant Pete testified that she sometimes reviewed each of Pl. Garcia's invoices, and other times she would delegate the task to Desiree Perez of Roc Nation. PRUMF No. Around August of 2022, although Rockefeller was the business management

3

firm in charge of processing invoices, Roc Nation determined Rockefeller to be overwhelmed and decided to "lean in" and assist with handling invoices, including communicating with vendors, cleaning them up, and ensuring they were clear.  PRUMF No. 6.  Around this time, Mr. Garcia began to have problems receiving payment and had reached out many times to get paid— ultimately bringing his attorney in to assist. PRUMF No. 41.  Roc Nation's CEO, Desiree Perez, described Mr. Garcia as a "problem" because he kept reaching out.  PRUMF No. 41.  Ms. Perez ultimately determined that Mr. Garcia should not be paid for work when he was not present but was on call for editing, should be paid a different rate for editing than for work performed in person, decided Mr. Garcia's per diem rate, and determined that three days off was a fair number. PRUMF No. 6.  Defendant Pete has no recollection of having a conversation in which it was determined that Pl. Garcia would only be paid when he was physically present, no recollection of anyone asking her if Mr. Garcia could be paid for things beyond taking pictures and videos, and no memory of not approving something on an invoice because Pl. Garcia had not done it.  PRUMF No. 6.  Pl. Garcia was expected to be on call 24/7.  Sometimes, a representative from Roc Nation would call Pl. Garcia and tell him that something needed to be done.  When he would ask if he could do it later because he was at dinner, they would say it needed to be done at that moment. PRUMF No. 53.

Furthermore, Roc Nation obtained the camera equipment needed for the shoot after Mr. Garcia simply provided a list of what they used last time. PRUMF No. 6.  Managers at Roc Nation provided direction on edits for projects on which Mr. Garcia was working, which Pl. Garcia raised in a message thread with Roc Nation and Defendant Pete.  PRUMF No. 6.  Manager Sam from Roc Nation assigned Mr. Garcia a project to do a "Takeover" for Dolce and Gabbana.  PRUMF No. 6.  Jess from Roc Nation states that Emilio could do project capturing images with Defendant Pete and her nanny, despite initial suggestion that another photographer take the photos.  PRUMF No. 6.  Sometimes, a representative from Roc Nation would call Pl. Garcia and tell him that something needed to be done.  When he would ask if he could do it later because he was at dinner, they would say it needed to be done at that moment.  Defendant Pete and Roc Nation would also

instruct him to attend meetings at Roc Nation headquarters in New York City, where they directed him to prepare a creative proposal to present at the meetings.  Garcia Declaration at 5.  He would also receive training through these creative meetings.  PRUMF No. 70.

In June of 2023, Defendant Pete discovered text messages on the cell phone of her makeup artist, Alejandra Garcia, between Ms. Garcia and Mr. Garcia.  Def. SSUMF No. 51.  Defendant Pete interpreted these text messages as speaking negatively about her, called Mr. Garcia on Facetime, yelled at him about wanting to quit on her, called him a "lazy bitch," and yelling, "We're good!" before hanging up the phone.  PRUMF No. 52.  Defendant Pete testified that she did not advise Roc Nation that she no longer wanted to work with Mr. Garcia; however, Roc Nation retracted an offer for Pl. Garcia to work for Defendant Pete at Essence Festival.  PRUMF No. 52. Mr. Garcia was later informed of his termination by a representative at Roc Nation, named Renika. PRUMF No. 52.

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment in U.S. federal courts, as articulated by the U.S. Supreme Court, requires that the court view the evidence in the light most favorable to the non-moving party.  Summary judgment is appropriate only if the movant demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.  The court must draw all reasonable inferences in favor of the non-moving party and may not weigh the evidence or make credibility determinations, as these are functions reserved for the jury.  *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133.  This principle underscores the importance of preserving the jury's role in resolving factual disputes.  *N.S. v. Kan. City Bd. of Police Comm'rs*, 143 S. Ct. 2422, *Tolan v. Cotton*, 572 U.S. 650.

A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  The trial judge's role is not to weigh the evidence but to determine whether there is a genuine issue for trial.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242.

At the summary judgement stage, the trial court must review the entire record but disregard evidence favorable to the moving party that the jury is not required to believe.  The court must give credence to evidence favoring the nonmovant and to uncontradicted and unimpeached evidence from disinterested witnesses.  Thus, if defendant's evidence is contradicted, or comes from an interested witness, it cannot be credited unless it is favorable to the plaintiff. *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150 (2000).

When the disputed issue turns on a question of motive and intent "jury judgments about credibility are typically thought to be of special importance."  *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995) ("No credibility assessment may be resolved in favor of the party seeking summary judgment."); *see, Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962) (summary judgment procedures should be used sparingly where the issues of motive and intent play a role); *Pullman-Standard v. Swint*, 456 U.S. 273, 288-90 (1982) (discriminatory intent is a factual matter for the trier of fact).

Even when the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues.  *Hunt v. Cromartie*, 119 S. Ct. 1545, 1551-52 (1999) (explaining that "[w]here reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage").

IV.   **LEGAL ARGUMENT**

**A. Plaintiff was Misclassified as an Independent Contractor Under California Law**

The Pete Defendants argue that Plaintiff's California Labor Code Claims for (1) meal and rest break violations; (2) failure to pay overtime; (3) provision of inaccurate wage statements; and (4) waiting time penalties each fail solely because Plaintiff was an independent contractor. Plaintiff, however, has proffered sufficient evidence to establish a genuine dispute of material fact as to whether Plaintiff was misclassified as an independent contractor.

