UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMILIO GARCIA,

                                          Plaintiff,

        -against-

                                                        Civil Action No. 1:24-cv-07587-GHW

ROC NATION LLC, a Delaware business
organization; HOT GIRL TOURING, LLC, a
Delaware business organization; MEGAN THEE
STALLION ENTERTAINMENT, a Delaware
business organization; MEGAN THEE STALLION,
an individual; and DOES 1 through 10, inclusive.

                                          Defendants.


**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT ROC**

**NATIONS MOTION FOR SUMMARY JUDGMENT**

**TABLE OF CONTENTS**

I.   INTRODUCTION ...................................................................................................... 1

II.   FACTUAL BACKGROUND ...................................................................................... 2

III.   LEGAL STANDARD FOR SUMMARY JUDGMENT ............................................ 5

IV.   LEGAL ARGUMENT ............................................................................................... 6

   A.   Roc Nation's Motion Concedes Plaintiff was Not an Independent Contractor Under California Law ............................................................................................................. 6

   B.   Roc Nation was a Joint Employer of Plaintiff Under California Law .............................. 7

      i.   Standard for Wage and Hour Claims ............................................................................ 7

   C.   Genuine Disputes of material fact Remain with Respect to Plaintiff's Wage and Hour Claims ............................................................................................................................. 12

   D.   Genuine Disputes of Material Fact Remain with Respect to Plaintiff's California Claim Under Labor Code 1102.5 and Labor Code 98.6. ....................................................... 13

   E.   Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Unfair Business Practices Claim ............................................................................................................. 15

   F.   Genuine Disputes of Material Fact Remain with Respect to Plaintiff's New York Claims 16

      i.   Plaintiff's New York Labor Law Claims. ..................................................................... 16

      ii.   Roc Nation Exercised Formal Control Over Plaintiff. ................................................. 17

      iii.   Roc Nation Exercised Functional Control Over Plaintiff. ......................................... 18

   G.   Plaintiff's New York State and City Human Rights Law Claims. .................................. 19

V.   CONCLUSION ........................................................................................................ 20

**TABLE OF AUTHORITIES**

**Case**                                                                                                    **Page(s)**

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 ................................................................... 6

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ............................................................... 14

*Demirovic v. Ortega*, 2017 WL 5196240 ................................................................. 18, 19

*Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903 (2018) ......................................... 7, 8, 14

*Garcia v. Border Transportation Grp.*, LLC, 28 Cal. App. 5th 558 (2018)................................. 10

*Garcia v. Seacon Logix, Inc.*, 238 Cal. App. 4th 1476 (2015) ................................................ 12, 13

*Griffin v. Sirva, Inc.*, 29 N.Y.3d 174 (2017)..................................................................... 21

*Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901 (S.D.N.Y. 2013) ............................... 18, 20

*Hunt v. Cromartie*, 119 S. Ct. 1545 (1999) ..................................................................... 7

*Martinez v. Combs*, 49 Cal. 4th 35 (2010)..................................................................Passim

*Mattei v. Corp. Mgmt. Sols., Inc.*, 52 Cal. App. 5th 116 (2020)............................................. 11, 12

*N.S. v. Kan. City Bd. of Police Comm'rs*, 143 S. Ct. 2422................................................... 6

*Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099 (9th Cir. 2000)............. 8

*Noe v. Superior Court*, 237 Cal. App. 4th 316 (2015).................................................... 15

*Pinder v. Emp. Dev. Dep't*, 227 F. Supp. 3d 1123 (E.D. Cal. 2017) ...................................... 15, 16

*Poller v. Columbia Broad. Sys.*, 368 U.S. 464 (1962)...................................................... 7

*Pullman-Standard v. Swint*, 456 U.S. 273 (1982).......................................................... 7

*Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133...................................................... 6

*Salinas v. Cornwell Quality Tools Co.*, 635 F. Supp. 3d 954 (C.D. Cal. 2022) ........................ 7, 8

*Tolan v. Cotton*, 572 U.S. 650 ................................................................................. 6

*Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106 (9th Cir. 2021) ................................. 8

*Woodman v. Haemonetics Corp.*, 51 F.3d 1087 (1st Cir. 1995)........................................... 7

*Yanowitz*, 36 Cal. 4th ......................................................................................... 16

**Statutes**                                                                                                **Page(s)**

Cal. Lab Code §98.6 ...................................................................................... 15, 16

*California Labor Code* section 2810.3 ........................................................................................ 15

California Labor Code sections 1102.5 and 98.6.................................................................... 15, 16

California Labor Code § 2775 ................................................................................................ 7, 14

N.Y. Exec. L. § 296-d.............................................................................................................. 22

subdivision (a) of Section 1102.5 ........................................................................................... 16

**Other Authorities**                                                                                          **Page(s)**

Factors 2 through 4 ................................................................................................................. 21

Tr. 198....................................................................................................................................... 22

Tr. at 69..................................................................................................................................... 3

Tr. at 125................................................................................................................................... 4

### I.    INTRODUCTION

This case arises of out Plaintiff Emilio Garcia's (hereinafter "Mr. Garcia") work with the Pete Defendants and Roc Nation.  Mr. Garcia worked for Megan the Stallion (Hereinafter "Ms. Pete" or "Defendant Pete") as a photographer beginning in 2018 and worked for her continuously for many years.  He captured footage of her behind the scenes, for endorsements on social media, for a web series,  and more.  In 2019, Defendant Pete had Mr. Garcia quit his full time job to work for her.   In March of 2020, Mr. Garcia signed a contract that declared him an independent contractor for Defendant Pete.  However, Defendant Pete would go on to severely limit his ability to practice photography, as she made it clear that she did not want her team working with other artists in the industry and wanted others to know that they could not hire her team.  This limitation under threat of termination by no longer booking the team members.  Thus, Mr. Garcia was only permitted to work non-industry, local gigs that lined up with Defendant Pete's schedule or occurred while she was on hiatus.