Whether a worker is an employee or independent contract for the purposes of wage orders—including minimum wages, maximum hours, and basic working conditions—is addressed in the ABC test put forth in *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 957 (2018) and later codified as California Labor Code § 2775. *See Salinas v. Cornwell Quality Tools Co.*, 635 F. Supp. 3d 954, 964–65 (C.D. Cal. 2022). Pursuant to this test, workers are presumed employees unless the defendant can prove ***all*** of the following: "(1) the worker is free from the control and direction of the hiring entity; (2) the worker performs work that is outside the usual course of the hiring entity's business; (3) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." Cal. Lab. Code § 2775; *Dynamex Operations W.*, 4 Cal. 5th at 916-917; *Salinas*, 635 F. Supp. 3d at 964–65.

"[T]he ABC test is conjunctive, so a finding of any prong against the hiring entity directs a finding of an employer-employee relationship." *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021). Further, the *Dynamex* court stresses that the employer must prove the three prongs both under contract ***and in fact***. *Dynamex Operations W.*, 4 Cal. 5th at 962 (emphasis added); *see People v. Uber Techs., Inc.*, 56 Cal. App. 5th 266, 295 (2020) (quoting *Linton v. Desoto Cab Company, Inc.*, 15 Cal.App.5th 1208, 1217 (2017) ("[T]he parties' characterization of their relationship is not dispositive because their "actions determine the relationship, not the labels they use."); *see Parada v. E. Coast Transp. Inc.*, 62 Cal. App. 5th 692, 702 (2021) (remanding for trial court to determine whether truckers were employees of trucking company, despite truck drivers signing contracts that they were independent contractors).

"The determination of an individual's status as an employee or independent contractor is one of fact if dependent upon the resolution of disputed evidence or inferences. . . ." *Bright v. Dennis Garberg & Assocs.*, No. CV1007933AHMJCX, 2011 WL 13085923, at *2 (C.D. Cal. May 13, 2011).

### i.        *Plaintiff was Not Free From Control and Direction*

Prong A of the "ABC" test states that a worker is an employee if the worker "is subject, either as a matter of contractual right or in actual practice, to the type and degree of control a

business typically exercises over employees."  Cal Lab Code § 2775; *Dynamex Operations*, 4 Cal. 5th at 958.  This means that the hiring entity must not exercise control over how the worker performs their tasks, and the worker must operate independently in carrying out their duties. *Dynamex Operations W.*, 4 Cal. 5th at 958.  However, "a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its employees, but does not possess over a genuine independent contractor."  *Id.*  Accordingly, the question is not what control the worker has, but what control the business has retained the right to exercise--either through contract or practice.  *Id.* at 918, 958 (noting Dynamex's retained authority to terminate without cause); *Salinas*, 635 F. Supp. 3d at 964–65.  The Ninth Circuit has found that "[a]pplication of Prongs A and C is most likely to trigger the need for further factual development, because the considerations relevant to those prongs are the most factually oriented."  *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021).

In this case, Defendant Pete, individually, and in her capacity as sole owner of MTS and sole member of HGT, exercised substantial control over Plaintiff Garcia.  The entity responsible for Mr. Garcia's work as reflected on invoice tracking was HGT before it changed to MTS. PRUMF No. 2.  Mr. Garcia believed Defendant Pete to be his boss, and, at some point, talked to Ms. Alexandra Garcia about quitting.  PRUMF No. 18.  In 2021 and part of 2022, Mr. Garcia sent the same invoice "as if it were salary," regardless of the number of hours he was working or if he was at home.  PRUMF No. 18.

Credible testimony indicates that the Pete Defendants controlled Mr. Garcia's schedule. Specifically, the Pete Defendants expected Mr. Garcia to be on call twenty-four hours a day, seven days a week ("24/7").  PRUMF No. 2.  Defendant Pete would text Mr. Garcia for pictures throughout the day, and she expected him to provide them.  PRUMF No. 3.  Further, Defendant Pete's best friend testified that, for ten or eleven years, Mr. Garcia was with Defendant Pete every time she saw Defendant Pete, and Mr. Garcia was her photographer for all those years.  PRUMF No. 3.  When the team was on the road, if a person wanted to go back home for a weekend to see

8

a loved one, Defendant Pete would take it as being lazy and that the person doesn't want to work, and then they would not see that person for a while. PRUMF No. 3. That Mr. Garcia was expected to be available to Defendant Pete 24/7 is further evidenced by the fact that Mr. Garcia negotiated three days off when he requested a pay increase. Def SSUMF No. 29, PRUMF No. 3. It should be noted that the Pete Defendants *agreed* to Mr. Garcia's request for three days off, and no one said it was unnecessary because Mr. Garcia was an independent contractor or set his own schedule. DEF SSUMF No. 30.

The amount of continuous time Mr. Garcia spent performing work with Megan also indicates that he was an employee. *See Alexander v. FedEx Ground Package Sys., Inc.*, 765 F.3d 981, 996 (9th Cir. 2014) (finding FedEx drivers to be employees where they worked on a regular basis for FedEx for years). Not only was Mr. Garcia expected to be on call 24/7, but he started working for Ms. Pete in 2018 and worked with her continuously for years. PRUMF Nos. 14, 15, 18, 21-23. Similar to *Alexander*, "[t]his was not a circumstance where a contractor was hired to perform a specific task for a defined period of time. There was no contemplated end to the service relationship at the time that the plaintiff [d]rivers began working for [FedEx]."