In September of 2019, Defendant Pete signed an artist management agreement with Roc Nation, pursuant to which Roc Nation managed aspects of her business and brand deals.  Under the agreement, Roc Nation did not make money unless Defendant Pete made money, so they did anything necessary to support her.  Roc Nation eventually began exercising control over Mr. Garcia.  In August of 2022, Roc Nation determined that the business processing Defendant Pete's invoices was overwhelmed and decided to help.  At that time, Mr. Garcia began having difficulty getting paid. Contrary to Mr. Garcia's prior payment arrangement, Roc Nation determined that he should not get paid for hours that he was remote and on call but not physically present, he should receive a different rate of pay when he edited versus being physically present, and determined his per diem.  They would also tell him things needed to be done and direct him to do it immediately. Things began to get tense, and Roc Nation eventually described Mr. Garcia as a "problem."

In June of 2023, Defendant Pete discovered text messages between Mr. Garcia and her makeup artists that she deemed offensive.  She called Mr. Garcia on Facetime, yelled at him, called him a "lazy bitch" and finished the conversation by yelling, "we're good."  Although Defendant

Pete states that she did not tell Roc Nation she no longer wanted to work with Mr. Garcia, Roc Nation sent a text to Mr. Garcia retracting a previous offer to work at Essence Festival. He then received word that he was terminated and now brings this suit arising out of misclassification, discrimination, and violation of labor laws.

## II.     FACTUAL BACKGROUND

Megan Pete is an artist from Houston, Texas, who performs under the stage name Megan Thee Stallion. PRUMF No. 1. Defendant Pete is the owner of MTS Ent. And the sole member of HGT. PRUMF No. 2-3. One of the ways Ms. Pete earns revenue is through engaging in brand deals. Def. SSUMF No. 1. Plaintiff Emilio Garcia began working for Defendant Pete as a photographer in 2018. Over the course of Mr. Garcia's employment with the Defendants, Mr. Garcia worked about fifty (50%) to sixty percent (60%) of the time in Los Angeles, California, forty (40%) to 50% in New York, and the remaining five (5%) to ten percent (10%) traveling in other locations with Defendant Pete. Garcia Decl. ¶ 4.

Defendant Pete initially expected Mr. Garcia to record her performances and take pictures. PRUMF No. 79. Over the years, Mr. Garcia captured photos and video footage of Defendant Pete behind the scenes, during performances, shooting for endorsements, and web series, amongst other things. PRUMF No. 79. Defendant Pete's social media accounts constitute pictures of her, behind the scene footage, videos of her performances, and music videos. Defendant Pete has endorsements and advertisements that run on her social media, and the content includes footage captured by Mr. Garcia. PRUMF No. 79.

Defendant Pete asked Pl. Garcia to stop working his full-time job with the City of Houston in July of 2019. PRUMF No. 53. On March 1, 2020, Mr. Garcia signed an agreement with HGT that named him an independent contractor. Def. SSUMF No. 18. However, according to what Defendant Pete would tell Pl. Garcia, Pl. Garcia believed Defendant Pete to be his boss and him to be Defendant Pete's employee. PRUMF No. 53. In 2021 and part of 2022, Pl. Garcia sent the same invoice "as if it were salary," regardless of the number of hours he was working or if he was at home. PRUMF No. 53. Defendant Pete conveyed to her team, including Pl. Garcia and

2

Alejandra Garcia, that she wanted her team to be solid and exclusive, meaning that other artists know they cannot hire them. It was understood that, if they worked with an artist of which Defendant Pete did not approve, they would not be booked again. When asked if she ever told Pl. Garcia that she did not want him to provide services to other artists, Defendant Pete responded:

> I will say this:· Me and Emilio were very close, so he knew that me, as a female rapper, a lot of us have our own teams that we work with frequently.· We don't really like to share a lot of hairstylists, makeup artists, like your close personal team.· Like, you don't really like for other girls to look the way you look. So obviously female rapping is very competitive.· I don't feel like there couldn't have been a time where I told -- where I said ·something like, I don't want other girls to look like me.· I don't want other girls to have what I have.· I can't say that I didn't say those things, but I never told him you can't work with other artists.· But I wouldn't like it if he worked with other female rappers because you work so closely with me every day, and I don't want other girls to have my look.· But if he went -- he shot one of my friends that's a female rapper.· I didn't have a problem with that.· She just didn't like his pictures.· So I don't know if girls weren't using him because they didn't want to or if we just all have that female code of that's your team, those are your people.

PRUMF No. 53. Defendant Pete also made it clear to Mr. Garcia that she was to be his priority, and she was only okay with him taking gigs if the schedule lined up and he happened to coincidentally be free. Ex. A (Pl. Garcia Tr. at 69:23-24). Thus, while Mr. Garcia had established a stage name of Emilio Coochie, which he used both for photography and for performing as a performance artist, Mr. Garcia was not able to freely solicit photography work, and was limited to only non-industry, local gigs that did coincided with Defendant Pete's schedule or occurred when she took a hiatus. PRUMF No. 56. At some point, Pl. Garcia began talking about quitting. Ex. B (Pete Tr. at 125:17-25).

Around September of 2019, Roc Nation entered into an artist management contract with Defendant Pete. Def. SSUMF No. 6. In its role for Defendant Pete, Roc Nation manages the business aspect of Defendant Pete's career, including brand deals. Def. SSUMF No. 6. Roc Nation does not make money unless Defendant Pete makes money, so Roc Nation supports Defendant Pete in any way it can. PRUMF No. 6. Defendant Pete testified that she sometimes reviewed each of Pl. Garcia's invoices, and other times she would delegate the task to Desiree Perez of Roc Nation. PRUMF No.  Around August of 2022, although Rockefeller was the business management

3

firm in charge of processing invoices, Roc Nation determined Rockefeller to be overwhelmed and decided to "lean in" and assist with handling invoices, including communicating with vendors, cleaning them up, and ensuring they were clear. PRUMF No. 6. Around this time, Mr. Garcia began to have problems receiving payment and had reached out many times to get paid—ultimately bringing his attorney in to assist. PRUMF No. 41. Roc Nation's CEO, Desiree Perez, described Mr. Garcia as a "problem" because he kept reaching out. PRUMF No. 41. Ms. Perez ultimately determined that Mr. Garcia should not be paid for work when he was not present but was on call for editing, should be paid a different rate for editing than for work performed in person, decided Mr. Garcia's per diem rate, and determined that three days off was a fair number. PRUMF No. 6. Defendant Pete has no recollection of having a conversation in which it was determined that Pl. Garcia would only be paid when he was physically present, no recollection of anyone asking her if Mr. Garcia could be paid for things beyond taking pictures and videos, and no memory of not approving something on an invoice because Pl. Garcia had not done it. PRUMF No. 6. Pl. Garcia was expected to be on call 24/7. Sometimes, a representative from Roc Nation would call Pl. Garcia and tell him that something needed to be done. When he would ask if he could do it later because he was at dinner, they would say it needed to be done at that moment. PRUMF No. 53.