Defendant Pete also controlled whether and when Mr. Garcia could photograph other clients. PRUMF No. 18. Specifically, Defendant Pete's makeup artist, Alexandra Garcia, testified that Defendant Pete conveyed very clearly to her team, including Mr. Garcia, that she wanted to be "solid" and "exclusive," and she wanted other artists to know that they could not hire anyone from her team. PRUMF No. 18. It was understood by the team that, if they worked with an artist of which the Pete Defendants did not approve, Defendant Pete would not book them again. PRUMF No. 18. When Defendant Pete was asked in deposition if she ever told Mr. Garcia he could not work with other artists, Defendant Pete stated in part, "But I wouldn't like it if he worked with other female rappers because you work so closely with me every day, and I don't want other girls to have my look." PRUMF No. 18. Mr. Garcia further testified that he was concerned about "defying or going against Defendant Pete in some way" because she may not book him anymore. PRUMF No. 2. By assuring compliance through threat or fear of termination is to exert control

9

like an employer would over an employee. *See N.L.R.B. v. Friendly Cab Co.*, 512 F.3d 1090, 1099 (9th Cir. 2008) (quoting City *Cab Co. of Orlando, Inc. v. NLRB*, 628 F.2d 261 (D.C.Cir.1980) (finding that drivers' reluctancy to refuse a dispatch call for fear of not receiving future dispatches to be an indicator of business's control over workers); *Yellow Cab Coop., Inc. v. Workers' Comp. Appeals Bd.*, 226 Cal. App. 3d 1288, 1298 (1991) (noting that a mere lessor has no interest in restricting the lessee's freedom to render service to another and "by imposing such a restriction, Yellow exerted a form of control typical of employment. . . .").

The Pete Defendants also retained the power to terminate Mr. Garcia, and a material fact exists as to whether it was the Pete Defendants or Roc Nation that decided to terminate Mr. Garcia. Roc Nation and Mr. Garcia had already agreed that Mr. Garcia would work for them at Essence Festival before Defendant Pete called Mr. Garcia and yelled at Mr. Garcia about wanting to quit and talking negatively about her.  PRUMF No. 17.   At the end of the phone call, Defendant Pete yelled at Mr. Garcia, "We're good!"  PRUMF No. 52.  Defendant Pete testified that she did not tell Roc Nation that she no longer wanted to work with Mr. Garcia.  PRUMF No. 17.  However, after the conversation with Defendant Pete yelling at Mr. Garcia, Mr. Garcia received a text from a representative of Roc Nation stating that they decided to go another way with the photographer. PRUMF No. 17.  Mr. Garcia also received a text from a Roc Nation representative stating that he was terminated, and Mr. Garcia never worked with Defendant Pete after that day.  Def SSUMF Nos. 50, 52.  Assessing the credibility of the witnesses to determine whether a conversation occurred between Defendant Pete and Roc Nation to terminate Mr. Garcia, or whether Roc Nation single handedly decided to terminate and replace Mr. Garcia, is for a jury to decide.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge ... ruling on a motion for summary judgment. . . .").

        *ii.*        *Plaintiff Performed Work Within the Usual Course of the Pete Defendants'*

                          *Business*

Under Prong B of the ABC test, a worker is an employee unless the business proves that the work the worker performs is outside Defendants' usual course of business. Cal. Lab. Code § 2775; *Dynamex Operations W.*, 4 Cal. 5th at 916-917; *Salinas*, 635 F. Supp. 3d at 964–65. In analyzing this prong, courts focus on whether the worker's role is reasonably viewed as providing services to the business in a role comparable to an employee or that of a traditional contractor. *Dynamex Operations W.*, 4 Cal. 5th at 959; *Gonzales v. San Gabriel Transit, Inc.*, 40 Cal. App. 5th 1131, 1154–55 (2019). More specifically, courts have framed the prong B inquiry as whether the work of the employee is necessary to or merely incidental to that of the hiring entity, whether the work of the employee is continuously performed for the hiring entity, and what business the hiring entity proclaims to be in. *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021). Courts will look at how a business describes itself and, "[i]n some cases, this inquiry can be conducted through a common-sense observation of the nature of the businesses." *Id.* Further, "A business cannot alter the substance of its usual course of business merely by careful (or careless) self-labeling in its dealings with contractors, employees, customers, or the public. [citations omitted] Nor may it create[e] a false dichotomy between the administrative and operational aspects of their business." *Cunningham v. Lyft, Inc.*, No. 1:19-CV-11974-IT, 2020 WL 2616302, at *10 (D. Mass. May 22, 2020) (citations omitted).

As the Pete Defendants acknowledge, the Pete Defendants are in the business of endorsements, and Defendant Pete makes money on endorsements. *See* Pete Defendants' Motion for Summary Judgment at p. 11. Common sense reveals that using celebrities for endorsements is effective due to the fame and following that celebrities typically hold. Defendant Pete has 32.7 million followers on Instagram, 8.2 million followers on X, 16.6 million followers on TikTok, and 7.27 million subscribers on Youtube. PRUMF No. 79. Common sense again establishes that making and maintaining that following is essential to profiting on endorsements. A look at Defendant Pete's social media reveals that her social media presence consists mainly of

11

photographs of Defendant Pete, behind the scenes footage of Defendant Pete, footage from Defendant Pete's performances, and music videos. PRUMF No. 79. Defendant Pete's social media posts also include endorsements and ads. PRUMF No. 79. Mr. Garcia's main job as Defendant Pete's photographer was to record footage for her social media. Def. SSUMF No. 79. The Pete Defendants used the footage captured by Mr. Garcia in social media posts with endorsements and promos. PRUMF No. 79; Garcia Decl. ¶¶ 10-13. For example, clicking on the Hottie World series, which Mr. Garcia filmed requires viewers to watch an ad before watching the videos. Def SSUMF Nos. 71, 72, 79; PRUMF No 79. As further examples, the Pete Defendants used Mr. Garcia's photos to endorse Cashapp on Defendant Pete's X account, Cheetos and Revlon on Defendant Pete's TikTok account, and Revlon on Defendant Pete's Instagram account. PRUMF No. 79.

Defendant Pete also uses her social media to promote herself and direct users towards her other social media pages and streams of income. For example, Defendant Pete's Youtube page has a link to her Instagram account, X account, Apple Music page, and Spotify page. PRUMF No. 79.