Furthermore, Roc Nation obtained the camera equipment needed for the shoot after Mr. Garcia simply provided a list of what they used last time. PRUMF No. 6. Managers at Roc Nation provided direction on edits for projects on which Mr. Garcia was working, which Pl. Garcia raised in a message thread with Roc Nation and Defendant Pete. PRUMF No. 6. Manager Sam from Roc Nation assigned Mr. Garcia a project to do a "Takeover" for Dolce and Gabbana. PRUMF No. 6. Jess from Roc Nation states that Emilio could do project capturing images with Defendant Pete and her nanny, despite initial suggestion that another photographer take the photos. PRUMF No. 6. Sometimes, a representative from Roc Nation would call Pl. Garcia and tell him that something needed to be done. When he would ask if he could do it later because he was at dinner, they would say it needed to be done at that moment. Defendant Pete and Roc Nation would also

instruct him to attend meetings at Roc Nation headquarters in New York City, where they directed him to prepare a creative proposal to present at the meetings. Garcia Decl. ¶ 5. He would also receive training through these creative meetings. PRUMF No. 70.

In June of 2023, Defendant Pete discovered text messages on the cell phone of her makeup artist, Alejandra Garcia, between Ms. Garcia and Mr. Garcia. Def. SSUMF No. 51. Defendant Pete interpreted these text messages as speaking negatively about her, called Mr. Garcia on Facetime, yelled at him about wanting to quit on her, called him a "lazy bitch," and yelling, "We're good!" before hanging up the phone. PRUMF No. 52. Defendant Pete testified that she did not advise Roc Nation that she no longer wanted to work with Mr. Garcia; however, Roc Nation retracted an offer for Pl. Garcia to work for Defendant Pete at Essence Festival. PRUMF No. 52. Mr. Garcia was later informed of his termination by a representative at Roc Nation, named Renika. PRUMF No. 52

## III.    LEGAL STANDARD FOR SUMMARY JUDGMENT

The standard for summary judgment in U.S. federal courts, as articulated by the U.S. Supreme Court, requires that the court view the evidence in the light most favorable to the non-moving party. Summary judgment is appropriate only if the movant demonstrates that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law. The court must draw all reasonable inferences in favor of the non-moving party and may not weigh the evidence or make credibility determinations, as these are functions reserved for the jury. *Reeves v. Sanderson Plumbing Prods.*, 530 U.S. 133. This principle underscores the importance of preserving the jury's role in resolving factual disputes. *N.S. v. Kan. City Bd. of Police Comm'rs*, 143 S. Ct. 2422, *Tolan v. Cotton*, 572 U.S. 650.

A dispute about a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. The trial judge's role is not to weigh the evidence but to determine whether there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242.

5

At the summary judgement stage, the trial court must review the entire record but disregard evidence favorable to the moving party that the jury is not required to believe. The court must give credence to evidence favoring the nonmovant and to uncontradicted and unimpeached evidence from disinterested witnesses. Thus, if defendant's evidence is contradicted, or comes from an interested witness, it cannot be credited unless it is favorable to the plaintiff. *Reeves v. Sanderson Plumbing, Inc.*, 530 U.S. 133, 150 (2000) (emphasis added).

When the disputed issue turns on a question of motive and intent "jury judgments about credibility are typically thought to be of special importance." *Woodman v. Haemonetics Corp.*, 51 F.3d 1087, 1091 (1st Cir. 1995) ("No credibility assessment may be resolved in favor of the party seeking summary judgment."); *see, Poller v. Columbia Broad. Sys.*, 368 U.S. 464, 473 (1962) (summary judgment procedures should be used sparingly where the issues of motive and intent play a role); *Pullman-Standard v. Swint*, 456 U.S. 273, 288-90 (1982) (discriminatory intent is a factual matter for the trier of fact).

Even when the facts are not in dispute, summary judgment should be denied if competing inferences can be drawn from the undisputed facts on material issues. *Hunt v. Cromartie*, 119 S. Ct. 1545, 1551-52 (1999). (explaining that "[w]here reasonable inferences from undisputed facts can be drawn in favor of either party, it is error for the district court to resolve the disputed fact of motivation at the summary judgment stage").

IV.    **LEGAL ARGUMENT**

A.    **Roc Nation's Motion Concedes Plaintiff was Not an Independent Contractor Under California Law**

Whether a worker is an employee or independent contract for the purposes of wage orders—including minimum wages, maximum hours, and basic working conditions—is addressed in the ABC test put forth in *Dynamex Operations W. v. Superior Ct.*, 4 Cal. 5th 903, 957 (2018) and later codified as California Labor Code § 2775. *See Salinas v. Cornwell Quality Tools Co.*, 635 F. Supp. 3d 954, 964–65 (C.D. Cal. 2022). Pursuant to this test, workers are presumed employees unless the business can prove *all* of the following: "(1) the worker is free from the

6

control and direction of the hiring entity; (2) the worker performs work that is outside the usual course of the hiring entity's business; (3) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed." Cal. Lab. Code § 2775; *Dynamex Operations W.*, 4 Cal. 5th at 916-917; *Salinas*, 635 F. Supp. 3d at 964–65. Further, "the ABC test is conjunctive, so a finding of any prong against the hiring entity directs a finding of an employer-employee relationship." *Vazquez v. Jan-Pro Franchising Int'l, Inc.*, 986 F.3d 1106, 1125 (9th Cir. 2021).