Moreover, Defendant Pete uses photography services, videography services, and social media continuously as an artist. As stated above, Mr. Garcia was always with Defendant Pete when she was working, and he worked as her photographer for years—since 2018, specifically. Def. SSUMF No. 14; PRUMF Nos. 56, 80. Exhibiting the integral nature of photography in the Pete Defendants' business, sometime towards the end of Mr. Garcia's work for Defendant Pete, Defendant Pete referenced having "a rotation" of photographers. PRUMF No. 1. *See Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1126–27 (9th Cir. 2021) ("A hiring entity cannot meet its burden under Prong B when it performs the [putative employee's] activity on a regular or continuous basis, without regard to the substantiality of the activity in relation to the enterprise's other business activities.").

Accordingly, a reasonable jury will find that the Pete Defendants' attempts to minimize the integral nature of photography, videography, and social media in the business of an artist such as Defendant Pete cannot be given credence.

### iii.    *Plaintiff was Not Engaged in an Independently Established Trade*

Prong C of the ABC test requires the business to establish that the worker is "customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity." *Dynamex Operations W.*, 4 Cal. 5th at 961. The focus is on whether the worker has "*independently* made the decision to go into business for himself." *Id.* at 962. The business must show that the worker was "actually engaged in an independent business, not merely that he or she could be." *Id.* at 962. As stated above, the Ninth Circuit has found Prong C among the most likely to trigger the need for further factual development because the considerations relevant to this prong are the most factually oriented." *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021).

Here, Mr. Garcia was not actively engaged in an independently established trade. Firstly, although Mr. Garcia signed an agreement stating that he was performing work for the Pete Defendants as an independent contractor, he believed Defendant Pete to be his boss, as evident by him talking with Defendant Pete's makeup artist, Alexandra Garcia, about quitting. PRUMF Nos. 18, 51. Defendant Pete also supplied Mr. Garcia with a laptop. PRUMF No. 68. Roc Nation supplied camera equipment for Mr. Garcia, and despite Roc Nation asking Mr. Garcia what equipment was needed, Mr. Garcia simply regurgitated the list of equipment that was rented "last time." PRUMF No. 68.

Secondly, as stated above, the Pete Defendants controlled whether and when Mr. Garcia could photograph other clients. PRUMF No. 18. Specifically, Mr. Garcia was largely prohibited from photographing others in the industry, Defendant Pete made it very clear that she was to be Mr. Garcia's priority, and he was only allowed to take local, non-industry gigs if they coincidentally lined up with Defendant Pete's tour schedule and he happened to be free. PRUMF No. 13. As Defendant Pete's makeup artist explained, Defendant Pete ensured that her team would

13

comply with her desire that they not work with other artists under threat of termination, as the team, including Mr. Garcia, knew very well that they were at risk of not being booked again if they worked with a person of whom Defendant Pete did not approve.  PRUMF No. 18.  When Defendant Pete was asked in deposition if she ever told Mr. Garcia he could not work with other artists, Defendant Pete stated, amongst other things, "But I wouldn't like it if he worked with other female rappers because you work so closely with me every day, and I don't want other girls to have my look."  PRUMF No. 18.  Furthermore, none of the engagements in which Mr. Garcia was able to participate were similar in kind to the type of personal cameraman he was for Defendant Pete, as he not only shot posed photos, he shot behind the scenes footage, footage for a multi-part Youtube series, endorsements, and ongoing daily services for Defendant Pete.  PRUMF No. 79.

Accordingly, though the Pete Defendants attempt to name Mr. Garcia's engagements in a flurry as if the mere existence establishes Prong C, a closer look at the dates and types of engagements further evidences that Mr. Garcia was not actively engaged in an independently established trade of the same nature while he was working for the Pete Defendants, as well as the severe limitations on the work he did perform.  For example, Mr. Garcia was able to take small local jobs when Defendant Pete went on hiatus due to the Covid-19 pandemic and being shot.  PRUMF No. 57.  He was able to photograph a non-industry person of the LGBTQ community, Vitamin B.  PRUMF No. 58.  The Pete Defendants include work that Mr. Garcia performed for female rapper, JT, but JT had asked Defendant Pete to have Mr. Garcia edit photos of her.  Def. SSUMF No. 59.  Defendant Pete asked JT how she wanted the photos edited and relayed that information to Mr. Garcia.  PRUMF No. 59.  The Pete Defendants' list photographs that Mr. Garcia took in June of 2023, after Defendant Pete had yelled at Mr. Garcia and told him, "We're Good!."  Def. SSUMF No. 60.  The Pete Defendants further acknowledge that Defendant Pete went on hiatus in the fall of 2022, but they include non-industry and small local projects that Mr. Garcia was permitted to work on under Defendant Pete's restrictions.  Def. SSUMF Nos. 43, 61.  The Pete Defendants also list performances that Mr. Garcia did as a performance artist/rapper and not as a photographer.  Def. SSUMF Nos. 62-63.  Further, the Pete Defendant's highlight a date that

14

they allege that Mr. Garcia was not available to perform services for Defendant Pete, even though even employees are permitted to take days off, and Mr. Garcia often performed remote work for Defendant Pete. PPRUMF Nos. 63, 65. Therefore, although Mr. Garcia occasionally posted on social media about his photography and performed small local non-industry jobs as permitted under Defendant Pete's restrictions, he was not able to solicit and engage freely and thus was not *actively engaged* in an independent trade of the same nature. PRUMF No. 13; *see Ruiz v. Affinity Logistics Corp.*, 754 F.3d 1093, 1104 (9th Cir. 2014) (finding drivers to be employers where business admitted that drivers were "strongly discouraged" from engaging in other business).

Mr. Garcia also did not have time to actively engage in an independently established trade by providing services to other people. Ms. Jones and Ms. Garcia testified that Mr. Garcia was always with Defendant Pete while she was working, and Mr. Garcia testified that he was expected to be on call 24/7. PRUMF No. 56.