As with in their prior Motion to Dismiss, Roc Nation **again** does nothing to address the required burden under the ABC test—failing to cite *Dynamex* or the pertinent history scheme. Instead, Roc Nation addresses only whether it should be considered a "joint employer" pursuant to *Martinez v. Combs*, 49 Cal. 4th 35, 75 (2010). Therefore, Roc Nation has legally conceded that Plaintiff was not an independent contractor.

Given that Roc Nation fails to legally dispute that Mr. Garcia was direct employee of Roc Nation, Roc Nation's motion for summary judgment must fail as a matter of law and an analysis of Roc Nation as a joint employer is not necessary. *Nissan Fire & Marine Ins. Co. v. Fritz Companies, Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000) ("If a moving party fails to carry its initial burden of production, the non-moving party has no obligation to produce anything, even if the non-moving party would have the ultimate burden of persuasion at trial."). However, in the event that the Court so requires, Plaintiff Garcia includes the below substantive argument regarding joint employment.

**B.      Roc Nation was a Joint Employer of Plaintiff Under California Law**

i.        *Standard for Wage and Hour Claims*

Even if the Court finds that Roc Nation is not Mr. Garcia's direct employer under *Dynamex*, Roc Nation is Mr. Garcia's joint employer under California law. *See Martinez*, 49 Cal. 4th at 75. Multiple entities may be employers where they "control different aspects of the employment relationship." *Id.* For wage and hour claims under California law, the governing standard is the three-part test established in *Martinez*. *Id.* Under this test, an entity is considered an employer if

7

it: (1) exercises control over the wages, hours, or working conditions of the employee; (2) suffers or permits the employee to work; or (3) engages the employee, thereby creating a common law employment relationship. *Id.* As discussed below, Plaintiff has proffered evidence to establish Roc Nation as a joint employer under this test.

<em><strong>a)    Roc Nation Exercised Control over Plaintiff's Wages, Hours, and Working Conditions</strong></em>

The Court clarified that the first prong imposes liability on entities that directly, indirectly, or through an agent exercise control over the worker's wages, hours, or working conditions. *Martinez*, 49 Cal. 4th at 71. This definition is broad and does not require control over all three—control over any one of them suffices. *Martinez*, 49 Cal. 4th at 71.

Here, Roc Nation exercised control over Mr. Garcia's pay. Although Rockefeller was handling the processing of invoices for vendors, Roc Nation perceived Rockefeller to be overwhelmed and decided to "lean in" and help with the process of handling invoices, including communicating with vendors, cleaning them up, and ensuring that they were clear. PRUMF No. 4. However, Roc Nation did more than simply ensure invoices were clear and communicate with Mr. Garcia. Defendant Pete testified that she sometimes reviewed each of Mr. Garcia's invoices, and other times, she would delegate the task to Roc Nation. PRUMF No. 9. CEO of Roc Nation, Desiree Perez, determined that Mr. Garcia should be paid at a different rate for editing than when he was physically present. PRUMF No. 4. Further, although Mr. Garcia advised Ms. Perez that he was always paid for the hours he was remote and on call for edits and support, Ms. Perez determined that Mr. Garcia should only be paid for hours that Mr. Garcia was physically present. PRUMF No. 4. Although Roc Nation claims that it had no discretion and only followed Defendant Pete's direction regarding paying Mr. Garcia, Defendant Pete has no recollection of having a conversation in which it was determined that Mr. Garcia would only be paid when he was physically present. PRUMF No. 25. Ms. Perez of Roc Nation also determined that Mr. Garcia should not be paid for certain hours because she believed someone else was doing the same work; whereas, Defendant Pete had no memory of not approving something on an invoice because Mr.

8

Garcia had not done it.  PRUMF No. 39.  Roc Nation also determined Mr. Garcia's per diem. PRUMF No. 32.

Roc Nation also exercised control over Mr. Garcia's hours.  For example, Mr. Garcia testified that he would receive a call from a representative of Roc Nation telling him that something needed to be done.  When he would ask if he could do it later because he was at dinner, they would say it needed to be done at that moment.  PRUMF No. 9.  Roc Nation also determined that Mr. Garcia receiving three days off a month felt fair.  PRUMF No. 32.  Accordingly, a reasonable jury will find that Roc Nation exercised control over Mr. Garcia's wages and hours.

<strong>b)        <em>Roc Nation "suffered or permitted" Plaintiff to Work</em></strong>

The "suffer or permit to work" standard imposes liability on a proprietor who knowingly allows work to occur under their business without taking steps to prevent it, even in the absence of a formal employment relationship.  *Martinez*, 49 Cal. 4th at 70.  This interpretation ensures that the IWC's wage orders provide broad protection to workers in California.  *Garcia v. Border Transportation Grp.*, LLC, 28 Cal. App. 5th 558, 571 (2018).  It imposes a duty on business proprietors to prevent work from occurring under unlawful conditions. Specifically, a proprietor who knows that individuals are working in their business without being formally hired, or while being paid less than the minimum wage, "clearly suffers or permits that work by failing to prevent it, while having the power to do so."  *Id.*; *Martinez*, 49 Cal. 4th at 70.

In this case, Roc Nation not only permitted Mr. Garcia to perform work for them, Roc Nation directed him to do so.  Roc Nation's argument that any work Mr. Garcia performed was solely for Defendant Pete must fail.  Roc Nation earns its money by promoting the career of artists through branding deals and general support, as well as by helping its clients "in any way it can." PRUMF No. 4.  Roc Nation did not make money unless Defendant Pete made money, so Roc Nation provided direction to ensure that Defendant Pete *and* Roc Nation made money.  PRUMF No. 4.  Thus, to assist Roc Nation with supporting Defendant Pete, her brand deals, and any other way that Roc Nation decides to support Defendant Pete is also to perform work for Roc Nation— especially when Defendant Pete did not direct Roc Nation to give assignments to Mr. Garcia.  Roc

9

Nation would also assign projects to Mr. Garcia. For example, Roc Nation manager, Sam Riddle, assigned Mr. Garcia a project to do a "Takeover" for Dolce and Gabbana. PRUMF No. 4. In another example, Jess from Roc Nation states that Emilio could do project capturing images with Defendant Pete and her nanny, despite initial suggestion that another photographer take the photos. PRUMF No. 6. Evidence shows that managers at Roc Nation would also direct edits for projects on which Mr. Garcia was working, and Mr. Garcia raised the issue in a text thread, which a reasonable jury will infer was to get permission not to include. PRUMF No. 4.