Moreover, a reasonable jury will see that the Pete Defendants' argument that Mr. Garcia ability to hire an assistant to assist him with photographing Defendant Pete established him as an independent contractor is patently false. As Mr. Garcia testified, because Mr. Garcia traveled so often for work, he wanted to have his partner near, but neither he nor his partner felt comfortable with his partner being present without contributing. PRUMF No. 78. Not only was Mr. Garcia's partner the only person he ever brought to Defendant Pete's photo shoots, but he had to ask before bringing him. PRUMF No. 78; *see Ruiz*, 754 F.3d at 1102–03 (finding that workers were employees where they "did not have an unrestricted right to choose [their helpers], which is an important right that would normally inure to a self-employed contractor").

A reasonable jury will find that, to permit the Pete Defendants to limit where, when, and for whom Mr. Garcia could practice photography outside of Defendant Pete, occupy all of his time by expecting him to be on call 24/7 and respond immediately, and require him to work continuously and for an infinite duration for Defendant Pete establishes that Mr. Garcia was not actively engaged in an independently established trade while working for Defendant Pete.

**B. Plaintiff was Misclassified as an Independent Contractor Under New York Law**

Similar to the reasons discussed above, *supra,* Section IV.A, the evidence proffered to date established, at the very least, a genuine dispute of material fact exists as to whether Plaintiff was an employee of Defendants but misclassified as an independent contractor.

With respect to misclassification claims under the NYLL, "the critical inquiry in determining whether an employment relationship exists pertains, to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results," rather than the economic reality of the situation. *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198, 802 N.E.2d 1090, 770 N.Y.S.2d 692 (2003).

In determining when an employee was misclassified under NYLL, "[f]actors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003). Additionally, important, "it is not significant how the parties defined the employment relationship." *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 924 (S.D.N.Y. 2013).

### i.      *Plaintiff Did Not Work at His Own Convenience*

Based on the evidence, it is clear Plaintiff did not work at his own convenience and would have faced retaliation if he refused assignments.  Indeed, penalizing workers for refusing assignments supports a finding a worker is in fact an employee.  *Landaeta v. New York & Presbyterian Hosp., Inc.*, No. 12 CIV. 4462 JMF, 2014 WL 836991, at *6 (S.D.N.Y. Mar. 4, 2014).

Although Plaintiff regularly accepted Defendant Pete's assignments, Plaintiff noticed repeated retaliation from Defendant Pete when an employee refused an assignment. PRUMF No. 80.  Throughout his employment, Plaintiff was unable to leave Defendant Pete's entourage at his own convenience or when he wished.  PRUMF No. 80.  Additionally, Plaintiff was expected to travel in accordance with Defendant Pete's personal and professional schedules, traveling for events such as her birthday as well as for performances and professional engagements. DEF

16

SSUMF No. 106.  During these travels, Defendant Pete required Plaintiff's constant availability.

PRUMF No. 80.  Thus, Plaintiff was not afforded the flexibility of an average independent

contractor and did not work at his own convenience.

The Pete Defendants' reliance on *Sellers v. Royal Bank of Canada*, 2014 WL 104682 *9

(S.D.N.Y. Jan. 8, 2014), is misplaced.  For example, The Pete Defendants exercised a high degree

of control over Plaintiff, such as expecting Mr. Garcia to be on call twenty-four hours a day, seven

days a week ("24/7").  PRUMF No. 2.  Further, Defendant Pete would text Mr. Garcia for pictures

throughout the day, and she expected him to provide them.  PRUMF No. 3.  Further, unlike, the

Plaintiff in *Sellers,* Plaintiff's position was not limited to short-term contracts as he worked for

Pete for several years.[1]

Here, Defendant Pete's best friend testified that, for ten or eleven years, Mr. Garcia was

with Defendant Pete every time she saw Defendant Pete, and Mr. Garcia was her photographer for

all those years.  PRUMF No. 3.  Further, Mr. Garcia had to ask permission to take days off.  While

the Pete Defendants claim he took certain days off, they omit the fact, for example, Pete *agreed* to

Mr. Garcia's request for three days off, and no one said it was unnecessary for him to ask

permission due to his independent contractor status or because Mr. Garcia set his own schedule.

DEF SSUMF No. 30.

Additionally, as Pete's main photographer, he was certainly integral to Pete's business.  It

cannot be disputed that photographs, videos, social media posts are one of the most integral parts

of a celebrities' business, if not the most integral.  Mr. Garcia was responsible for such work

product for several years as Pete's career continued its upward trajectory.

ii.    *Plaintiff Was Not Free to Engage in Other Employment*

Plaintiff was clearly unable to engage in other employment during his time employed with

the Pete Defendants.  Plaintiff was clearly unable to engage in other employment during his time

employed with the Pete Defendants.  Defendant Pete restricted Plaintiff's ability to photograph

---

[1]    By contrast, in *Sellers,* the Court noted that five renewals of no more than three months each were indicia
of an independent contractor status.

other celebrities, going so far as to forbid Plaintiff from engaging other assignments despite limiting his opportunities to photograph her. PRUMF No. 58. Additionally, Plaintiff quit his prior role with the City of Houston to work for the Pete Defendants *exclusively*, further demonstrating his inability to work elsewhere during his employment with Defendants. PRUMF No. 18.

Thus, the Pete Defendants exercised substantial control over Plaintiff's ability to engage in other photography employment opportunities. The strictness and exclusivity of his employment with Defendants clearly identifies how little control Plaintiff maintained over his services let alone his ability to engage in other employment. Simply put, Plaintiff was not free to engage in any other employment. Unlike the Plaintiff in *Sellers,* it cannot be disputed he had a minimal "opportunity for profit and loss" through other work. *Sellers* 2014 WL 104682at 20.

### iii.    *Fringe Benefits and Payroll Inclusion*

The fringe benefits and payroll inclusion factors have not been afforded substantial weight by New York Courts. *Hart* at 926. Under the NYLL, it is not significant how the parties defined the employment relationship or how the worker identified himself on tax forms. *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404 (S.D.N.Y. 2017).