Further, a triable issue of material fact remains as to whether Roc Nation had the authority to terminate, and did terminate, Mr. Garcia, thus establishing that Roc Nation had the authority to halt the work. *See Martinez*, 49 Cal. 4th at 70 (noting that power to fire establishes that a business suffered or permitted work). Defendant Pete testified that she did not advise Roc Nation that she no longer wanted to work with Pl. Garcia; however, Roc Nation retracted an offer for Mr. Garcia to work for Defendant Pete at Essence Festival. Def. SSUMF No. 54; PRUMF Nos. 17, 52.

### c) Roc Nation "engaged" Plaintiff

The legal meaning of "to engage" as used in the definition of "employ" under the test established in *Martinez*, is to create a common law employment relationship. *Martinez*, 49 Cal. 4th at 64; *Mattei v. Corp. Mgmt. Sols., Inc.*, 52 Cal. App. 5th 116, 124–25 (2020). Specifically, the California Supreme Court in *Martinez* interpreted the term "to engage" to have no other apparent meaning within the context of the Industrial Welfare Commission (IWC) wage orders than its plain, ordinary sense of "to employ," which is to establish a common law employment relationship. *Id.*

The common law employment relationship, as referenced in *Martinez*, focuses on the right to control the manner and means by which the worker accomplishes the work. *Martinez*, 49 Cal. 4th at 64. The Court emphasized that this definition ensures that the IWC's wage orders extend their regulatory protection to workers whose employment status might not be recognized under the common law, while still covering regularly hired employees. *Id.* The common law employment test also considers many secondary factors, including "(1) whether the worker is engaged in a

10

distinct occupation or business, (2) whether, considering the kind of occupation and locality, the work is usually done under the principal's direction or by a specialist without supervision, (3) the skill required, (4) whether the principal or worker supplies the instrumentalities, tools, and place of work, (5) the length of time for which the services are to be performed, (6) the method of payment, whether by time or by job, (7) whether the work is part of the principal's regular business, and (8) whether the parties believe they are creating an employer-employee relationship." *Garcia v. Seacon Logix, Inc.*, 238 Cal. App. 4th 1476, 1484 (2015).  Accordingly, any agreement between the parties, or lack thereof, is irrelevant if the parties' conduct establishes a different relationship. *Id.*  "The individual factors cannot be applied mechanically as separate tests; they are intertwined and their weight depends often on particular combinations." *Id.* at 1486.

In this case, a triable issue of fact exists as to whether Roc Nation exercised control over Mr. Garcia in terms of how he carried out his projects.  For example, Mr. Garcia had meetings at Roc Nation where he received creative direction on how to edit videos.  PRUMF No. 67.  Managers at Roc Nation would also direct edits for projects on which Mr. Garcia was working.  PRUMF No. 4.  While Roc Nation argues that Mr. Garcia was free to override them, Mr. Garcia did not simply override and move on.  Rather, he raised the issue in a message thread with Roc Nation and Defendant Pete, from which a reasonable jury can infer that he was seeking permission not to include.  PRUMF NO. 4.  Roc Nation obtained the camera equipment needed for the shoot after Mr. Garcia simply provided them with a list of the equipment they rented last time.  PRUMF No. 4.  Roc Nation would also assign projects to Mr. Garcia.  For example, Roc Nation manager, Sam Riddle, assigned Mr. Garcia a project to do a "Takeover" for Dolce and Gabbana.  PRUMF No. 4.  In another example, Jess from Roc Nation states that Emilio could do project capturing images with Defendant Pete and her nanny, despite initial suggestion that another photographer take the photos.  PRUMF No. 6.

Regarding the secondary factors, as discussed above, Roc Nation's earned money through brand deals and general support, and Mr. Garcia's photography, videography, and editing directly benefitted Roc Nation in its regular course of business.  For example, Roc Nation recruited Mr.

Garcia to assist with the execution of a brand deal for Dolce and Gabbana.  PRUMF No. 4.  Mr. Garcia's job required photography skills and creativity, and Roc Nation provided Mr. Garcia with further training through creative meetings in their offices.  PRUMF No. 67.  Roc Nation acquired the camera equipment that Mr. Garcia needed after Mr. Garcia simply provided a list of what they used "last time."  PRUMF No. 68.  Further, as stated above, a triable issue of fact remains about whether Roc Nation had the authority to, and did, terminate Mr. Garcia.  PRUMF Nos. 17, 52; *see Garcia*, 238 Cal. App. 4th at 1486-87 ("Strong evidence in support of an employment relationship is the right to discharge at will, without cause.").

Accordingly, a reasonable jury will find that Roc Nation exercised sufficient control over the manner and means in which Mr. Garcia performed his work such that they created an employment relationship under common law.

### C.    Genuine Disputes of material fact Remain with Respect to Plaintiff's Wage and Hour Claims

Roc Nation put forth no argument to dispute Plaintiff's allegations that it was directly engaged in the conduct amounting to violations of meal and rest break provisions, failure to pay overtime, provision of inaccurate wage statements, and failure to pay all applicable waiting time penalties. Instead, Roc Nation simply states that Plaintiff cannot establish obligations on the part of Roc Nation without any further explanation, facts, or legal authority. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986) ("The party moving for summary judgment bears the initial burden of establishing the absence of a genuine issue of material fact and can satisfy this burden by presenting evidence that negates an essential element of the non-moving party's case.").

As stated above, Roc Nation had an obligation as Mr. Garcia as Mr. Garcia's direct employer under *Dynamex*, and Roc Nation fails to negate this argument.  *See California Labor Code* § 2775; *Dynamex Operations West, Inc. v. Sup.Ct. (Lee)*, 4 Cal.5th 903, 916-917, 956-957 (2018) (holding that, for ROC NATION to meet its burden under the "ABC test," Roc Nation must establish three factors: (A) the worker is free from the control and direction of the hiring entity in connection with the performance of the work, both under the contract for the performance of the

work and in fact; *and* (B) the worker performs work that is outside the usual course of the hiring entity's business; *and* (C) the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed).  Because Roc Nation has failed to establish all three of these factors and triable issues of fact remain, Roc Nation's motion for summary judgment must be denied as a matter of law.