Thus, although Plaintiff may not have received fringe benefits directly from his employers, this factor does not receive significant consideration when making the determination of employment status. Additionally, Plaintiff was routinely paid by the Defendants from the start of his full-time employment until his termination. PRUMF Nos. 14, 18. Although Defendants argue that Plaintiff was only paid when he sent an invoice, Plaintiff was paid similarly to a salary structure by Defendants, receiving a standardized payment regardless of the number of hours worked in a particular pay period. PRUMF No. 18.

### iv.    Plaintiff was on a Fixed Schedule

Where, as here, an expectation that employees remain available at all times supports a finding that the employee was misclassified as an independent contractor under NYLL. *See, e.g., Landaeta* at *6.

18

Mr. Garcia was expected to work full time and around the clock when photographing Defendant Pete. PRUMF Nos. 2, 3, 80. Plaintiff's fixed schedule required his constant availability to Defendant Pete while engaged in his employment with Defendants. PRUMF No. 80. Plaintiff was unable to come and go on his own accord and was not setting his own hours or conducting business outside of his employment with the Defendants. PRUMF No. 80. Additionally, as referenced above, Defendant Pete routinely ceased working with individuals who left early from long traveling employment obligations, thus limiting Plaintiff's confidence that he could set his own hours or work whenever he pleased, as argued by the Pete Defendants.

### C. Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Claims Under California Labor Code Sections 1102.5 and 98.6.

Retaliation claims under California Labor Code sections 1102.5 and 98.6 have three components to establish a *prima facie* case. A plaintiff may meet his burden of proof for a claim of retaliation by showing, by a preponderance of the evidence, (1) involvement in protected activity such as reporting conduct in violation of state or federal law; (2) an adverse employment action, and (3) a causal link between the protected activity and the adverse action. Cal. Lab Code §1102.5; Cal. Lab Code §98.6; *Pinder v. Emp. Dev. Dep't*, 227 F. Supp. 3d 1123, 1147 (E.D. Cal. 2017). An adverse action is any action that "materially affect[s] the terms, conditions, or privileges of employment." *Yanowitz v. L'Oreal USC, Inc.*, 36 Cal. 4th 1028, 1047 (2005). "A plaintiff opposing a motion for summary judgment on retaliation claims under . . . §§ 98.6 and 1102.5 of the California Labor Code may use the *McDonnell Douglas* burden shifting framework." *Pinder*, 227 F. Supp. 3d at 1147. Accordingly, "once the prima facie case is established, the burden of production shifts to the employer to present a legitimate, non-retaliatory reason for the adverse employment action." *Id.* "If the employer carries this burden, a plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer is pretext for retaliation." *Id.*

Under subdivision (a) of Section 1102.5, an employer is prohibited from retaliating against an employee who discloses information to a government or law enforcement agency, a person with

authority over the employee, or another employee with authority to investigate or correct the violation, if the employee has reasonable cause to believe that the information discloses a violation of a state or federal statute, or a local, state, or federal rule or regulation. Since FEHA and the Labor Code are state statutes, reporting violations of either would fall within the scope of this protection. Cal Lab Code § 1102.5. Similarly, California Labor Code section 98.6 explicitly prohibits employers from retaliating against employees for engaging in protected activities, including asserting their rights under the Labor Code. Reporting violations of the California Fair Employment and Housing Act (FEHA) and/or the California Labor Code is considered a "protected activity" under California Labor Code sections 1102.5 and 98.6. *See Yanowitz*, 36 Cal. 4th at 1047 (noting that an employee engages in protected activity "when an employee opposes conduct they reasonably and in good faith believe to be discriminatory").

In this case, triable issues of material fact exist as to whether the Pete Defendants retaliated against Mr. Garcia. As discussed *ad nauseam* above of this motion, Defendant Pete was Mr. Garcia's employer. PPRUMF Nos. 2, 3, 79, 80. Mr. Garcia repeatedly complained to the Pete Defendants and Roc Nation about not receiving payment and later brought in his attorney to assist, both of which are protected activities. PRUMF No. 9. Rockefeller took over the processing of Defendant Pete's invoices around June 1, 2022, and shortly thereafter, Roc Nation determined that Rockefeller was struggling to manage invoices and decided to "lean in" to help Rockefeller with the invoices. Def. SSUMF No. 27; PRUMF No. 4. When Nation started managing invoices, Mr. Garcia began having difficulty getting paid. PRUMF No. 40. Specifically, the CEO of Roc Nation, Desiree Perez, described Mr. Garcia as a "problem" because he continued to call and email the Pete Defendants and representatives of Roc Nation about receiving payment. PRUMF No. 9. Following the period when Ms. Perez described Mr. Garcia as a problem, Mr. Garcia started receiving less assignments. Then, Mr. Garcia had a phone call with Defendant Pete in which she yelled at Mr. Garcia about wanting to quit on her. PRUMF No. 51. At that time, Mr. Garcia had been booked to work on a project at the Essence Festival. Defendant Pete testified that she did not tell Roc Nation that she no longer wanted to work with Mr. Garcia after this phone call. PRUMF

20

No. 17.  However, a representative of Roc Nation texted Mr. Garcia retracting an offer for Mr. Garcia to work for Defendant Pete at the Essence festival.  PRUMF No. 55.  Mr. Garcia was later informed of his termination by a representative at Roc Nation.  PRUMF No. 55.

Accordingly, a triable issue of material fact exists as to whether the Pete Defendants or Roc Nation terminated Mr. Garcia.  Furthermore , a reasonable jury could find that this termination was in retaliation for Mr. Garcia's repeated complaints about receiving payment, having his attorney address the issue, and becoming "a problem" for the Pete Defendants and Roc Nation.

### D.  Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Failure to Prevent Claim under FEHA

The Pete Defendants' Motion fails to address Plaintiff's tenth cause of action for Failure to Prevent and Remedy Harassment as alleged against Hot Girl Touring and Stallion Entertainment. As such, Defendants' Motion should be denied as to Plaintiff's tenth cause of action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.").