Further, while as a joint employer, Roc Nation is not *automatically* jointly liable for the *California Labor Code* violations of its co-joint employer, it is liable for conduct which it directly engaged.  *Noe v. Superior Court*, 237 Cal. App. 4th 316, 333-34 (2015).  Joint employers share liability for Labor Code violations if they are found to have exercised control over the wages, hours, or working conditions of employees. However, joint liability does not automatically apply; it depends on the specific duties imposed by the relevant Labor Code provisions. For instance, under *California Labor Code* section 2810.3 a client employer may share liability with a labor contractor for wage and hour violations and workers' compensation obligations See Cal. Lab. Code § 2810.3; *Noe*, 237 Cal. App. 4th at 333-34)

As discussed above, Roc Nation exercised control over Mr. Garcia's wages, hours and working conditions. PRUMF Nos. 4, 6, 25, 39.  For example, Roc Nation handled the invoices for payment submitted by Plaintiff, provided Plaintiff with his hourly schedule for events (leaving no room for rest/meal breaks), and dictated how/when Plaintiff would be paid and for which work he would be paid.  PRUMF Nos. 4, 6, 25, 39.  Further, given that Roc Nation directly negotiated with Mr. Garcia for his pay increase and contract terms in June of 2022, Roc Nation "voluntarily and knowingly misclassified" Mr. Garcia.  *See Noe*, 237 Cal. App. 4th at 333-34.

**D.      Genuine Disputes of Material Fact Remain with Respect to Plaintiff's California Claim Under Labor Code 1102.5 and Labor Code 98.6.**

Retaliation claims under California Labor Code sections 1102.5 and 98.6 have three components to establish a *prima facie* case.  A plaintiff may meet his burden of proof for a claim of retaliation by showing, by a preponderance of the evidence: (1) involvement in protected activity such as reporting conduct in violation of state or federal law; (2) an adverse employment

action, and (3) a causal link between the protected activity and the adverse action. Cal. Lab Code §1102.5; Cal. Lab Code §98.6; *Pinder v. Emp. Dev. Dep't*, 227 F. Supp. 3d 1123, 1147 (E.D. Cal. 2017). An adverse action is any action that "materially affect[s] the terms, conditions, or privileges of employment." *Yanowitz*, 36 Cal. 4th at 1047. "A plaintiff opposing a motion for summary judgment on retaliation claims under . . . §§ 98.6 and 1102.5 of the California Labor Code may use the *McDonnell Douglas* burden shifting framework." *Pinder*, 227 F. Supp. 3d at 1147. Accordingly, "once the prima facie case is established, the burden of production shifts to the employer to present a legitimate, non-retaliatory reason for the adverse employment action." *Id.* "If the employer carries this burden, a plaintiff must demonstrate a genuine issue of material fact as to whether the reason advanced by the employer is pretext for retaliation." *Id.*

Under subdivision (a) of Section 1102.5, an employer is prohibited from retaliating against an employee who discloses information to a government or law enforcement agency, a person with authority over the employee, or another employee with authority to investigate or correct the violation, if the employee has reasonable cause to believe that the information discloses a violation of a state or federal statute, or a local, state, or federal rule or regulation. Since FEHA and the Labor Code are state statutes, reporting violations of either would fall within the scope of this protection. Cal Lab Code § 1102.5. Similarly, California Labor Code section 98.6 explicitly prohibits employers from retaliating against employees for engaging in protected activities, including asserting their rights under the Labor Code. Reporting violations of the California Fair Employment and Housing Act (FEHA) and/or the California Labor Code is considered a "protected activity" under California Labor Code sections 1102.5 and 98.6. *See Yanowitz*, 36 Cal. 4th at 1047 (noting that an employee engages in protected activity "when an employee opposes conduct they reasonably and in good faith believe to be discriminatory").

In this case, triable issues of material fact exist as to whether Roc nation retaliated against Mr. Garcia. As discussed above, Roc Nation does not dispute being Mr. Garcia's direct employer under *Dynamex*, and Roc Nation was Mr. Garcia's joint employer pursuant to *Martinez v. Combs*, 49 Cal. 4th 35, 75 (2010). PPRUMF Nos. 2, 3, 79, 80. Mr. Garcia repeatedly complained to the

14

Pete Defendants and Roc Nation about not receiving payment and later brought in his attorney to assist, both of which are protected activities.  PRUMF No. 9.  Rockefeller took over the processing of Defendant Pete's invoices around June 1, 2022, and shortly thereafter, Roc Nation determined that Rockefeller was struggling to manage invoices and decided to "lean in" to help Rockefeller with the invoices.  Def. SSUMF No. 27; PRUMF No. 4.  At the time that Roc Nation started managing invoices, Mr. Garcia began having difficulty getting paid.  PRUMF No. 40. Specifically, the CEO of Roc Nation, Desiree Perez, described Mr. Garcia as a "problem" because he continued to call and email the Pete Defendants and representatives of Roc Nation about receiving payment.  PRUMF No. 9.  Following the period when Ms. Perez described Mr. Garcia as a problem, Mr. Garcia started receiving less assignments.   Then, Mr. Garcia had a phone call with Defendant Pete in which she yelled at Mr. Garcia about wanting to quit on her.  PRUMF No. 51.  At that time, Mr. Garcia had been booked to work on a project at the Essence Festival. Defendant Pete testified that she did not tell Roc Nation she no longer wanted to work with Mr. Garcia after this phone call.  PRUMF No. 17.  However, Roc Nation texted Mr. Garcia retracting an offer for Mr. Garcia to work for Defendant Pete at the Essence festival.  PRUMF No. 55.  Mr. Garcia was later informed of his termination by a representative at Roc Nation.  PRUMF No. 55.