### E.  Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Unfair Business Practices Claim

The Pete Defendants' Motion fails to address Plaintiff's seventeenth cause of action for Violation of California Business and Professions Code. As such, Defendants' Motion should be denied as to Plaintiff's seventeenth cause of action.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.").

21

**F. Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Discrimination Claims under the NYSHRL and NYCHRL**

The Pete Defendants address Plaintiff's claims under the New York State Human Rights Law ("NYSHRL") and the New York City Human Rights Law ("NYCHRL") (inclusive of Plaintiff's first and third cause of action) collectively. Contrary to the record evidence, the Pete Defendants claim: (1) there was no impact on Plaintiff in New York; and (2) the discrimination suffered by Plaintiff occurred outside of New York.

The New York Court of Appeals "established an 'impact' test for nonresidents pursuing claims under the State and City Human Rights Laws." *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451 (2024) (citing *Hoffman v. Parade Publications*, 15 N.Y.3d 285 (2010)). There are "two ways in which a nonresident may satisfy the impact requirement: (1) working in New York or (2) establishing that the challenged conduct had some impact on the plaintiff within the respective New York geographic boundaries." *Id.* at 452. "[T]he impact test [thus] 'expands' the protections of the Human Rights Laws 'to nonresidents who work in the' state or city and to those who 'state a claim that the alleged discriminatory conduct had any impact in either of those locations.'" *Id.* at 451–52 (internal citations omitted) (quoting *Hoffman*, 15 N.Y.3d at 290, 292). *Garcia v. ROC Nation LLC*, No. 1:24-CV-7587-GHW, 2025 WL 1865965, at *12 (S.D.N.Y. July 2, 2025).

i.  *Plaintiff Proffered Evidence the Discriminatory Conduct Impacted Him Within New York City and New York State*

In relation to his employment for the Pete Defendants, Plaintiff regularly attended meetings in New York City, as well as events where his photography services were required. Garcia Decl. ¶ 5. In order to attend these meetings and provide his services, Plaintiff remained in New York City for several days per month, and sometimes several weeks, at a time. Garcia Decl. ¶ 4. This fact alone allows Plaintiff to assert claims under the NYSHRL and NYCHRL as an employee spending a substantial amount of time working in New York.

Further, while physically located in New York City for work, Mr. Garcia had to attend Ms. Pete's surprise birthday party in New York. PRUMF No. 106. As part of the "festivities," Ms.

22

Pete, Mr. Garcia, and others went to a strip club called Sapphire. PRUMF No. 107. Mr. Garcia told multiple individuals that he believed going to the strip club for Ms. Pete's surprise birthday party constituted harassment PRUMF No. 109.

In a footnote, the Pete Defendants also attempt to argue that the underlying policy behind *Syeed* is inapplicable here, because Plaintiff produced no evidence that he has applied for and was denied from a Pete Defendants' New York based assignment for an unlawful reason, because he never intended to relocate to New York. *See*, Pete Defendants' MOL at p. 22, footnote 9.

However, this argument has been rejected by Second Circuit Courts on multiple occasions. For example, in *Ronen v. FlipCX, Inc.*, the Court rejected this exact argument that the *Syeed* test should only be applied to failure-to-promote or hire claims and exclude claims relating to wrongful termination. *Ronen v. FlipCX, Inc.*, No. 21-CV-2732 (RPK) (RML), 2025 WL 2590393, at *3 (E.D.N.Y. Sept. 8, 2025). The Court reasoned that the *Syeed* test does indeed apply in the discriminatory denial of "the *chance* to work and perhaps live in New York City." *Id.* at *3.

Similarly, in *Shiber v. Centerview Partners, LLC*, this Court held that a Plaintiff who worked remotely but would have been expected to work in person in New York City satisfied the *Syeed* test by showing that, but for her termination, she would have been expected to work in her employer's New York City offices. *Shiber v. Centerview Partners, LLC*, No. 21 CIV. 3649 (ER), 2024 WL 3274420, at *4 (S.D.N.Y. July 2, 2024). The Court reasoned that, based on the *Syeed* court's declination to narrowly construe the statutes, failure-to-promote claims and wrongful termination claims similarly allege a denial of the opportunity to work in New York and are thus appropriate to raise under the NYSHRL and NYCHRL. *Id.* at *4.

Here, Plaintiff was expected to work in New York roughly half of his time employed with Defendants. Garcia Decl. ¶ 4. The wrongful termination of his employment by Defendants undoubtedly restricted his ability and the opportunity to work in New York City, and eliminated the potential for him to relocate to New York in the future. Thus, the impact of the wrongful termination of his employment were felt in New York State as well as New York City.

23

ii.     *Plaintiff's Claims Need Not Be Limited to Conduct Occurring Within New*
        *York State or New York City*

Because Plaintiff spent a substantial amount of time working in New York City, conduct occurring outside of New York can form the basis for claims arising under the NYSHRL and NYCHRL, as addressed by this Court previously. *Garcia v. ROC Nation LLC*, No. 1:24-CV-7587-GHW, 2025 WL 1865965, at *12 (S.D.N.Y. July 2, 2025).   Plaintiff provides evidence for discriminatory conduct that occurred in several different locations that relate directly to his employment in New York.  Garcia Decl. ¶¶ 4, 5. Therefore, the incidents that occurred outside of New York relate to his employment in New York City and can provide a basis for claims arising under NYSHRL and NYCHRL.

**G. Genuine Disputes of Material Fact with Respect to Plaintiff's Retaliation Claims Under the NYSHRL, NYCHRL, and NYLL**

To bring a claim for retaliation under the NYSHRL and NYCHRL, a plaintiff must allege that "(1) [he] engaged in a protected activity as that term is defined under the NYCHRL, (2) [his] employer was aware that [he] participated in such activity, (3) [his] employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238,246 (N.Y. App. Div. 2d Dept. 2021).

i.     *Plaintiff Engaged in Protected Activity and the Pete Defendants were*
       *Aware of the Protected Activity*

"The New York Court of Appeals has held that 'opposing any practice' can include situations where a person, before the retaliatory conduct occurred, merely 'made clear her disapproval of the defendant's discrimination by communicating to him, in substance, that she thought his treatment of the victim was wrong.'" *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 112 (citing *Albunio v. City of New York*, 16 N.Y.3d 472, 479 (2011)).