Accordingly, a triable issue of material fact exists as to whether the Pete Defendants or Roc Nation terminated Mr. Garcia.  Further, a reasonable jury could find that this termination was in retaliation for Mr. Garcia's repeated complaints about receiving payment, having his attorney address the issue, and becoming "a problem" for the Pete Defendants and Roc Nation.

E.    **Genuine Disputes of Material Fact Remain with Respect to Plaintiff's Unfair Business Practices Claim**

Roc Nation provides no argument or analysis as to why summary judgement should be granted as to Plaintiff's cause of action aside from "[b]ecause this claim is wholly dependent on Plaintiff's other legally insufficient claims, it must fail as to Rock Nation as well for the same reasons noted herein." As discussed thoroughly in each section above, Rock Nation's

15

assertion is unsupported by law and fact – Plaintiff has proffered sufficient evidence for each of his causes of action against Roc Nation.

**F.      Genuine Disputes of Material Fact Remain with Respect to Plaintiff's New York Claims**

Roc Nation does not argue in its motion that Plaintiff failed to proffer evidence supporting his claims. Rather, Roc Nation improperly argues only that said claims fail because  it was not a Joint Employer under either the NYLL or the New York State and City Human Rights Laws. As discussed below, Roc Nation's argument fails on both accounts.[1]

    *i.     Plaintiff's New York Labor Law Claims.*

The statutory standard for employer status under the NYLL is nearly identical to that of the FLSA. Accordingly, Courts in this District have regularly applied the same tests to determine, under the FLSA and the NYLL, whether entities were joint employers. *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 940 (S.D.N.Y. 2013). The Second Circuit has recognized the determination of joint employment is rarely appropriate to make at the summary judgment stage because of the fact-intensive character of a determination of joint employment. *Id*. at 941. When it comes to joint employer status under the FLSA, control is key. In assessing economic reality, the Second Circuit has articulated two tests for determining whether an employment relationship existed for the purposes of the FLSA, one relating to formal control, the other, to functional control. *Id*. at 939.  Further, with respect to Plaintiff's retaliation claims, "the text of the New York Labor Law's prohibition on retaliation is broad and applies to both an employer and to any other person." Thus, a person or organization need not be an employer to be held liable under the NYLL. *Demirovic v. Ortega*, 2017 WL 5196240, at *3 (E.D.N.Y. Nov. 9th, 2017.  Since Roc Nation's motion fails to address Plaintiff's retaliation claims under the NYLL, those claims must survive.

---

[1]  To the extent Roc Nation's arguments can be construed to argue more substantively with respect to Plaintiff's NYLL, NYSHRL and NYCHRL claims, Plaintiff fully incorporates and adopts its arguments in opposition to the Pete Defendants' Motion for Summary Judgement in opposition to the instant motion.

    *ii.*   *Roc Nation Exercised Formal Control Over Plaintiff.*

The formal control test asks "whether the alleged employer (1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records. *Id*.

Here, a triable issue of fact remains about whether Roc Nation had the authority to, and did, terminate Mr. Garcia. PRUMF Nos. 17, 52. Roc Nation retracted an offer for Mr. Garcia to work for Defendant Pete at Essence Festival. Def. SSUMF No. 54; PRUMF Nos. 17, 52. Plaintiff testified that the individual who informed him that Ms. Pete would no longer be working with him was a Roc Nation employee. PRUMF No. 52.

Further, Roc Nation handled the invoices for payment submitted by Plaintiff, provided Plaintiff with his hourly schedule for events, and dictated how/when Plaintiff would be paid and for which work he would be paid. PRUMF Nos. 4, 6, 25, 39. Indeed, individuals at Roc Nation were responsible for providing Mr. Garcia with scheduling details for the video and photography assignment he worked on with Ms. Pete. These schedules provided by Ben and Sam Riddle included not only the dates and times that he was expected to arrive but also details regarding where and what Mr. Garcia and others in Ms. Pete's entourage were expected to be doing at specific times. Garcia Decl. ¶ 5; s*ee also,* GAR0004850, GAR0004862. Plaintiff also received specific instructions on how to edit Ms. Pete's photos and videos from Roc Nation employees such as Gilly Iyer, Sam Riddle. PRUMF No. 17.

With respect to payment, Defendant argues that Plaintiff negotiated his rates and methods of pay with Ms. Pete, rather than individuals at Roc Nation. This argument fails as evidence and deposition testimony from Mr. Garcia, and documents produced both by Plaintiff and Roc Nation show that Roc Nation's CEO Desiree Perez directly engaged in communications with Plaintiff and his personal counsel relating to issues with payment for services rendered. PRUMF No. 6. While Defendants argue that these communications were at the behest of Ms. Pete, at best these conflicting statements still create an issue of fact.

*iii.*        *Roc Nation Exercised Functional Control Over Plaintiff.*

As to the functional control test, the Second Circuit has identified a number of factors pertinent to determining whether a person or entity, even if lacking formal control, exercised "functional control" over an employee: (1) whether [alleged employers'] premises and equipment were used for the plaintiffs' work; (2) whether the [subcontractors] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line job that was integral to [alleged employers'] process of production; (4) whether responsibility under the contracts could pass from one subcontractor to another without material changes; (5) the degree to which the [alleged employers'] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the [alleged employers]. *Id.* at 940.

Here, all of these factors weigh in Plaintiff's favor.   By virtue of the nature of Ms. Pete's work, Mr. Garcia did not have a set workplace, but rather was required to travel with Ms. Pete regularly, making his workplace effectively wherever she was located at a given time.  PRUMF No. 78.  Nevertheless, on numerous occasions, Plaintiff attended creative meetings at Roc Nation's New York office.  PRUMF No. 67; Garcia Decl. ¶ 5. Moreover, while Plaintiff did not have an exclusivity requirement written in his contract, the demanding nature of Ms. Pete and Roc Nations expectations made it effectively impossible for him to maintain ongoing work. Mr. Garcia was effectively "on call 24/7" as individuals from Roc Nation namely Alec Henderson and Sam Riddle expected him to be available at a moment's notice to the point where if Mr. Garcia informed them that he was at dinner and could not perform a task immediately he would be told to go to the bathroom inside the restaurant to complete the task or find a way to get the task done right that second.  PRUMF No. 80.[2]

---

[2] Factors 2 through 4 are inapplicable to the relationship here, and thus do not weight against a joint employer finding.