Here, Plaintiff made his disapproval of Defendant Pete's behavior known by removing himself from the New York strip club during Pete's birthday party.  DEF SSUMF Nos. 106, 107.

24

Additionally, although not stating in such plain language as naming the act "discriminatory," Plaintiff made clear to Defendant Pete that the Ibiza incident made him uncomfortable, adequately asserting his disapproval of her behavior.  PRUMF No. 117.  Plaintiff also raised the issue of his wages to Roc Nation employees, such as Desiree Perez, who are directly associated with the Pete Defendants.  PRUMF No. 4.  Ms. Perez herself described Mr. Garcia's complaints about issues regarding his compensation.  PRUMF No. 40.  She testified he was calling and emailing everyone all the time, calling his lawyer, having his lawyer call Sean Riddle at Roc Nation. *Id.* Further, Plaintiff discussed his concerns at an additional time during his Facetime conversation with Defendant Pete prior to his wrongful termination.  PRUMF No. 131.  Further still, Plaintiff's actions in leaving Pete's birthday party, which he testified was discriminatory, and several conversations expressing his various concerns of discrimination and unpaid wages put the Pete Defendants on notice of his engagement in protected activity.

      ii.      *<u>The Pete Defendants Engaged in Conduct that Deterred Plaintiff from Engaging in Protected Activity</u>*

The Pete Defendants engaged in retaliatory behavior that restricted Plaintiff's ability to engage in additional protected activity. On the morning following the SUV incident in Ibiza, Pete strictly ordered Plaintiff never to bring up the incident again. PRUMF No. 114.  Further, Plaintiff testified that Pete had a repetitive habit of firing or discontinuing employment with individuals who complained or who refused to work on a particular assignment.  PRUMF No. 2.  Plaintiff additionally testified that this behavior routinely deterred him from confronting Pete on a more regular basis or bringing any of the unlawful conduct to the attention of other employees of the Defendants. PRUMF No. 114; Ex. A (Pl. Garcia Tr. Vol. 1 130:6-15).  Therefore, Defendant Pete's behavior specifically deterred Plaintiff from engaging in further protected activity.

      iii.      *<u>ii. Plaintiff was Terminated as a Result of his Engagement in Protected Activity</u>*

Following Plaintiff's FaceTime conversation with Defendant Pete, Plaintiff was notified that he would not be working with the Defendants anymore.  PRUMF No. 132.  This termination

from his employment came as a direct result of Plaintiff's complaints to Pete and others that he was uncomfortable in the workplace and that he was not being paid all the wages he was owed. *Id.* Thus, Plaintiff's termination directly connects to his protected activity and adequately alleges a retaliation cause of action under NYSHRL and NYCHRL.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Roc Nation's Motion for Summary Judgment in its entirety.

Dated: December 11, 2025

Respectfully Submitted,
VALIANT LAW

By:   /s/ *Joseph Jeziorkowski*

      Joseph Jeziorkowski, Esq.
      Daniel Folchetti, Esq.
      *Attorneys For Plaintiff*
      *Emilio Garcia*
      2975 Westchester Ave, Suite 418
      Purchase, NY 10577
      914-730-2422
      jjj@valiantlaw.com
      dcf@valiantlaw.com

WEST COAST TRIAL LAWYERS, APLC

By:   /s/ *Ronald L. Zambrano*

      Ronald L. Zambrano, Esq. (*pro hac vice*)
      *Attorneys For Plaintiff*
      *Emilio Garcia*
      1147 South Hope Street
      Los Angeles, CA 90015
      213-927-3700
      ron@westcoasttriallawyers.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 11, 2025, I served the foregoing Plaintiff's Opposition to the Pete Defendants' Motion for Summary Judgment by electronic mail upon the following counsel of record for Defendants:

| | |
|---|---|
| Michael R. Kleinmann, Esq.<br>  *mkleinmann@reedsmith.com*<br>Charlyn Jones<br>  *charlyn.jones@reedsmith.com*<br>Corrie Buck<br>  *cbuck@reedsmith.com*<br>REED SMITH LLP<br>355 South Grand Avenue, Suite 2900<br>Los Angeles, California 90071 | Counsel for Defendant,<br>ROC NATION LLC |
| Jordan W. Siev, Esq. (*pro hac vice*)<br>  *jsiev@reedsmith.com*<br>REED SMITH LLP<br>599 Lexington Avenue<br>New York, New York, 10022 | |
| Mari F. Henderson, Esq.<br>  *marihenderson@quinnemanuel.com*<br>Janet C. Shamilian, Esq.<br>  *janetshamilian@quinnemanuel.com*<br>Julian T. Schoen, Esq.<br>  *julianschoen@quinnemanuel.com*<br>Gabby Trevino<br>  *gabbytrevino@quinnemanuel.com*<br>Lucille Clavel<br>  *lucilleclavel@quinnemanuel.com*<br>Joanna Menillo<br>  *joannamenillo@quinnemanuel.com*<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, California 90017 | Counsel for Defendants,<br>MEGAN THEE STALLION,<br>HOT GIRL TOURING, LLC, and<br>MEGAN THEE STALLION<br>ENTERTAINMENT, INC. |
| Alex B. Spiro, Esq. (*pro hac vice*)<br>  *alexspiro@quinnemanuel.com*<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010-1601 | |

/s/ *Marlyn Cortez*
Marlyn Cortez
*Assistant to Plaintiff's Counsel*

1

2

Ronald L. Zambrano, Esq. (*pro hac vice*)