18

G.       **Plaintiff's New York State and City Human Rights Law Claims.**

As a threshold matter, Roc Nation relies on the sole argument it cannot be held liable for misconduct under the NYSHRL and NYCHRL due to Plaintiff's alleged independent contractor status.  Thus, while Plaintiff maintains he was an employee, Roc Nation nevertheless conceded liability because these laws provide protections to independent contractors as well.  Tellingly, Roc Nation's motion is silent as to Plaintiff's retaliation claims.  As such, those claims must proceed to trial.

The New York Court of Appeals has held that when determining who is an employer for the purposes of the human rights law, courts should consider four factors: (1) the selection and engagement of the servant; (2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct. The really essential element of the relationship is the right of control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter. *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017).

Here, while the initial terms of Plaintiff's employment were negotiated with MS. Pete, individuals at Roc Nation such as Sam Riddle were directly involved in the renegotiation of Plaintiff's employment terms, with Roc Nation CEO Desiree Perez having secondary authority of approval subject to Ms. Pete's final say.  (Perez Tr.) 25:21-28:13. Perez and Riddle also negotiated Mr. Garcia's days off per month, ultimately settling on allowing him three days off per month. Defendant Pete had no memory of approving the specific rate Mr. Garcia was to be paid or  if he could have three days off during the month, suggesting that Perez unilaterally approved of these terms without Ms. Pete's final say. Ex. X (Pete Tr. 198:17-199:7), GARCIA_000098. Accordingly, at best these conflicting statements create an issue of fact.

With respect to wages, Plaintiff also testified that in 2021 irrespective of how many hours he worked for Ms. Pete he would be paid the same amount, seeming more indicative of a salary. (Garcia Vol. 2.) 268:21-270:3. Additionally as detailed above, individuals at Roc Nation informed Plaintiff that his employment with Ms. Pete had been terminated.

19

Further, even if Roc Nation were not Plaintiff's employer (which they were), the NYSHRL and NYCHRL both protect non-employees (including independent contractors) in addition to employees.  Under N.Y. Exec. L. § 296-d, "[a]n employer may be held liable to a non-employee who is a *contractor*, subcontractor, vendor, consultant or other person providing services pursuant to a contract in the workplace." N.Y.C. Admin Code § 80192 similarly provides "natural persons working as *independent contractors* in furtherance of an employer's business enterprise shall be counted as persons in the employ of such employer" (emphasis added).

Here, at worst, there is an issue of fact as to whether Plaintiff provided services to further Roc Nation's enterprise.  Indeed, Plaintiff provided services to Roc Nation even though his "independent contractor" agreement was with Ms. Pete (but provided by Roc Nation).  Roc Nation's business of providing management services to artists was certainly furthered by Mr. Garcia's services, which they directed, controlled, approved and paid him for. As discussed *supra,* issues of fact still exist as to Roc Nations involvement in providing compensation to Plaintiff. Accordingly, this argument also fails.

## V.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendant Roc Nation's Motion for Summary Judgment in its entirety.

Dated:  December 11, 2025

Respectfully Submitted,
VALIANT LAW

By:   /s/ *Joseph Jeziorkowski*
      Joseph Jeziorkowski, Esq.
      Daniel Folchetti, Esq.
      *Attorneys For Plaintiff*
      *Emilio Garcia*
      2975 Westchester Ave, Suite 418
      Purchase, NY 10577
      914-730-2422
      jjj@valiantlaw.com
      dcf@valiantlaw.com

WEST COAST TRIAL LAWYERS, APLC

By:   /s/ *Ronald L. Zambrano*
      Ronald L. Zambrano, Esq. (*pro hac vice*)
      *Attorneys For Plaintiff*
      *Emilio Garcia*
      1147 South Hope Street
      Los Angeles, CA 90015
      213-927-3700
      ron@westcoasttriallawyers.com

## <u>CERTIFICATE OF SERVICE</u>

       I hereby certify that on December 11, 2025, I served the foregoing Plaintiff's Opposition to Defendant Roc Nation, LLC's Motion for Summary Judgment by electronic mail upon the following counsel of record for Defendants:

| | |
|---|---|
| Michael R. Kleinmann, Esq.<br>  *mkleinmann@reedsmith.com*<br>Charlyn Jones<br>  *charlyn.jones@reedsmith.com*<br>Corrie Buck<br>  *cbuck@reedsmith.com*<br>REED SMITH LLP<br>355 South Grand Avenue, Suite 2900<br>Los Angeles, California 90071 | Counsel for Defendant,<br>ROC NATION LLC |
| Jordan W. Siev, Esq. (*pro hac vice*)<br>  *jsiev@reedsmith.com*<br>REED SMITH LLP<br>599 Lexington Avenue<br>New York, New York, 10022 | |
| Mari F. Henderson, Esq.<br>  *marihenderson@quinnemanuel.com*<br>Janet C. Shamilian, Esq.<br>  *janetshamilian@quinnemanuel.com*<br>Julian T. Schoen, Esq.<br>  *julianschoen@quinnemanuel.com*<br>Gabby Trevino<br>  *gabbytrevino@quinnemanuel.com*<br>Lucille Clavel<br>  *lucilleclavel@quinnemanuel.com*<br>Joanna Menillo<br>  *joannamenillo@quinnemanuel.com*<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>865 South Figueroa Street, 10th Floor<br>Los Angeles, California 90017 | Counsel for Defendants,<br>MEGAN THEE STALLION,<br>HOT GIRL TOURING, LLC, and<br>MEGAN THEE STALLION<br>ENTERTAINMENT, INC. |
| Alex B. Spiro, Esq. (*pro hac vice*)<br>  *alexspiro@quinnemanuel.com*<br>QUINN EMANUEL URQUHART & SULLIVAN, LLP<br>51 Madison Avenue, 22nd Floor<br>New York, New York 10010-1601 | |

                                    /s/ *Marlyn Cortez*
                                    Marlyn Cortez
                                    *Assistant to Plaintiff's Counsel*

2

Ronald L. Zambrano, Esq. (*pro hac vice*)