USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED:  8/7/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------ X
                                                   :

EMILIO GARCIA                                               :
                                                   :

                                         Plaintiff,    :                1:24-cv-7587-GHW

                                                   :

                              - v -                :             MEMORANDUM
                                                   :             OPINION & ORDER

ROC NATION LLC, *et al.*,                                    :

                                                   :

                                       Defendants.   :

                                                   :

------------------------------------------------------------------ X

GREGORY H. WOODS, United States District Judge:

From January 2018 through June 2023, Plaintiff Emilo Garcia was a photographer and videographer for Defendant Megan "Thee Stallion" Pete, a rapper and celebrity. As a member of Ms. Pete's entourage, he worked at her concerts and celebrity appearances across the globe.

Ms. Pete initially paid Mr. Garcia a fixed monthly rate. She would reach out to Mr. Garcia when she needed his services for one of her events. Ms. Pete took an active role in supervising edits to Mr. Garcia's work. She expected Mr. Garcia to respond to her requests for work product at all hours. Later, Defendant Roc Nation LLC ("Roc Nation") took responsibility for managing aspects of Ms. Pete's business. Thereafter, either Ms. Pete or Roc Nation would reach out to Mr. Garcia to staff Ms. Pete's events. Roc Nation also set the schedules for those events and sent them to Mr. Garcia. Roc Nation also expected Mr. Garcia to respond to its requests for work product at all hours. In June and August 2022, Mr. Garcia renegotiated his pay with Ms. Pete and Roc Nation representatives.

Ms. Pete and Mr. Garcia's relationship deteriorated beginning in early 2022. Ms. Pete exposed Mr. Garcia to abusive and lewd conduct. In late 2022, Mr. Garcia began having issues with his pay and raised those issues in communications with Roc Nation representatives. In June 2023,

Ms. Pete and Mr. Garcia had a falling out.  Thereafter, Roc Nation and Ms. Pete stopped working with Mr. Garcia.

In May 2024, Mr. Garcia filed this action, asserting an assortment of claims for wage and hour violations, discrimination and a hostile work environment, and retaliation under California and New York law.  He named Roc Nation, Ms. Pete, and Ms. Pete's corporate entities as Defendants.  Defendants now move for summary judgment on all of Mr. Garcia's claims.

Because a reasonable jury could conclude that all Defendants exercised a high degree of control over Mr. Garcia's schedule, pay, and performance of his duties such that they jointly employed him, Defendants' motions for summary judgment with respect to Mr. Garcia's wage and hour claims are denied.  Because a reasonable jury could also conclude that each of the Defendants terminated Mr. Garcia because he raised concerns about his pay, Defendants are not entitled to summary judgment on Mr. Garcia's retaliation claims under the New York Labor Law and California law.  However, because Mr. Garcia did not engage in protected activity concerning any alleged discriminatory conduct, Defendants are entitled to summary judgment on Mr. Garcia's retaliation claims under the New York City and State Human Rights Laws.

I.      **BACKGROUND**

      A.      **Factual Background[1]**

            1.      **The Parties**

Plaintiff Emilio Garcia is a photographer and videographer.  PRUMF ¶ 10.  He is a resident of Texas.  *Id.*  He identifies as a gay man.

---

[1] The facts are taken from the Defendants' Local Rule 56.1 statement of material facts, Dkt. No. 149 ("DSOMF"), Plaintiff's response to Defendants' Local Rule 56.1 statement, Dkt. No. 157-2 ("PRUMF"), and the other documents submitted in connection with Defendants' motions for summary judgment.  The facts are undisputed in relevant part unless otherwise noted, and where disputed, the Court resolves all ambiguities and draws all permissible factual inferences in favor of Mr. Garcia, as the party against whom summary judgment is sought.  *See Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012).

Defendant Megan Pete, a California resident, is a rapper who performs under the stage name Megan Thee Stallion. Pete Dep. 7:8–15.[2] Ms. Pete "earn[s] revenue from releasing music, performing live concerts, engaging in brand deals, public appearances, and" through licensing rights to her music. Dkt. No. 155 ("Pete Decl.") ¶ 2.

Defendant Hot Girl Touring, LLC ("HGT") is a limited liability company based in Los Angeles, California. *See* PRUMF ¶ 2; Pete Decl. ¶ 2. Ms. Pete is the sole member of HGT. *Id.* HGT is responsible for intaking payments related to Ms. Pete's live performances and for paying individuals who provide services related to those performances. Pete Dep. 161:4–20.

Defendant Megan Thee Stallion Entertainment, Inc. ("MTSE," and together with Ms. Pete and HGT, the "Pete Defendants") is a Delaware corporation with a principal place of business in California. Dkt. No. 128 ("SAC") ¶ 7; *see* PRUMF ¶ 3. Ms. Pete owns MTSE. *Id.* MTSE is "responsible for intaking payments from [Ms. Pete's] public appearances and business deals outside of touring and performing" and for paying individuals for services provided related to those activities. *See id.*

Defendant Roc Nation is a limited liability corporation whose members are citizens of New York, California, New Jersey, and Delaware. *See* Dkt. No. 7 (Roc Nation corporate disclosure statement). Roc Nation provides management services to musical artists, including Ms. Pete. Dkt. No. 144 ("Perez Decl.") ¶ 2. At all relevant times, Roc Nation's CEO was Desiree Perez. *See id.* ¶ 1.

Roc Nation began to provide management services to Ms. Pete in 2019. *Id.* ¶ 5. In that role, Roc Nation "manage[d] the business aspects of Ms. Pete's musical career." *Id.* During the time period relevant to Mr. Garcia's claims, one of Roc Nation's responsibilities included the planning and coordination of Ms. Pete's professional events and photoshoots. *See* Perez Decl. ¶¶ 6, 9. Roc Nation was responsible for "negotiat[ing] contracts" and "deals with vendors" that performed

---

[2] Both Plaintiff and Defendants filed excerpts from Ms. Pete's deposition. *See* Dkt. No. 153-1; Dkt. No. 159-1.

services for Ms. Pete's events.  Dkt. No. 161-10 ("Perez Dep.") 115:12–116:11.  Roc Nation could only profit from an event if the expenses for that event—including amounts paid to vendors—did not exceed Ms. Pete's fees.  *Id.*  Ms. Pete would "advise Roc Nation which photographer she wanted, and Roc Nation would reach out to photographers on Ms. Pete's behalf to find out their availability."  Perez Decl. ¶ 10.  Roc Nation also "recommend[ed] options of vendors to Ms. Pete based on [its] industry experience for her to choose from."  *Id.* ¶ 6.  If Ms. Pete provided instructions as to "which photographer [she] wanted to use," Roc Nation "did not have the authority to contradict" that instruction.  *Id.* ¶ 18.

Roc Nation also set the schedule for Ms. Pete's events.  *See, e.g.*, Dkt. No. 153-56 ("Defs.' Ex. 56"); Dkt. No. 153-55 ("Defs.' Ex. 55").  Once Mr. Garcia had been booked for one of Ms. Pete's events, Roc Nation representatives would send that schedule to Mr. Garcia.  Perez Decl. ¶ 11.

Finally, Roc Nation would also review and process invoices for Ms. Pete.  Perez Decl. ¶ 7. Roc Nation would review invoices for "accuracy and completeness" before sending them to Ms. Pete for final approval and payment.  *Id.*  Ms. Pete would also request that Ms. Perez personally "double-check" invoices to "make sure everything's right" and that she was not overcharged.  *See* Pete Dep. 108:5–23.  "All of these acts were undertaken subject to Ms. Pete's express approval . . . ." Perez Decl. ¶ 7.

### 2.    Mr. Garcia Joins the Entourage

Mr. Garcia began to perform photography services for Ms. Pete in January 2018.  PRUMF ¶ 14.  Initially, Mr. Garcia performed his services for free while pursuing other, full-time employment, only receiving reimbursement for travel expenses.  *Id.*

In July 2019, Ms. Pete asked Mr. Garcia to quit his full-time job to join her entourage. Garcia Dep. 88:13–23.[3] Like Mr. Garcia, all members of Ms. Pete's entourage identify as gay or bisexual. Pete Dep. 266:4–9.

In August 2019, Mr. Garcia began invoicing Ms. Pete's prior record label for photography and videography services. PRUMF ¶ 15; Dkt. No. 153-6 ("Defs.' Ex. 6") at GAR00000106–08.

On March 1, 2020, Mr. Garcia and HGT entered into agreement for his services (the "March 2020 Agreement"). Dkt. No. 153-7 ("Defs.' Ex. 7"). The March 2020 Agreement described the scope of the agreement and Mr. Garcia's services under it as follows:

> [HGT] hereby engage[s] [Mr. Garcia] as an independent contractor, to provide photography and videography and editing services (including retouching) . . . to be used in any manner or medium, worldwide in perpetuity . . . including but not limited to in connection with (a) press and publicity; (b) online and social media); and (c) promotional and commercial uses in connection with the upcoming tours or album projects (including use for any promotions, advertising, marketing, merchandizing materials in connection therewith) for the recording artist professionally known as "Megan Thee Stallion" ("Artist").

*Id.* ¶ 1.

### 3.    Mr. Garcia's Services

As a member of Ms. Pete's entourage, Mr. Garcia provided photography and videography services at Ms. Pete's professional events. These events took place in various locations in the United States and abroad, including New York, Los Angeles, Miami, Austin, Japan, Europe, and Brazil. PRUMF ¶¶ 45–46. Of his time working with the Pete Defendants, he spent "the majority of his working time physically located in Los Angeles, California and New York, New York." Dkt. No. 157-3 ("Garcia Decl.") ¶ 4. He "spent approximately 50-60% of [his] time in California, 40-50% of [his] time in New York City, and the remaining 5-10% of [his] time" in other locations. *Id.* The events he covered included Ms. Pete's musical performances and celebrity appearances. PSUMF ¶ 46. For example, from February 2022 through June 2023, he provided his services in New York

---

[3] Both parties filed excerpts of the transcript of Mr. Garcia's deposition. *See* Dkt. Nos. 153-4, 153-5, 161-1.

for Ms. Pete's surprise birthday party, for the Met Gala, for musical performances by Ms. Pete, and for a series of photoshoots.  PSUMF ¶ 47.

Ms. Pete disliked it when members of her entourage took breaks and would respond to members' requests to return home from in-person events by limiting that member's future opportunities for a period of time.  *See* Garcia Dep. 183:16–22.  Mr. Garcia declined in-person assignments because he had personal conflicts.  In those instances, he negotiated time off with Roc Nation representatives.  For example, he declined a New York-based assignment in August 2021 because he had previously committed to perform in an event in Houston.  *See* Dkt. No. 153-34 ("Defs.' Ex. 34").  In that instance, he originally sought to take five days off but limited his request to a single day so he could "get the job done."  *Id.* at GAR00001618.  In June 2022, Mr. Garcia and Defendants agreed that he was to be allowed to take off three days per month under an agreement that would remain in effect until June 2023.  *See* Dkt. No. 153-8 ("Defs.' Ex. 8").  Mr. Garcia took advantage of this provision of the parties' agreement:  for instance, he left Ms. Pete's European tour in August 2022 to return to Houston.  *See* Dkt. No. 153-53 ("Defs.' Ex. 53.").

Once Mr. Garcia was booked to provide services for Ms. Pete, either the Pete Defendants or Roc Nation would provide Mr. Garcia logistical information, including the location, dates, times, and schedules for the engagement.  PRUMF ¶¶ 75–76; *see also* Defs.' Exs. 55–56.  Some days were as long as twelve hours.  *See, e.g.*, Dkt. No. 153-18 ("Defs.' Ex. 18") at GAR00000187.  In other instances, Mr. Garcia had time to engage in leisure activities.  PRUMF ¶¶ 82–83.

Mr. Garcia selected the equipment he would use to provide photography and videography services at these events.  Garcia Dep. 272:7–9; *see also* Dkt. No. 153-37 ("Defs.' Ex. 37").  At times, he purchased and provided his own equipment.  PRUMF ¶ 98.  He wrote those purchases off on his tax returns.  *See id.*  On other occasions, Roc Nation rented the necessary equipment with Mr. Garcia's input.  *See* Defs.' Ex. 37.

6

In addition to providing in-person photography and videography services, Mr. Garcia's responsibilities included editing work and responding to ad-hoc requests. Mr. Garcia performed this work remotely. Garcia Dep. 268:21–269:9. Mr. Garcia expected to receive editing requests from either Ms. Pete or Roc Nation at all hours. *See id.*; *see also id.* 275:5–276:7; Dkt. No. 153-11 ("Defs.' Ex. 11") at GAR00000076. These assignments were sometimes urgent, and he was expected to complete them notwithstanding personal obligations. Garcia Dep. 268:21–269:9; 275:5–276:7.

Mr. Garcia did not have complete discretion in how to photograph for Ms. Pete and how to edit those images. Ms. Pete "had her own way of wanting things done." Garcia Dep. 277:1–5. The Pete Defendants and Roc Nation required Mr. Garcia to attend creative meetings at Roc Nation's offices in Los Angeles and New York. Garcia Dep. 277:6–279:1; Garcia Decl. ¶ 5. In preparation for those meetings, Ms. Pete instructed him to prepare creative proposals to present to meeting attendees. *Id.*; *see also* Dkt. No. 161-20 ("Plf. Ex. AD") at RN_Garcia_00000003 (creative proposal dated December 16, 2019); Dkt. No. 157-1 ("Zombrano Decl.") ¶ 60. When Mr. Garcia proposed edits to his work, Ms. Pete provided feedback. *See* Dkt. No. 153-45 ("Defs.' Ex. 45") at GAR00001109–10; *see also* Garcia Dep. 277:1–5. Ms. Pete also retained authority over the distribution of the images and footage that Mr. Garcia captured. *See* Dkt. No. 153-46 ("Defs.' Ex. 46"); Dkt. No. 153-47 ("Defs.' Ex. 47").

On some occasions, Mr. Garcia was given wide latitude to edit his work as he saw fit. In a series of videos Ms. Pete posted to YouTube, Mr. Garcia was credited as a "Creative Director." DSOMF ¶ 71. Mr. Garcia directed the edits of those videos, and Roc Nation representatives deferred to his creative decisions. *See id.*

When Ms. Pete took breaks from her career, Mr. Garcia provided photography services to other individuals. In 2020, Ms. Pete reduced her professional activities as a result of both the COVID-19 pandemic and because she had suffered a gunshot wound. DSOMF ¶ 57. During that time period, Mr. Garcia photographed high school graduates, weddings, family portraits, and

Houston rapper Paul Wall, among others. *Id.* In the fall of 2022, Ms. Pete took a mental health break and limited her professional activities. Dkt. No. 153-16 ("Defs.' Ex. 16") at GAR00008661. During that time, Mr. Garcia photographed a number of other clients, including some of Ms. Pete's friends and a female rapper named Princess Nokia. *See* DSOMF ¶ 61. In another instance, Mr. Garcia photographed another female rapper named JT. *Id.* ¶ 59.

Ms. Pete preferred that members of her team not work for her competitors. The space of female rappers was highly competitive, and Ms. Pete believed that it was important to have an exclusive and devoted team to maintain her unique appearance. Pete Dep. 97:11–98:14. Thus, Ms. Pete would discourage or prohibit members of her team, including Mr. Garcia, from working with others. *See id.* In one instance, Ms. Pete's former make-up artist, Alejandra "Aleks" Garcia, informed Ms. Pete that another female hip-hop artist named Saweetie was interested in working with Ms. Garcia. Dkt. No. 161-2 ("Aleks Garcia Dep.") 80:25–82:1. Ms. Pete forbade Ms. Garcia from working with Saweetie. *Id.* Mr. Garcia also understood that this form of exclusivity was a condition of his work with Ms. Pete. Garcia Dep. 70:14–24.

### 4. Mr. Garcia's Compensation

Mr. Garcia's compensation was initially established on terms set forth in the March 2020 Agreement. The March 2020 Agreement specified that its "[T]erm" shall "commence from the date of this agreement . . . and continue on a monthly basis thereafter." Defs.' Ex. 7 ¶ 1. Pursuant to the March 2020 Agreement, HGT agreed to pay Mr. Garcia "a fee of . . . $5,500[] once a month . . . ." *Id.* ¶ 3.

Mr. Garcia sent HGT monthly invoices for $5,500 between 2020 and 2022. *See, e.g.*, Defs.' Ex. 6 at MTS00000195–MTS00000235. He sent an invoice for that amount regardless of whether he was working remotely or providing services to Ms. Pete at one of her events. Garcia Dep.

269:16–270:10.  He considered his monthly pay to be a salary.  *Id.*  HGT or MTSE issued Mr. Garcia a 1099 tax form, not a W-2.  *See* Dkt. No. 159-9 ("Plf. Ex. AC").

In May 2022, Mr. Garcia and Ms. Pete discussed the prospect of a raise for Mr. Garcia.  Dkt. No. 153-8 ("Defs.' Ex. 8") at GAR00000054.  Following that discussion, Mr. Garcia and representatives from Roc Nation negotiated the terms of a new compensation agreement for his services (the "June 2022 Agreement").  *See id.*

Through his counsel, Mr. Garcia proposed a "weekly rate of $2,884.61 for" a renewable, one year term beginning June 1, 2022.  *Id.* at GAR00000053.  In addition to the raise in pay, Mr. Garcia requested three days off a month and a "supply of equipment or possible replacement for prior equipment's wear and tear[.]"  *Id.*  Roc Nation discussed the terms of the agreement internally and confirmed that Ms. Pete approved of the new terms.  Dkt. No. 153-9 ("Defs.' Ex. 9").  Roc Nation's Chief Financial Officer Sam Riddle responded to Mr. Garcia's proposal in an email thread that included Mr. Garcia, Roc Nation employees, and Mr. Garcia's attorney as follows:

> Hi – *we're agreed here* in rate, material terms, etc!
>
> May need to get the long form of things right but possible to send over an agreement and we'll send back any comments / language that we need in there?
>
> Thanks
>
> SAM

Defs.' Ex. 8 at GAR00000053 (emphasis added).

Just as before, Mr. Garcia sent invoices for his services.  *See* Defs.' Ex. 6.  In June 2022, Mr. Riddle instructed him to send his invoices to Rockefeller Capital, a firm that had taken over Ms. Pete's accounting.  Defs.' Ex. 8 at GAR00000054.  Rockefeller Capital was charged with reviewing and processing invoices.  Dkt. No. 161-5 ("Mulvehill Dep.") 14:16–22.[4]  At some point, Roc Nation took over the process of reviewing invoices.  *See id.* 15:7–17.  Accordingly, Mr. Garcia sent his

---

[4] The parties both filed excerpts from Mr. Mulvehill's deposition transcript.  *See* Dkt. No. 153-10; Dkt. No. 161-5.

invoices directly to Roc Nation representatives, including Ms. Perez. *See* Defs.' Ex. 11. For the months of June 2022 and July 2022, Mr. Garcia sent an invoice for four weeks at his new weekly rate. Defs.' Ex. 6 at MTS00000048, GAR00000132.

After Roc Nation and Mr. Garcia's initial negotiation over Mr. Garcia's weekly rate, Roc Nation and Mr. Garcia negotiated a different rate for Mr. Garcia's editing services. On August 11, 2022, Ms. Perez informed Mr. Garcia via email that his July 2022 invoice had not been approved. Dkt. No. 153-12 ("Defs.' Ex. 12") at GAR00000077. Mr. Garcia added his attorney to the email chain and re-submitted the invoice in question. *Id.*; *see also* Defs.' Ex. 6 at GAR00000132 (July 2022 invoice reflecting four weeks at a rate of $2,884.61 per week).

On August 22, 2022, Mr. Garcia asked Ms. Perez why the July 2022 invoice had not been paid. Defs.' Ex. 12 at GAR00000076–77. Ms. Perez responded that "*we* have an issue billing for the days you weren[']t present." *Id.* at GAR00000076 (emphasis added).

Mr. Garcia responded:

> On the monthly invoice, *I have always been paid on weeks when I am away remotely*, as I am required to be on call for required edits or support from the MTS team. Would love to get his cleared up and if anything is different from prior payment arrangements we can discuss that for anything moving forward. At this time *I would like to get paid for my work and time*.

*Id.* (emphasis added).

On August 26, 2022, Mr. Garcia once again asked Ms. Perez for the issue to be resolved promptly. Ms. Perez responded "of course[,] but *we* believe *we* are over billed, [and] *we* can[']t pay for that." *Id.* at GAR00000074 (emphasis added).

Mr. Garcia then responded as follows:

> As far as my remote 2x weeks of standby work, please send an email o[n] how you want to handle the Month of July. 2 weeks were in person and two weeks were on call with editing work. Please clarify what you would like to do on payment, and allows me to get my payment taken care of today.
>
> Please also clarify if I am to deny all future edits or work when being remote *and that Megan is notified.*

*Id.* at GAR00000074 (emphasis added).

Ms. Perez responded and rejected his request to be paid the same rate for his editing work.

Her response in full was as follows:

> *We* can not pay you for time you aren't present, *we* are happy to pay for editing, it would not be the same pricing, I don[']t want to suggest pricing, you should advise what that is but it can not be the same as being present.
>
> [A]s far as what happens on edits, I don't want you to deny doing the work and happy to compensate you, *let's agree on the rate.*
>
> I[']m due to speak to your lawyer in a few minutes[.]

*Id.* at GAR00000073 (emphasis added).  As before, the only individuals on the email thread were Mr. Garcia, his attorney, and representatives from Roc Nation.

Thereafter, Mr. Garcia submitted invoices that included a different, hourly rate for his editing services.  *See, e.g.*, Defs.' Ex. 6 at MTS00000052.

On several occasions, Mr. Garcia flagged the fact that he had not been timely paid for his work.  As described above, Mr. Garcia inquired about unpaid invoices in the August 2022 email exchange.  In September 2022, Mr. Garcia once again reached out to Roc Nation because several of his invoices had not been approved.  *See* Dkt. No. 153-13 ("Defs.' Ex. 13").  On September 23, 2022, he flagged that the payment for several invoices was "13 days late from the original due date." *Id.* at GAR00000098.  He requested updates from Roc Nation representatives on September 26, 2022 and September 29, 2022.  *Id.* at GAR00000095–97.  Ms. Perez described Mr. Garcia as "a problem" due to his continued outreach to Roc Nation representatives on his own behalf and through his lawyer.  Perez Dep. 93:20–94:4.

### 5.    Mr. Garcia's Working Environment

As a part of Mr. Garcia's work as Ms. Pete's photographer and videographer, the Pete Defendants and Roc Nation required Mr. Garcia to attend nighttime excursions to nightclubs, strip clubs, and similar venues.  Pete Dep. 154:10–25; *see also* Defs.' Exs. 55, 56.  Mr. Garcia worked as a

11

photographer in strip clubs in several locations, including California, *see* Dkt. No. 161-19 ("Madelon Dep.") 54:2–55, and New York, Garcia Dep. 284:17–21.  While other members of Ms. Pete's entourage had the option to attend these outings, either for leisure or in their professional capacities, Ms. Pete and Roc Nation required him to attend these outings so that he could photograph them. Pete Dep. 154:10–25; Defs.' Exs. 55, 56.

As the basis for his claims that Defendants discriminated against him, created a hostile work environment, and retaliated against him, Mr. Garcia highlights three incidents:  a February 2022 outing to a strip club in New York City (the "New York Outing"), a nighttime outing during a June 2022 trip to Ibiza, Spain (the "Ibiza Outing"), and an incident in a hotel room in Portugal (the "Portugal Incident").

### a.  The New York Outing

On February 15, 2022, Mr. Garcia staffed Ms. Pete's surprise birthday party in New York City.  PRUMF ¶ 106.  Roc Nation organized the party, a portion of which included an outing to a strip club.  *See* Defs.' Exs. 55, 56.  As was the typical practice for outings to strip clubs, Mr. Garcia was required to go to the club with Ms. Pete.  *Id.*  At some point in the evening, Mr. Garcia "just walked out of the strip club."  Garcia Dep. 284:17–21.  After the event, he confided in three individuals that he believed having to perform photography services at a strip club constituted harassment:  his ex-boyfriend Joshua Sanchez, a Pete photographer named Aliyah Rios, and Ms. Rios's mother.  PRUMF ¶ 109.

### b.  The Ibiza Outing

On June 13, 2022, Mr. Garcia, Ms. Garcia, Ms. Pete, and others traveled to Ibiza, Spain for a vacation.  PRUMF ¶ 110.  Mr. Garcia and Ms. Pete stayed in a rental house.  *Id.*  On June 19, 2022, Mr. Garcia, Ms. Pete, and three of Ms. Pete's college friends—Jaela Mitchell, Daren Kyle, and

12

Queenitra Jones (the "Friends")—went to a dinner and a nightclub. *Id.* ¶ 111. Ms. Garcia attended the dinner but went back to her hotel room before the group went to the nightclub. *See id.* ¶ 117.

Ms. Pete was heavily intoxicated during the dinner. Garcia Dep. 144:8–16. She commented on what Mr. Garcia and Ms. Garcia were eating. *Id.* According to Mr. Garcia, Ms. Pete called both him and Ms. Garcia "fat b****es." *Id.* at 148:2–24. Ms. Pete does not recall making those comments. Pete Dep. 82:21–83:6. After the comments, Ms. Garcia returned to her hotel room. Aleks Garcia Dep. 34:1–16. Ms. Garcia told Mr. Garcia that she wanted to quit. Garcia Dep. 152:7–15. She also emailed representatives of Roc Nation asking to return home. Aleks Garcia Dep. 34:22–35:8.

At the end of the evening, Mr. Garcia, Ms. Pete, and the Friends drove back to the rental house together. PRUMF ¶ 112. Ms. Pete and Ms. Mitchell kissed. *Id.* ¶ 113. The interaction escalated to other, explicit sexual acts. Garcia Dep. 193:17–21.

The following morning, Ms. Pete and Mr. Garcia had a conversation about the events of the prior evening. Mr. Garcia told Ms. Pete that she had made comments to him and Ms. Garcia about food. Garcia Dep. 148:2–9. Mr. Garcia told Ms. Pete that Ms. Garcia had been hurt by the comments and was thinking about quitting. *See id.* Mr. Garcia did not tell Ms. Pete that he was offended by Ms. Pete's comments. *Id.* Subsequently, Ms. Pete reached out to Ms. Garcia and apologized. Aleks Garcia Dep. 35:10–23.

Ms. Pete and Mr. Garcia also discussed the events that took place during the ride home from the nightclub. Ms. Pete asked Mr. Garcia not to speak about what she had done. Garcia Dep. 193:7–21. Mr. Garcia did not verbalize any displeasure for having been made to witness explicit sexual acts during the ride home. *See id.*; *see also* Dkt. No. 161-18 ("Sanchez Dep.") 109:12–18.

### c.   The Portugal Incident

After the trip to Ibiza, Mr. Garcia joined Ms. Pete for the Portuguese leg of her European tour.  PRUMF ¶ 119.  While Ms. Pete, Mr. Garcia, and others were in a hotel room in Portugal, Ms. Pete threw a remote control at Mr. Garcia.  *Id.*  Immediately afterwards, Mr. Garcia asked Ms. Pete if she had thrown the remote control.  Garcia Dep. 285:24–286:6.  Ms. Pete denied throwing the remote and stated, "in an aggressive tone," "and if I did throw it, so what?"  *Id.*  Mr. Garcia confirmed with other members of Ms. Pete's entourage that Ms. Pete had thrown the remote.  Garcia Dep. 286:7–286:20.  He did not discuss the incident with Ms. Pete, or any other representative of the Corporate Defendants.  *See id.*

### 6.      The June 2023 Texts and Facetime Conversation

In June 2023, Ms. Pete saw a text exchange between Ms. Garcia and Mr. Garcia on Ms. Garcia's phone (the "June 2023 Texts").  Pete Dep. 99:17–100:12.  In that text conversation, Ms. Garcia and Mr. Garcia discussed Ms. Pete's appearance.  *Id.* 93:17–94:18.  Mr. Garcia also complained that Ms. Pete had not been using his services during her mental health break.  *Id.*  He complained that the reduction had led to a drop in his income.  *Id.*  He also contemplated quitting. *Id.*

Ms. Pete felt hurt by the texts.  *Id.* 258:4–259:9.  She was hurt because someone she trusted spoke of her in negative terms.  *Id.* 94:4–18.  In particular, she was hurt that he was seemingly blaming her for his lack of income.  *Id.* 94:4–18.

Ms. Pete called Mr. Garcia over Facetime to confront him (the "June 2023 Facetime Conversation").  *Id.* 124:6–18.  Ms. Pete was angry and yelled during the conversation.  Garcia Dep. 287:13–23.  Ms. Pete said "b****, you wanna f***ing quit on me . . . ?"  *Id.*  Mr. Garcia apologized at the end of the conversation.  Pete Dep. 125:9–16.  Ms. Pete ended the conversation by saying "We're good.  We're good"  Garcia Dep. 289:2–6.

### 7.    Roc Nation and the Pete Defendants Terminate Mr. Garcia

After the June 2023 Facetime Conversation, Ms. Pete spoke to Ms. Perez about the June 2023 Texts.  Pete Dep. 204:15–205:1; Perez Decl. ¶ 23.  Ms. Pete communicated that she was hurt by the June 2023 Texts.  Perez Dep. 134:8–23.  Ms. Pete did not say that she no longer wanted to work with Mr. Garcia.  Pete Dep. 204:15–205:1.  Based on that conversation, Ms. Perez "understood that [Ms. Pete] no longer wished to work with Ms. Garcia."  Perez Decl. ¶ 23.

The last time either the Pete Defendants or Roc Nation reached out to Mr. Garcia for his photography services was in June 2023.  Mr. Garcia provided his services at a photoshoot for Essence that took place in Los Angeles, California on June 14–16, 2023.  *See* Defs.' Ex. 6 at GAR00000164–65.

On June 21, 2023, a representative from Roc Nation reached out and asked Mr. Garcia was available for an event for Essence in New Orleans, Louisiana on July 2, 2023.  Dkt. No. 153-20 ("Defs.' Ex. 20") at GAR00003484.  On the same day, Mr. Garcia confirmed that he was available, and the representative responded "Copy—I'll inform the team."  *Id.* at GAR00003485.

On June 29, 2023—the day before Mr. Garcia was to travel to New Orleans for the Essence event—the Roc Nation representative sent Mr. Garcia the following text message:

> hi emilio - *we* decided to go with a different direction for videography this weekend at essence.  apologies for notifying you so close to the event.

*See id.* (emphasis added).  Neither Ms. Pete nor any representative from the Corporate Entities reached out to book Mr. Garcia for any of Ms. Pete's future events.

### B.    Procedural History

The Court refers the reader to its prior opinion granting in part and denying part Defendants' motions to dismiss for a full history of the early procedural history of this case.  *See Garcia v. ROC Nation LLC*, No. 1:24-CV-7587, 2025 WL 1865965 (S.D.N.Y. July 2, 2025).  The

15

Court reviews the procedural history of this case as is relevant to the pending motions for summary judgment.

Plaintiff filed his second amended complaint on August 22, 2025. *See* SAC. He asserted sixteen causes of action: (1) a claim of discrimination under the New York State Human Rights Law (the "NYSHRL"), *id* ¶¶ 147–49; (2) a claim of retaliation under the NYSHRL, *id.* ¶¶ 150–54; (3) a claim of discrimination under the New York City Human Rights Law (the "NYCHRL"), *id.* ¶¶ 155–61; (4) a claim of retaliation under the NYCHRL, *id.* ¶¶ 162–67; (5) a claim of retaliation under Section 740 of the New York Labor Law (the "NYLL"), *id.* ¶¶ 162–67; (6) a claim of retaliation under Section 215 of the NYLL, *id.* ¶¶ 168–73; (7) a claim of failure to pay proper wages and overtime under the NYLL, *id.* ¶¶ 174–85; (8) a claim of failure to provide proper wage notices and pay statements under the NYLL, *id.*, ¶¶ 186–97; (9) a claim of a hostile work environment under the California Fair Employment and Housing Act (the "FEHA"), *id.* ¶¶ 198–213; (10) a claim of failure to prevent and remedy harassment under the FEHA, *id.* ¶¶ 214–26; (11) a claim of failure to provide meal and rest periods under the California Labor Code, *id.* ¶¶ 227–35; (12) a claim of failure to pay overtime wages under the California Labor Code, *id.* ¶¶ 236–58; (13) a claim of failure to provide accurate wage statements under the California Labor Code, *id.* ¶¶ 259–74; (14) a claim of failure to pay waiting time penalties under the California Labor Code, *id.* ¶¶ 275–82; (15) a claim of retaliation under the California Labor Code, *id.* ¶¶ 283–99; and (16) a claim of violations of the California Business & Professions Code, *id.* ¶¶ 300–11. With the exception of the tenth cause of action, he asserted all sixteen claims against all Defendants. He only asserted his tenth cause of action against the Corporate Defendants.

After the close of discovery, the Pete Defendants and Roc Nation separately moved for summary judgment.

### 1.    The Pete Defendants' Motion

On October 21, 2025, the Pete Defendants moved for summary judgment on nearly all of Mr. Garcia's claims. *See* Dkt. No. 151 ("Pete Mem."). The Pete Defendants argued they were entitled to summary judgment on Mr. Garcia's California Labor Code and New York Labor Law claims related to his wages and hours because Mr. Garcia was an independent contractor, and therefore, could not bring a claim under the applicable laws. *Id.* at 7–17. As it relates to his claims under California law, the Pete Defendants argued that Mr. Garcia was not an employee because he maintained significant control and direction over the means by which he performed his services. *Id.* at 8–9. They argued that he had a high degree of creative control over his work product and maintained a high degree of control over his own schedule. *Id.* at 8–10. As it relates to his claims under New York law, the Pete Defendants argued that Mr. Garcia was an independent contractor because he worked at his own convenience and could freely engage in other employment. *Id.* at 15–16. They also pointed to the fact that he was not on the Pete Defendants' payroll, did not receive fringe benefits, and did not work regular hours. *Id.*

Next, they argued that Mr. Garcia's FEHA claims failed because there was no evidence in the record that Mr. Garcia was subjected to any discriminatory conduct in California animated by his sexual orientation. *Id.* at 17–20.

Turning to Mr. Garcia's discrimination claims under the New York City and State Human Rights Laws, the Pete Defendants argued that the Court should limit those claims to conduct that occurred in New York City because any alleged discriminatory conduct that took place outside of New York City did not have an impact on Mr. Garcia in New York City. *Id.* at 20–23.

Finally, the Pete Defendants argued that they were entitled to summary judgment on Mr. Garcia's retaliation claims. *Id.* at 23–27. In particular, they argued that Mr. Garcia had not complained to Ms. Pete either about any alleged discriminatory conduct or about his wages. *Id.* at 23–25. They also argued that any purported protected activity was too distant in time from any

alleged retaliatory action to establish that there was a causal nexus. *Id.* at 25–26. Finally, they argued that the relationship between Ms. Pete and Mr. Garcia ended because Ms. Pete no longer wished to work with Mr. Garcia after seeing the insulting text messages. *Id.* at 26–27.

On November 17, 2025, Mr. Garcia filed his opposition to the Pete Defendants' motion. *See* Dkt. No. 174 ("Pete Opp."). Mr. Garcia first argued that he was misclassified as an independent contractor under both California and New York law. *Id.* at 6–19. As it related to California law, he argued that he was not free from the Pete Defendants' control and direction because they controlled his work schedule, limited his ability to work for others, and retained the authority to terminate him. *Id.* at 7–10. Similarly, he argued that he was not an independent contractor under New York Law because he was made to work all hours and because he was not free to engage in other employment. *Id.* at 16–19.

Next, he argued that genuine disputes of material fact remained with respect to his retaliation claims under both California law and New York law. *Id.* at 19–21; 24–26. He argued that his complaints about his wages constituted protected activity and that both Ms. Perez and Ms. Pete's retaliatory animus was evidence of a causal link between his protected activity and his eventual termination. *Id.* at 19–21. He also argued that his departure from the strip club during the New York Outing constituted protected activity within the meaning of the NYSHRL and the NYCHRL. *Id.* at 24–26.

Mr. Garcia did not address the Pete Defendants' arguments concerning his hostile work environment claim under the FEHA. Instead, he argued that the Pete Defendants had waived any arguments with respect to his failure to prevent claim under the FEHA because they did not address that claim. *Id.* at 21. For similar reasons, he argued that the Pete Defendants' motion should be denied with respect to Plaintiff's unfair business practices claim under California law. *Id.*

Finally, Mr. Garcia argued that disputed issues of fact remained with respect to his discrimination claims under the NYCHRL and NYSHRL because he had proffered evidence that

18

the alleged discriminatory conduct had an impact on him in New York City and New York State, respectively. *Id.* at 22–24. In particular, he cited to a declaration he filed alongside his opposition in which he affirmed that he spent "40-50% of" his working time was spent in New York City and that he attended meetings at Roc Nation's New York City offices. *Id.*; Garcia Decl. ¶¶ 4–5.

The Pete Defendants' motion was fully submitted when they replied on December 8, 2025. Dkt. No. 167 ("Pete Reply"). The Pete Defendants reprised their argument that Mr. Garcia was an independent contractor under both New York and California law. *Id.* at 1–6. Responding to Mr. Garcia's assertion that he could not work at his convenience because he remained "on call," the Pete Defendants argued that the deposition testimony Mr. Garcia proffered to support that fact was not competent evidence because it was self-serving and unsupported by the record. *Id.* at 1–2.

The Pete Defendants next argued that Mr. Garcia had abandoned his discrimination claim under the FEHA by failing to address the arguments raised in their moving papers. *Id.* at 6–7. They argued that because Mr. Garcia had abandoned his discrimination claim under the FEHA, they were entitled to summary judgment on that claim and on his failure to prevent claim under the FEHA. *Id.*

Next, the Pete Defendants argued that the evidence in the record did not demonstrate that any alleged discriminatory conduct had an impact on Mr. Garcia in New York, and that Mr. Garcia's declaration filed alongside his opposition was self-serving and contradicted by other record evidence. *Id.* at 7–8.

Finally, the Pete Defendants once again argued that Mr. Garcia's retaliation claims failed for the same reasons as identified in their moving papers. *Id.* at 9–12.

### 2. Roc Nation's Motion

On October 20, 2025, Roc Nation filed its motion for summary judgment. Dkt. No. 145 ("Roc Nation Mem."); *see also* Dkt. No. 144 ("Perez Decl."). Roc Nation argued that it was entitled

to summary judgment on Mr. Garcia's NYLL claims both because Mr. Garcia was an independent contractor and, in the alternative, because Roc Nation did not employ him. Roc Nation Mem. at 10–12. In particular, Roc Nation argued that it did not exercise formal control over Mr. Garcia because it did not hire him, did not control his schedule, did not determine his rate of pay, and did not possess any employment records. *Id.*

Roc Nation also argued that it was entitled to summary judgment on Mr. Garcia's California wage and hour claims because it did not jointly employ him. *Id.* at 14–19. Roc Nation once again argued that it did not have the ability to control the terms and conditions of Mr. Garcia's work environment and that it had no ability to hire or terminate Mr. Garcia. *Id.* at 15–17. It argued that, in the alternative, Plaintiff could not point to any evidence that Roc Nation was liable for any California Labor Code violations. *Id.* at 19–20.

Roc Nation also argued that Roc Nation was not liable for Mr. Garcia's discrimination claims under the NYCHRL and the NYSHRL because it was not his employer. *Id.* at 12–13. As related to Mr. Garcia's retaliation claims under both statutes, Roc Nation argued once again that Mr. Garcia was not a Roc Nation employee and that Roc Nation had no knowledge of any purported protected activity. *Id.* at 20–21.

Next, Roc Nation argued that it was entitled to summary judgment on Mr. Garcia's claim of a hostile work environment under the FEHA because he was not engaged by Roc Nation, because Roc Nation did not engage in harassing behavior, and because Roc Nation was not aware of any alleged harassment. *Id.* at 21–25. Roc Nation argued that Mr. Garcia's failure to prevent claim failed for similar reasons. Roc Nation concluded that it was entitled to summary judgment on the unfair business practices claim because the unfair business practices claim was derivative of Mr. Garcia's other California law claims and because it was entitled to summary judgment on those claims.

On November 17, 2025, Mr. Garcia filed his opposition to Roc Nation's motion. Dkt. No. 175 ("Roc Nation Opp."). Mr. Garcia first argued that, by not specifically addressing the applicable

law, Roc Nation had conceded that Mr. Garcia was not an independent contractor under California law. *Id.* at 6–7. Mr. Garcia next argued that there were genuine disputes of material fact concerning whether Roc Nation jointly employed him because there was evidence in the record showing that Roc Nation exercised control over his wages, hours, and working conditions. *Id.* at 8–9. In particular, he argued that Roc Nation exercised control over his pay because they negotiated his rates for in person events and editing in 2022. *Id.* at 7–9. He also argued that Roc Nation exercised control over his hours because it expected him to respond to requests for work product at all hours. *Id.* at 9. Finally, he argued that summary judgment was inappropriate on the issue of Roc Nation's liability for the wage and hour claims because its control over his wages, hours, and working conditions triggered duties to comply with the relevant provisions of the California Labor Code. *Id.* at 12–13.

As it related to his claim of retaliation under California law, Mr. Garcia once again argued that a reasonable jury could conclude that Roc Nation jointly employed him. *Id.* at 13–14. He also argued that that a reasonable jury could conclude that Roc Nation terminated him and that its decision to do so was retaliation for his complaints about his wages. *Id.* at 14–15.

Mr. Garcia argued that because summary judgment was inappropriate on his other claims under California law, Roc Nation was not entitled to summary judgment on his California unfair business practices claim. *Id.* at 15–16.

Turning to his New York claims, Mr. Garcia argued that there were triable issues of fact concerning whether Roc Nation jointly employed him under New York law. *Id.* at 16–18. He argued that a reasonable jury could conclude that Roc Nation terminated him, controlled his schedule, and dictated the amount he would be paid. *Id.* at 17. Thus, he argued, summary judgment was inappropriate on the New York wage and hour claims and on his NYLL retaliation claims. *Id.* at 16–18. He argued that the same genuine disputes of material fact precluded summary judgment on his discrimination claims under the New York State and City Human Rights Laws because a

reasonable jury could conclude that Roc Nation was his employer within the meaning of those statutes. *Id.* at 19–20. Mr. Garcia argued that, in the alternative, Roc Nation had conceded liability for his NYSHRL and NYCHRL claims because those statutes protect independent contractors and Roc Nation's motion had only addressed whether he was an employee. *Id.* at 19.

Roc Nation's motion for summary judgment was fully submitted when Roc Nation filed its reply on December 8, 2025. Dkt. No. 172 ("Roc Nation Reply"). Roc Nation first argued that it had not conceded that it directly employed Mr. Garcia under California law, and, in the alternative, that Mr. Garcia was foreclosed from arguing that Roc Nation was Mr. Garcia's direct employer because he alleged in his pleadings that Ms. Pete was his direct employer. *Id.* at 1–2. Roc Nation then reprised its argument that it did not jointly employ Mr. Garcia and that Mr. Garcia could not show that Roc Nation was liable for any wage or hour violations. *Id.* at 3–6. In particular, Roc Nation argued that it did not pay Mr. Garcia, was not responsible for approving his rate of pay, and did not have ultimate responsibility to pay his invoices. *Id.* at 3. Roc Nation also argued that any communications between it and Mr. Garcia regarding his work product, his work schedule, and his engagement for Ms. Pete's events was done on Ms. Pete's behalf and with her explicit authorization. *Id.* at 3–4.

Next, Roc Nation argued that—even assuming that Mr. Garcia was Roc Nation's employee—his retaliation claims failed because he did not engage in a protected activity with Roc Nation and because the relationship between any alleged protected activity and any alleged adverse action was too attenuated to establish a causal nexus. *Id.* at 6–7.

Roc Nation repeated the arguments stated in its moving papers that it was entitled to summary judgment on both of Mr. Garcia's claims under the FEHA. *Id.* at 7. Having argued that it was entitled to summary judgment on all of the other California claims, Roc Nation once again argued that it was entitled to summary judgment on the unfair business practices claim under California law. *Id.* at 8.

As it related to the New York claims, Roc Nation once again argued that it was entitled to summary judgment on the New York wage and hour claims because did not jointly employ Mr. Garcia. *Id.* at 8–11. As it argued in connection with Mr. Garcia's California wage and hour claims, Roc nation argued that Ms. Pete, not Roc Nation, was responsible for setting his rate of pay and overseeing his work product. *Id.* at 8–9. Roc Nation reiterated that it did not maintain employment records. *Id.* at 9.

Finally, Roc Nation argued it was entitled to summary judgment on the NYCHRL and NYSHRL claims because it was not his employer. *Id.* at 11. Addressing Mr. Garcia's argument that those laws protect independent contractors, Roc Nation argued that Mr. Garcia could not maintain his NYCHRL and NYSHRL claims against Roc Nation because he never signed an independent contractor agreement with Roc Nation. *Id.* at 11.

## II.    LEGAL STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine dispute exists where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," while a fact is material if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). "Factual disputes that are irrelevant or unnecessary will not be counted." *Id.*

To defeat a motion for summary judgment, the non-movant "must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting former Fed. R. Civ. P. 56(e)) (emphasis omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson*, 477 U.S. at 252. Moreover, the non-movant "must do more than simply show that there is

23

some metaphysical doubt as to the material facts," *Matsushita*, 475 U.S. at 586, and he or she "may not rely on conclusory allegations or unsubstantiated speculation," *Fujitsu Ltd. v. Fed. Express Corp.*, 247 F.3d 423, 428 (2d Cir. 2001) (quotation omitted).

In determining whether there exists a genuine dispute as to a material fact, the Court is "required to resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought." *Johnson v. Killian*, 680 F.3d 234, 236 (2d Cir. 2012) (quotation omitted). The Court's job is not to "weigh the evidence or resolve issues of fact." *Lucente v. Int'l Bus. Machs. Corp.*, 310 F.3d 243, 254 (2d Cir. 2002); *see also Hayes v. N.Y.C. Dep't. of Corr.*, 84 F.3d 614, 619 (2d Cir. 1996). "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quotation omitted).

Still, "[t]he possibility that a material issue of fact may exist does not suffice to defeat the motion; upon being confronted with a motion for summary judgment the party opposing it must set forth arguments or facts to indicate that a genuine issue—not merely one that is colorable—of material fact is present." *Gibson v. Am. Broad. Cos.*, 892 F.2d 1128, 1132 (2d Cir. 1989).

## III. DISCUSSION

### A. Wage and Hour Claims

#### 1. California Law

Defendants are not entitled to summary judgment on Mr. Garcia's California wage and hour claims. The Pete Defendants argue that Mr. Garcia is not protected by the relevant provisions of the California Labor Code because he was an independent contractor, not an employee.[5] Roc

---

[5] Roc Nation does not present its own arguments concerning whether Mr. Garcia was an independent contractor and instead "incorporates by reference the arguments made in Co-Defendants' motion for summary judgment as to Plaintiff's independent contractor status . . . ." Roc Nation Mem. at 15 n.8. The Court need not resolve the question of Mr. Garcia's independent contractor status as to Roc Nation. "In a joint employer claim, the worker is an admitted employee of a primary employer, and is subject to the protection of applicable labor laws and wage orders." *Henderson v. Equilon Enters., LLC*, 253 Cal. Rptr. 3d 738, 752 (Cal. Ct. App. 2019). Thus, the Court will first resolve the Pete

Nation argues that even if Mr. Garcia were an employee, Roc Nation is not liable under the California Labor Code both because Roc Nation did not employ him and because it was not responsible for any conduct violating the wage and hour laws.  The Court addresses each argument in turn.

### a.  Mr. Garcia's Independent Contractor Status

A reasonable jury could conclude that Mr. Garcia was not an independent contractor under California law.  Under California law,

> a worker is properly considered an independent contractor . . . only if the hiring entity establishes:  (A) that the worker is free from the control and direction of the hirer in connection with the performance of the work, both under the contract for the performance of such work and in fact; (B) that the worker performs work that is outside the usual course of the hiring entity's business; and (C) that the worker is customarily engaged in an independently established trade, occupation, or business of the same nature as the work performed for the hiring entity.

*Dynamex Operations W. v. Super. Ct.*, 4 Cal. 5th 903, 916–17 (2018) (the "ABC" test, codified by CAL. LAB. CODE § 2775(b)(1)).  "[T]he burden [is] on the hiring entity to establish that the worker is an independent contractor" by "establish[ing] each of the three factors."  *Id.* at 957.

There are genuine disputes of fact concerning the level of control and direction that the Pete Defendants had the right to exercise over Mr. Garcia's performance of his work.  Under Prong A, a worker "who is subject, either as a matter of contractual right or in actual practice, to the type and degree of control a business typically exercises over employees would be considered an employee." *Dynamex*, 4 Cal. 5th at 958.  "[D]epending on the nature of the work and overall arrangement between the parties, a business need not control the precise manner or details of the work in order to be found to have maintained the necessary control that an employer ordinarily possesses over its employees, but does not possess over a genuine independent contractor."  *Id.*  "[A]t the heart" of Prong A is "control over how a result is achieved."  *See Ayala v. Antelope Valley Newspapers, Inc.*, 59

---

Defendants' arguments regarding their status as a primary employer before turning to Roc Nation's arguments concerning whether Roc Nation jointly employed Mr. Garcia as a joint employer.

Cal. 4th 522, 533 (2014) (construing common law control test); *see also Dynamex*, 4 Cal. 5th at 958 (clarifying that, under Prong A, "worker who is subject, either as a matter of contractual right or in actual practice, to the type and degree of control a business typically exercises over employees would be considered an employee under the common law test, such a worker would, a fortiori, also properly be treated as an employee for purposes of the suffer or permit to work standard.").

"What matters" under Prong A "is not how much control a hirer *exercises*, but how much control the hirer retains the *right* to exercise." *Ayala*, 59 Cal. 4th at 533 (emphasis in original). "'[T]he fact that a certain amount of freedom of action is inherent in the nature of the work does not change the character of the employment where the employer has general supervision and control over it.'" *Aguiluz v. Flowers Foods, Inc.*, No. 2:23-CV-05712, 2024 WL 5251179, at *15 (C.D. Cal. Dec. 17, 2024) (quoting *Burlingham v. Gray*, 22 Cal. 2d 87, 100 (1943) (citation omitted)). "Where the parties genuinely dispute whether the hiring entity 'reserves the requisite degree of control and direction over its' workers, summary judgment is improper." *Id.* (quoting *Salinas v. Cornwell Quality Tools Co.*, 635 F. Supp. 3d 979, 991 (C.D. Cal. 2022)).

A reasonable jury could conclude that the Pete Defendants had the right to exercise the type and degree of control an employer might exercise over an employee. There are genuine disputes of fact concerning the Pete Defendants' right to control how Mr. Garcia produced photographs and videos. First, the record contains evidence that the Pete Defendants retained significant authority to devise a creative vision that constrained Mr. Garcia's discretion. Ms. Pete "had her own way of wanting things done," Garcia Dep. 277:1–5. In service of that set of preferences, Mr. Garcia attended "creative meetings at Roc Nation offices," *id.* 277:12–23, for which Ms. Pete directed him to generate "creative proposals" to be shared, Garcia Decl. ¶ 5 (emphasis added). *See also* Plf. Ex. AD. Ms. Pete supervised Mr. Garcia's work, provided granular feedback on his editing decisions, and directed what footage he was or was not allowed to use. *See, e.g.*, Defs.' Ex. 45 at GAR00001110; Ex. 46 at GAR00003845–47.

Second, a reasonable jury could also conclude that the Pete Defendants had the right to exercise a high degree of control over Mr. Garcia's schedule. Mr. Garcia felt compelled to accept assignments because he saw Ms. Pete punish other members of the entourage for requesting leave. Garcia Dep. 183:6–22. As it related to his remote responsibilities, Mr. Garcia was expected to respond to the Pete Defendants' requests for work product promptly at all hours. Pete Dep. 64:5–64:18 (testimony from Ms. Pete that she "expect[ed] [Mr. Garcia] to send [her] the pictures" that she would request via text message on an ad-hoc basis). For a portion of the period relevant to his claims, the Pete Defendants compensated him regardless of whether he staffed one of Ms. Pete's events because he was expected to promptly respond to such requests. Defs.' Exs. 6–8. On this record, a reasonable jury could conclude that even though Mr. Garcia had nominal freedom to reject in-person assignments, in reality he remained at the Pete Defendants' beck-and-call. *Cf. Sportsman v. A Place for Rover, Inc.,* 537 F. Supp. 3d 1081, 1091 (N.D. Cal. 2021) (finding that the defendant had met its burden under Prong A because the plaintiff "controlled when she worked, setting her availability on" a calendar she controlled).

In their reply, the Pete Defendants argue that Mr. Garcia has not raised a genuine dispute of material fact because his testimony is "self-serving" and "completely unsupported by the record." Pete Reply at 1–2. The Court declines the Pete Defendants' invitation to opine on Mr. Garcia's credibility. Mr. Garcia's testimony is competent evidence to defeat the Pete Defendants' motion for summary judgment. A "plaintiff's testimony alone may be independently sufficient to raise a genuine issue of material fact." *Barrows v. Brinker Rest. Corp.*, 36 F.4th 45, 50 (2d Cir. 2022) (quoting *Bellamy v. City of New York*, 914 F.3d 727, 746 (2d Cir. 2019)). "To hold . . . that the nonmovant's allegations of fact are (because 'self-serving') insufficient to fend off summary judgment would be to thrust the courts—at an inappropriate stage—into an adjudication of the merits." *Danzer v. Norden Sys. Inc.*, 151 F.3d 50, 57 (2d Cir. 1998); *see also Jeffreys*, 426 F.3d at 553 ("Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on

summary judgment." (quotation omitted)).[6]  Mr. Garcia's credibility is a matter for the jury in the trial that must take place to adjudicate the remaining claims in this case.

Accordingly, the Pete Defendants are not entitled to summary judgment on Mr. Garcia's California wage and hour claims.

### b.  Roc Nation's Employer Status

A reasonable jury could find that Roc Nation and the Pete Defendants jointly employed Mr. Garcia.  The relevant provisions of California's Labor Code impose obligations on "employers" in their treatment of their "employees."  "To employ . . . has three alternative definitions.  It means: (a) to exercise control over the wages, hours or working conditions, or (b) to suffer or permit to work, or (c) to engage, thereby creating a common law employment relationship."  *Martinez v. Combs*, 49 Cal. 4th 35, 64 (2010), *as modified* (June 9, 2010).[7]  Roc Nation is not entitled to summary judgment the issue of whether it was an employer because there are disputes of fact concerning the first definition.

There is a genuine dispute of fact concerning whether Roc Nation exercised control over Mr. Garcia's wages and his hours.  "[P]hrased as it is in the alternative (i.e., 'wages, hours, *or* working conditions')," this "definition has the obvious utility of reaching situations in which multiple entities control different aspects of the employment relationship, as when one entity, which hires and pays workers, places them with other entities that supervise the work."  *Martinez*, 49 Cal.

---

[6] In *Jeffreys*, the Second Circuit has recognized that there is a limited exception to the rule that a district court may not "weigh the credibility of the parties at the summary judgment stage."  426 F.3d at 554.  However, this is not one of those "rare circumstance[s]."  *Id.*  For this reason, the cases cited by the Pete Defendants are inapposite.  *See, e.g.*, *Dreni v. PrinterOn America Corporation*, No. 1:18-CV-12017-MKV, 2021 WL 4066635, at *13 (S.D.N.Y. Sept. 3, 2021) (finding that "self-serving deposition testimony and declaration [were] completely unsupported by the record and therefore [could not] create a genuine issue of material fact").

[7] *Martinez* looked to the definition of "employ" in Industrial Welfare Commission (the "IWC") wage order No. 14, which concerned the "agricultural industry," and held that IWC wage order No. 14, "and not the common law, properly defines the employment relationship in this action under section 1194" of the California Labor Code.  49 Cal. 4th at 62.  Although the parties do not identify which industry they operate in, each wage order defines the terms "employ" and "employer" in the same way.  *Mattei v. Corp. Mgmt. Sols., Inc.*, 265 Cal. Rptr. 3d 66, 72 (Cal. Ct. App. 2020), *as modified* (July 14, 2020).  The parties agree that this definition of "employ" from *Martinez* applies to all of Mr. Garcia's California Labor Code claims.  *See, e.g.*, *Turman v. Superior Ct. of Orange Cnty.*, 246 Cal. Rptr. 3d 607 (Cal. Ct. App. 2017).

4th at 59 (emphasis in original). "'[C]ontrol over wages' means that a person or entity has the power or authority to negotiate and set an employee's rate of pay, and not that a person or entity is physically involved in the preparation of an employee's paycheck." *Futrell v. Payday California, Inc.*, 119 Cal. Rptr. 3d 513, 524 (Cal. Ct. App. 2010).

A reasonable jury could conclude Roc Nation had the power to negotiate and set Mr. Garcia's rate of pay. Roc Nation managed the budget for Ms. Pete's professional events to ensure that it was appropriately compensated. Roc Nation also negotiated Mr. Garcia's rate of pay from June 2022 to June 2023. As a part of that negotiation, Roc Nation approved Mr. Garcia's proposed rate prior to requesting Ms. Pete's approval. Given Roc Nation's incentives to protect its own profit margin, a reasonable jury could conclude that Roc Nation exercised not only the authority to negotiate Mr. Garcia's rate of pay, but also to set a rate that would be favorable for its bottom line. That inference is bolstered by Roc Nation's response to Mr. Garcia's request for compensation at the negotiated rate for the time he spent "on call." Ms. Perez explained in an email to Mr. Garcia that "*we* can not pay you for time you aren't present," and that "*we* are happy to pay for editing, it would not be the same pricing." Defs.' Ex. 12 (emphasis added). Other than Mr. Garcia and his attorney, the only other individuals that were on the email thread were Roc Nation employees. Ms. Perez testified that her response was based on common practice in the "tour world and the music industry." Perez Dep. 63:3–63:24; 78:2-12. Thus, there is a genuine dispute of fact concerning whether Roc Nation "ha[d] the power or authority to negotiate and set [Mr. Garcia's] rate of pay." *Futrell*, 119 Cal. Rptr. 3d at 524.

A reasonable jury could also find that Roc Nation exercised control over Mr. Garcia's hours. Roc Nation played a significant role in the execution of Ms. Pete's professional appearances. In particular, Roc Nation set the schedule for events at which Mr. Garcia worked, and its representatives distributed the schedules to Mr. Garcia. *See* Defs. Ex. 56 at GAR00004844 (text message from Roc Nation representative to Mr. Garcia describing schedule of the New York

29

Outing); Perez Decl. ¶ 11.  And Roc Nation directed Mr. Garcia to promptly respond to their requests for work product at all hours.  Garcia Dep. 275:5–276:7.  Drawing all factual inferences in Mr. Garcia's favor, a reasonable jury could find that Roc Nation exercised control over Mr. Garcia's schedule.

### c.  Roc Nation's Liability

Roc Nation is not entitled to summary judgment on any of Mr. Garcia's California wage and hour claims.  "[W]hether an employer is liable under the [California] Labor Code depends on the duties imposed under the particular statute at issue."  *Noe v. Superior Ct.*, 187 Cal. Rptr. 3d 836, 852 (Cal. Ct. App. 2015).  Mr. Garcia brings California wage and hour claims under several sections of the California Labor Code:  Sections 226.7 and 512 (twelfth cause of action); Sections 510, 1194, and 1198 (thirteenth cause of action); Section 226(a) (fourteenth cause of action); and Sections 200–04 (fifteenth cause of action).  Notwithstanding Roc Nation's assertion that it did not "pay Plaintiff compensation" or "control [his] hours," there are triable issues of fact that preclude summary judgment on all of these causes of action.  The Court addresses each cause of action in turn below.

A reasonable jury could conclude that Roc Nation was obligated to provide Mr. Garcia a meal period.  Section 512 of the Labor Code requires that "[a]n employer shall not employ an employee for a work period of more than five hours per day without providing the employee with a meal period . . . ."  CAL. LAB. CODE § 512(a); *see also* CAL. LAB. CODE § 226.7(b) (entitling employee to "one additional hour of pay" for employer's failure to provide meal period).  The "condition triggering the employer's duty" to "make available meal periods" is "employment of any person for at least five hours."  *Brinker Rest. Corp. v. Superior Ct.*, 53 Cal. 4th 1004, 1034 (2012).  "When someone is suffered or permitted to work—*i.e.*, employed—for five hours, an employer is put to a choice:  it must (1) afford an off-duty meal period; (2) consent to a mutually agreed-upon waiver if one hour or less will end the shift; or (3) obtain written agreement to an on-duty meal period if circumstances

permit." *Id.* at 1039. "Failure to do one of these will render the employer liable for premium pay." *Id.* (citing CAL. LAB. CODE § 226.7(b)). As described above, there is a genuine dispute over the extent to which Roc Nation was Mr. Garcia's employer generally, and in particular whether it controlled Mr. Garcia's schedule. *See* Defs.' Ex. 56. at GAR0004844 (text message from Roc Nation representative to Mr. Garcia relaying a schedule that began at 12 PM and continued past 9 PM). The schedules Roc Nation provided do not include off-duty meal periods. *Id.*; *see also* Defs.' Ex. 45 (text message chain between Ms. Pete and Mr. Garcia concerning videos of dinner to be posted on Ms. Pete's social media). Additionally, Mr. Garcia was required to respond to Roc Nation's requests for work product at all hours—even if it meant interrupting a meal. Garcia Dep. 268:21–269:9; 275:5–276:7. Accordingly, Roc Nation is not entitled to summary judgment on Mr. Garcia's twelfth cause of action.

Because there are genuine disputes of fact concerning whether Roc Nation should have paid Mr. Garcia "one additional hour of pay" as a result of its failure to provide meal periods, Roc Nation is not entitled to summary judgment on the fourteenth and fifteenth causes of action. As is relevant to the fourteenth cause of action, Section 226 of the California Labor Code provides that "[a]n employer, semimonthly or at the time of each payment of wages, shall furnish to their employee . . . an accurate itemized statement . . . ." CAL. LAB. CODE § 226(a). That statement must include "all applicable hourly rates in effect . . . and the corresponding number of hours worked at each hourly rate . . . ." *Id.* The "extra pay for missed breaks constitutes 'wages' that must be reported on statutorily required wage statements during employment . . . ." *Naranjo v. Spectrum Sec. Servs., Inc.*, 13 Cal. 5th 93, 102 (2022). Thus, a plaintiff may assert a claim under section 226 against the entity that failed to provide a meal period for failures to provide a wage statement that included the premium payment. *See Miller v. Amazon.com Inc.*, No. 17-CV-03488-MMC, 2018 WL 6421868, at *5–7 (N.D. Cal. Dec. 6, 2018) (declining to dismiss section 226(a) claim against entity that did not furnish wages because it was derivative of claim under section 226.7). As described above, summary judgment is

31

inappropriate as to whether Roc Nation owed Mr. Garcia one additional hour of pay for its failure to provide required meal and rest periods. Roc Nation concedes that it did not maintain any wage statements—much less statements that included the required premium pay. *See* Perez Decl. ¶ 30 (affirming that "Roc Nation has never possessed any employment records relating to Mr. Garcia"). Therefore, summary judgment for Roc Nation on his fourteenth cause of action is inappropriate because a reasonable jury could conclude that Roc Nation did not meet its obligation to provide Mr. Garcia with an accurate wage statement.

As it relates to the fifteenth cause of action, Sections 201 of the California Labor Code provides that "[i]f an employer discharges an employee, the wages earned and unpaid at the time of discharge are due and payable immediately." CAL. LAB. CODE § 201. "[A] discharge is commonly understood as referring both to an involuntary termination from an ongoing employment relationship and to a release of an employee after completion of a specified job assignment or duration of time." *Smith v. Superior Ct.*, 39 Cal. 4th 77, 92 (2006). Section 203 provides a cause of action against "an employer" who "willfully fails to pay, without abatement or reduction, in accordance with Section[] 201 . . . any wages of an employee who is discharged . . . ." *Naranjo*, 13 Cal. 5th at 113. And "just like other forms of wages, any unpaid premium pay must be paid promptly once an employee leaves the job." *Id.* at 110.

There are two issues of fact that preclude summary judgment on the fifteenth cause of action. First, Mr. Garcia has offered evidence that Roc Nation discharged Mr. Garcia. Roc Nation was responsible for reaching out to individuals to staff Ms. Pete's events. In June 2023, a Roc Nation representative reached out to Mr. Garcia to staff an event. Roc Nation subsequently retracted that offer. Ms. Pete did not give Ms. Perez an explicit direction to cease using Mr. Garcia's services. Thereafter, Roc Nation did not reach out to Mr. Garcia for future events. Thus, a reasonable jury could conclude that Roc Nation discharged Mr. Garcia.

Second, as discussed, summary judgment is inappropriate on the question of whether Roc Nation owed Mr. Garcia an hour of premium pay. As a result, a reasonable jury could conclude that Roc Nation was obligated to promptly pay Mr. Garcia the additional hour of premium pay after deciding to discharge him. Therefore, summary judgment for Roc Nation is inappropriate on the fifteenth cause of action.

Finally, Roc Nation is not entitled to summary judgment on Mr. Garcia's thirteenth cause of action. Roc Nation argues that because it "did not pay [Mr. Garcia] any compensation at any point," it cannot be held liable under Sections 510, 1194, and 1198 of the California Labor Code. Roc Nation Mem. at 19. As is relevant to the thirteenth cause of action, while the "normal[]" rule is that one employer is not "jointly liable for Labor Code violation[s] committed by a co-employer," "every employer is liable to its employees for unpaid minimum wage and overtime compensation." *Noe*, 187 Cal. Rptr. 3d at 851 (citing *Martinez*, 49 Cal. 4th at 49); *see also Miller*, 2018 WL 6421868, at *3 (declining to dismiss minimum wage claim against a defendant even though the other entity engaged in the furnishing of wages). There is a triable issue of fact concerning whether Roc Nation jointly employed Mr. Garcia. Therefore, a reasonable jury could conclude that Roc Nation was jointly liable for unpaid minimum wage and overtime compensation.

Accordingly, the Court cannot grant Roc Nation summary judgment on any of Mr. Garcia's claims under the California Labor Code.

### 2.      New York Law

Defendants are also not entitled to summary judgment on Mr. Garcia's New York wage and hour claims. Just as with the California wage and hour claims, the Pete Defendants argue that Mr. Garcia is not protected by the relevant provisions of the NYLL because he was an independent

contractor, not an employee.[8]  Roc Nation once again argues that it did not jointly employ him.  The Court addresses each argument in turn.

### a.  Mr. Garcia's Independent Contractor Status

A reasonable jury applying New York law could conclude that Mr. Garcia was the Pete Defendants' employee, rather than an independent contractor.  Under the NYLL, "the critical inquiry in determining whether an employment relationship exists pertains to the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Bynog v. Cipriani Grp., Inc.*, 1 N.Y.3d 193, 198 (2003) (citing *Matter of Ted Is Back Corp.* (*Roberts*), 64 N.Y.2d 725, 726 (1984)).  "[C]ontrol over the means is the more important factor to be considered" *Roberts,* 64 N.Y.2d at 726.  "Minimal or incidental control over an employee's work product without the employer's direct supervision or input over the means used to complete the work is insufficient to establish a traditional employment relationship*" Bhanti v. Brookhaven Mem. Hosp. Med. Ctr.*, 687 N.Y.S.2d 667, 669 (N.Y. App. Div. 2d Dept. 1999) (citing *Roberts*, 64 N.Y.2d at 726).

"Factors relevant to assessing control include whether the worker (1) worked at his own convenience, (2) was free to engage in other employment, (3) received fringe benefits, (4) was on the employer's payroll and (5) was on a fixed schedule." *Bynog*, 1 N.Y.3d at 198 (citing *Bhanti*, 687 N.Y.S.2d at 669).  "[N[otwithstanding *Bynog's* enumeration of five factors, 'the critical determinant is the degree to which the purported employer exercises control in fact over the results produced or the means used to obtain them.'" *Hart v. Rick's Cabaret Int'l, Inc.*, 967 F. Supp. 2d 901, 923–24 (S.D.N.Y. 2013) (quoting *Edwards v. Publishers Circulation Fulfillment, Inc.*, 268 F.R.D. 181, 184 (S.D.N.Y. 2010)).  Therefore, "New York courts commonly consider additional factors." *Id.* at 923

---

[8] Here, again, Roc Nation incorporates these arguments by reference.  Roc Nation Mem. at 10 n.6.  For the same reasons identified above, the Court first resolves the issue whether the Pete Defendants were Mr. Garcia's primary employer before turning to the question of whether Roc Nation also jointly employed him.

(collecting cases). "[I]t is not significant how the parties defined the employment relationship." *Id.* at 924. Similarly, "[w]hile the manner in which the relationship is treated for income tax purposes is certainly a significant consideration, it is generally not singularly dispositive." *Gagen v. Kipany Prods., Ltd.*, 812 N.Y.S. 2d 689, 691 (N.Y. App. Div. 3d Dept. 2006).

"The fact-intensive nature of the [NYLL] test[] often precludes courts from granting summary judgment." *Landaeta v. New York & Presbyterian Hosp., Inc.*, No. 12 CIV. 4462, 2014 WL 836991, at *4 (S.D.N.Y. Mar. 4, 2014); *see also Sikorski v. Burroughs Drive Apartments, Inc.*, 762 N.Y.S.2d 718, 721 (N.Y. App. Div. 4th Dept. 2003) (noting that the determination of "whether a worker is an employee or an independent contractor usually presents questions of fact sufficient to preclude summary judgment" (internal quotation marks omitted)). However, "where evidence is undisputed, and the facts are compellingly clear, the issue may be determined as a matter of law." *Sikorski*, 762 N.Y.S.2d at 721 (internal quotation marks omitted); *c.f. Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1059 (2d Cir. 1988) ("The existence and degree of each factor is a question of fact while the legal conclusion to be drawn from those facts—whether workers are employees or independent contractors—is a question of law." (discussing the employment test under the federal Fair Labor Standards Act (the "FLSA"))).

There are genuine disputes of material fact concerning both the existence and degree of the first and second *Bynog* factors and the degree of the Pete Defendants' control over Mr. Garcia's results and the means he used to achieve those results. As it relates to the first *Bynog* factor, there is a genuine dispute of fact concerning whether Mr. Garcia could work at his convenience. "The ability to reject assignments without penalty can support a finding of independent contractor status." *Browning v. Ceva Freight, LLC*, 885 F. Supp. 2d 590, 600 (E.D.N.Y. 2012) (citing *Barak v. Chen*, 929 N.Y.S.2d 315 (N.Y. App. Div. 2nd Dept. 2011), and *Claim of Duffy*, 568 N.Y.S.2d 201 (N.Y. App. Div. 3rd Dept. 1991)). As described above, there is a genuine dispute of fact concerning whether Mr. Garcia could reject assignments without reprisal. *See, e.g.*, Garcia Dep. 183:16–22; Defs.' Exs. 8,

35

34, 53.  The fact that Mr. Garcia rejected assignments only after he had negotiated time off weighs against a finding that Mr. Garcia was an independent contractor.  *See Hart*, 967 F. Supp. 2d at 925 (fact that putative employees had to "obtain permission" before leaving supported denial of summary judgment on NYLL claims).  Additionally, as described above, the Pete Defendants expected Mr. Garcia to respond to requests for work product promptly at all hours.  Thus, a reasonable jury could conclude that Mr. Garcia could not work at his convenience.

As it relates to the second *Bynog* factor, a reasonable jury could conclude that Mr. Garcia's freedom to take other employment opportunities was limited.  "[O]n its face, a company relinquishes control over its workers when it permits them to work for its competitors."  *Saleem v. Corp. Transportation Grp., Ltd.*, 854 F.3d 131, 141 (2d Cir. 2017) (construing the FLSA).  "[W]hen an individual is able to draw income through work for others, he is less economically dependent on his putative employer."  *Id.*  "This lack of control, while not dispositive, weighs in favor of independent contractor status."  *Id.*  Mr. Garcia offered evidence that he could not photograph individuals that Ms. Pete viewed as competitors.  In particular, Ms. Pete testified that, in the competitive space of female rappers, it was important to have a "close personal team" that did not work with competitors in order to maintain a unique look.  Pete Dep. 97:11–98:14.  Ms. Pete prevented her make-up artist, Ms. Garcia, from working for another female artist she viewed as a competitor.  Aleks Garcia Dep. 80:25–81:13.  And Mr. Garcia viewed such exclusivity as a condition of his engagement with Ms. Pete.  Garcia Dep. 70:14–24.  Accordingly, there is a genuine dispute of fact regarding the extent to which the Pete Defendants permitted Mr. Garcia to work for others.

Finally, there are triable issues of fact that are relevant to the ultimate inquiry regarding the "degree of control exercised by the purported employer over the results produced or the means used to achieve the results."  *Bynog*, 1 N.Y.3d at 198.  As detailed in connection with the parallel inquiry under California law, there is a genuine dispute of fact concerning the extent to which Mr. Garcia retained control over his work product.  Ms. Pete required Mr. Garcia to generate creative proposals

for meetings at Roc Nation offices, controlled what footage he was allowed to use, and supervised the editing process. Thus, a reasonable jury could conclude that the Pete Defendants exercised a high degree of control over Mr. Garcia's work product and the process by which he produced that work product.

Although the third, fourth, and fifth *Bynog* factors weigh in favor of finding that Mr. Garcia was an independent contractor, they do not do so dispositively. As it relates to the third and fourth *Bynog* factors, the fact that Mr. Garcia was designated as an independent contractor in the March 2020 Agreement does not resolve the "critical inquiry" under the NYLL. *Bynog*, 1 N.Y.3d at 198. Under New York law, "[t]he fact that a contract exists designating a person as an independent contractor is a factor to be considered" in determining whether an individual was an employee or independent contractor, "but is not dispositive." *Perez v. NES Med. Servs. of New York, P.C.*, 162 N.Y.S.3d 777, 778 (N.Y. App. Div. 2d Dept. 2022). Mr. Garcia was not on the Pete Defendants' payroll and did not receive fringe benefits because the March 2020 Agreement designated him an independent contractor. Defs.' Ex. 7. Thus, the third and fourth *Byong* factors weigh in favor of a finding that Mr. Garcia was an independent contractor. However, those factors are not dispositive where, as here, there are genuine disputes of fact regarding such that a reasonable jury could conclude that the Pete Defendants exercised a high "degree of control" "over the results produced" and "the means used." *See Bynog*, 1 N.Y.3d at 198; *see also Hart*, 967 F. Supp. 2d at 925 ("To assign [the fringe benefits] factor much weight would effectively allow any employer to control, under New York law, a worker's status simply by labeling her an independent contractor and denying her employee benefits.").

Nor is the tax treatment of Mr. Garcia's relationship with the Pete Defendants dispositive. Under the terms of the March 2020 Agreement, Mr. Garcia was responsible for paying all applicable income taxes. Defs.' Ex. 7 at GAR00000016–18. Thus, the Pete Defendants issued him 1099 tax forms and Mr. Garcia wrote off his purchases of photography equipment on his tax filings.

DSOMF ¶¶ 90–96, 97.  The fact that he received a 1099 form and not a W-2 cuts in favor of finding that he was an independent contractor.  However, Mr. Garcia's tax filings are not singularly dispositive where, as here, a reasonable jury could conclude that the other factors weigh heavily against finding that Mr. Garcia was an independent contractor.  *See Hernandez v. Chefs Diet Delivery, LLC*, 915 N.Y.S.2d 623, 625–26 (N.Y. App. Div. 2nd Dept. 2011) (finding federal income tax documents and contracts identifying plaintiffs as independent contractors was insufficient to "conclusively establish[]" that the plaintiffs were independent contractors); *cf. Gagen*, 812 N.Y.S.2d at 691 (affirming court's decision granting putative employer's motion for summary judgment and noting that the only evidence of employee status was the plaintiff's "self-serving affidavit" controverted by income tax filings made "under penalty of perjury").

As it relates to the fifth *Bynog* factor, even though Mr. Garcia did not maintain regular working hours, this factor does not weigh dispositively in the Pete Defendants' favor.  The fact that a putative employee regularly worked at the same time each day for their putative employer weighs in favor of finding an employment relationship.  *Landaeta*, 2014 WL 836991, at *6.  Mr. Garcia's working hours were inconsistent.  He did not photograph Ms. Pete every day.  When he provided in-person services, he did not work at the same time of day.  *See* Defs.' Exs. 18, 56.  Instead, he worked all hours, often late into the night.  *Id.*  He was also expected to respond to requests for work products at all hours when he was not providing services at a particular event.  *See, e.g.*, Pete Dep. 63:3–64:18; Defs.' Ex. 12.  Although Mr. Garcia's hours were irregular, the fact that he was at his putative employers' beck and call is evidence that they exercised a high degree of control over the means by which he produced work product.  *See Frost v. Lentex Co., LLC*, No. 20-cv-5313, 2022 WL 17968058, at *6 (S.D.N.Y. Dec. 27, 2022) (denying putative employer's motion for summary judgment and noting that "Plaintiff was also 'on-call' to handle emergencies . . . .").

Accordingly, the Pete Defendants are not entitled to summary judgment on Mr. Garcia's New York wage and hour claims.

### b. Roc Nation's Employer Status

Roc Nation is not entitled to summary judgment on Mr. Garcia's New York wage and hour claims. "The NYLL's definition of 'employer' is [] broad, focused on the degree of control exercised by the purported employer over the results produced or the means used to achieve the results." *Nereo v. Shleppers Holdings, LLC*, No. 22-cv-9505, 2025 WL 936570, at *4 (S.D.N.Y. Mar. 27, 2025) (internal quotation marks omitted). "Even when one entity exerts 'ultimate' control over a worker, that does not preclude a finding that another entity exerts sufficient control to qualify as a joint employer." *Id.* at *5 (quoting *Barfield v. New York City Health & Hosps. Corp.*, 537 F.3d 132, 148 (2d Cir. 2008)). Because "[t]he statutory standard for employer status under the NYLL is nearly identical to that of the FLSA," *id.* at *4 (quoting *Hart*, 967 F. Supp. 2d at 940), "courts in this District regularly apply the same tests to determine whether entities were joint employers under NYLL and the FLSA," *id.* (quoting *Martin v. Sprint United Mgmt. Co.*, 273 F. Supp. 3d 404, 422 (S.D.N.Y. 2017) (collecting cases)).

"The qualification of a joint employer is grounded in the 'economic reality rather than technical concepts.'" *Id.* at *5 (quoting *Barfield*, 537 F.3d at 141). The joint employer test is a "flexible concept" that should be analyzed "on a case-by-case basis" after reviewing "the totality of the circumstances." *Id.* An entity can be considered a joint employer if it exercises either "formal control" or "functional control" over the worker. *Barfield*, 537 F.3d at 143.

"The formal-control test asks whether the alleged employer '(1) had the power to hire and fire the employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records.'" *Castillo v. Albert Einstein Coll. of Med. Inc.*, No. 24-cv-984, 2025 WL 692124, at *3 (S.D.N.Y. Mar. 4, 2025) (quoting *Carter v. Dutchess Cmty. Coll.*, 735 F.2d 8, 12 (2d Cir. 1984)). "No one of these factors is dispositive, nor [are] they, as a whole, exclusive." *Barfield*, 537 F.3d at 142–43. "[T]he determination of joint employer status is rarely appropriate to make at the summary

39

judgment stage, 'because of the fact-intensive character of a determination of joint employment.'" *Hart*, 967 F. Supp. 2d at 941 (quoting *Barfield*, 537 F.3d at 143–44).

A reasonable jury could find that Roc Nation exercised formal control over Mr. Garcia. There are genuine disputes of fact concerning all four formal control factors. With respect to the first formal control factor, there is a genuine issue of fact concerning whether Roc Nation had the authority to hire and fire Mr. Garcia. Roc Nation was responsible for staffing Ms. Pete's events. In June 2023, a Roc Nation representative reached out to Mr. Garcia to staff an event for Essence in New Orleans. The representative and Mr. Garcia confirmed that he would staff the event. Roc Nation subsequently retracted that offer. Ms. Pete did not give Ms. Perez an explicit direction to cease using Mr. Garcia's services. Thereafter, Roc Nation did not reach out to Mr. Garcia for future events. On this record, a reasonable jury could conclude that Roc Nation had the authority to hire and fire Mr. Garcia and exercised that authority by retracting the Essence offer and by deciding not to reach out for future events.

As discussed in connection with the Court's analysis of the joint employer inquiry under California law, there are genuine disputes of fact concerning the second and third factors. Roc Nation set schedules for Ms. Pete's events and directed Mr. Garcia to respond promptly to requests for work product. A reasonable jury could therefore conclude that Roc Nation thus "supervised . . . [Mr. Garcia's] work schedule[]." *Carter*, 735 F.2d at 12. As described above, there is also a disputed issue of fact regarding whether Roc Nation exercised authority to set Mr. Garcia's rate of pay.

As is relevant to the fourth formal control factor, there is a genuine dispute of fact concerning whether Roc Nation maintained employment records. This factor "examines whether the purported joint employer maintained Plaintiff's employment records, which include an employee's personnel files, time sheets, pay stubs, and government employment forms." *Hugee v. SJC Grp., Inc.*, No. 13 CIV. 0423, 2013 WL 4399226, at *7 (S.D.N.Y. Aug. 14, 2013). The "employment records on the matter most relevant to overtime obligations under the [NYLL]" are

those relating to "hours worked." *Barfield*, 537 F.3d at 144.  A reasonable jury could conclude that

Roc Nation maintained records related to Mr. Garcia's hours worked.  Mr. Garcia sent his invoices

to Roc Nation representatives, including Roc Nation's CEO Ms. Perez.  *See* Defs.' Ex. 6.  Those

invoices included the hours Mr. Garcia worked.  *See, e.g.*, *id.* at MTS00000052.  Roc Nation reviewed

these invoices, used them to determine whether Mr. Garcia's rate of pay was commensurate with the

agreement Roc Nation negotiated, submitted them for Ms. Pete's eventual approval, and at times

double-checked those invoices after they had been submitted.  *See, e.g.*, Defs.' Ex. 12.  Thus, a

reasonable jury could find that Roc Nation maintained Mr. Garcia's employment records.  *See Gil v.*

*Pizzarotti, LLC*, No. 1:19-CV-03497, 2021 WL 1178027, at \*12 (S.D.N.Y. Mar. 29, 2021) (concluding

that a jury could find that the fourth formal control factor "supports a finding of joint employment"

where putative joint employer "signed off on plaintiffs' timesheets, verified the number of hours

worked, and provided records of the hours worked" to primary employer, who "used the records to

compensate [the plaintiffs] on a per-hour basis" (citing *Barfield*, 537 F.3d at 144) (internal quotations

and alterations omitted)).

Accordingly, Roc Nation is not entitled to summary judgment on Mr. Garcia's New York

wage and hour claims.

### B.    Hostile Work Environment and Discrimination Claims

#### 1.    New York Law

##### a.  Impact Test

The Pete Defendants are not entitled to summary judgment on Mr. Garcia's Human Rights

Law discrimination claims because a reasonable jury could conclude that the Pete Defendants'

alleged discriminatory conduct had an impact on Mr. Garcia in New York City.  The NYSHRL

prohibits an employer from "discharg[ing] . . . or [] discriminat[ing] against [an] individual in

compensation or in terms, conditions or privileges of employment" "because of [the]

41

individual's . . . sexual orientation, . . . sex, [or] disability." N.Y. EXEC. LAW § 296(a). To establish a hostile work environment claim under the NYCHRL, "the plaintiff need only demonstrate by a preponderance of the evidence that she has been treated less well than other employees because of her [gender, disability, or sexual orientation]." *Mihalik v. Credit Agricole Cheuvreux N.A., Inc.*, 715 F.3d 102, 110 (2d Cir. 2013) (internal quotation marks omitted); *see* N.Y.C. ADMIN. CODE § 8-107(1)(a)(3). Under both the NYSHRL and the NYCHRL, "[t]he plaintiff[] bears the burden of showing that the conduct is caused by a discriminatory motive." *Mihalik*, 715 F.3d at 110. "It is not enough that a plaintiff has an overbearing or obnoxious boss[;] [s]he must show that she has been treated less well at least in part '*because of* her [protected characteristic].'" *Id.* (emphasis in original).

The New York Court of Appeals "established an 'impact' test for nonresidents seeking to assert claims under the State and City Human Rights Laws." *Syeed v. Bloomberg L.P.*, 41 N.Y.3d 446, 451 (2024) (citing *Hoffman v. Parade Publications*, 15 N.Y.3d 285 (2010)). There are "two ways in which a nonresident may satisfy the impact requirement: (1) working in New York or (2) establishing that the challenged conduct had some impact on the plaintiff within the respective New York geographic boundaries." *Id.* at 452. "[T]he impact test [thus] 'expands' the protections of the Human Rights Laws 'to nonresidents who work in the' state or city and to those who 'state a claim that the alleged discriminatory conduct had any impact in either of those locations.'" *Id.* at 451–52 (internal citations omitted) (quoting *Hoffman*, 15 N.Y.3d at 290, 292).

Defendants are not entitled to summary judgment on Mr. Garcia's City and State Human Rights Law discrimination claims. Here, Mr. Garcia worked in New York City: "approximately . . . 40-50% of [his working] time" was spent in New York City. Garcia Decl. ¶¶ 4–5.[9] Indeed, one of the events giving rise to Mr. Garcia's Human Rights Law claims occurred while Mr. Garcia was working in New York City—the New York Outing. Thus, a reasonable jury could conclude that

---

[9] The Pete Defendants ask the Court to opine on the credibility of Mr. Garcia's declaration. For the reasons stated above, the Court declines to do so.

Mr. Garcia has satisfied one of the "two ways in which a nonresident may satisfy the impact requirement." *Syeed*, 41 N.Y.3d at 452.

The Pete Defendants' reliance on *King v. Aramark Services, Inc.* is unavailing for the same reasons identified in the Court's prior order. 96 F.4th 546 (2d Cir. 2024). In *King*, "which was issued only days after *Syeed* and does not cite to *Syeed*, the Second Circuit held that the plaintiff could not prove an impact felt in New York because she spent only 'intermittent' time working in New York." *Garcia*, 2025 WL 1865965, at *12 (quoting *King*, 96 F.4th at 558). The Second Circuit concluded that "the fact that [the defendant] permitted [the plaintiff] to do *some* of her work from her New York residence, and *some* of the discriminatory conduct [the plaintiff] alleges took place while she was working from her New York home office" was insufficient to satisfy the impact test. *King*, 96 F.4th at 558 (emphasis in original). Here, however, New York City was not the incidental location where Mr. Garcia sometimes chose to work with Defendants' permission. Mr. Garcia staffed events that took place in New York City and worked in New York for nearly half of his working time. Therefore, a reasonable jury could conclude that he has satisfied the impact requirement.

For similar reasons, the Court declines to limit Mr. Garcia's Human Rights Law claims to conduct that took place in New York City. The cases on which the Pete Defendants rely on as legal support for their request are factually distinguishable because none of the plaintiffs worked in New York City. In *Lieberman v. C.A. Goldberg, PLLC*, the Rhode Island resident plaintiff worked remotely in Rhode Island for a New York-based law firm and did not connect any of the alleged discriminatory acts to New York City. No. 1:21-CV-5053, 2025 WL 1607098, at *7 (E.D.N.Y. Apr. 30, 2025). The same is true of the plaintiff in *Trotter v. National Football League*, a California resident

that worked in California.  737 F. Supp. 3d 172, 192–93 (S.D.N.Y. 2024).[10]  In *Troeger v. JetBlue Airways Corporation*, the court concluded alleged discriminatory conduct that took place following that plaintiff's transfer from New York to Florida could not sustain an HRL claim because the only allegations connecting the conduct to New York contradicted other allegations in the complaint.  No. 23-CV-10859, 2024 WL 5146185, at *7–8 (S.D.N.Y. Dec. 17, 2024) ("Where a complaint contains contradictory factual allegations, the Court is not obligated to accept them as true").  Here, Mr. Garcia worked in New York City.  Accordingly, the Pete Defendants are not entitled to summary judgment on Mr. Garcia's City and State Human Rights law discrimination claims, and Mr. Garcia's claims need not be limited to conduct that took place within the geographic boundaries of New York City and State.

### b.  Roc Nation's Employer Status

Roc Nation is not entitled to summary judgment on the NYCHRL and NYSHRL claims because a reasonable jury could conclude that Roc Nation was Mr. Garcia's employer.  The City and State Human Rights protect both employees and non-employees.  The New York Court of Appeals has held that when "determin[ing] who is an employer" for purposes of the human rights law, courts should consider four factors:  "(1) the selection and engagement of the servant; (2) the payment of salary or wages; (3) the power of dismissal; and (4) the power of control of the servant's conduct." *Griffin v. Sirva, Inc.*, 29 N.Y.3d 174, 186 (2017) (internal citation and quotation marks omitted); *see also Fernandes v. Jadah Carroll, LLC*, 134 N.Y.S.3d 181, 182 (N.Y. App. Div. 1st Dept. 2020) (holding that in the NYCHRL context, "control over the conduct of another including selection, payment of wages, and power of dismissal . . . is the essential element of being an employer" (internal quotation marks and brackets omitted)).  "[T]he really essential element of the relationship is the right of

---

[10] Although the Pete Defendants characterize *Trotter* and *Lieberman* as cases applying *Syeed*, neither decision cites to *Syeed*. They instead compare their respective plaintiffs' circumstances to those considered in *Hoffman*.  *Lieberman*, 2025 WL 1607098, at *7; *Trotter*, 737 F. Supp. 3d at 192–93.

control, that is, the right of one person, the master, to order and control another, the servant, in the performance of work by the latter." *Griffin*, 29 N.Y.3d at 186 (internal quotations and citations omitted).

For the same reasons as identified in connection with the wage and hour claims, there remain genuine disputes of fact concerning whether Mr. Garcia was an employee of Roc Nation within the meaning of the Human Rights Laws. While it is uncontroverted that Roc Nation was not involved in the decision to use Mr. Garcia's services in the first instance, there are genuine disputes of fact concerning their power to control his schedule, decide his rate of pay, and to terminate his services. Accordingly, Roc Nation is not entitled to summary judgment on Mr. Garcia's New York State and City Human Rights Law claims.

### 2.    California Law

Defendants are entitled to summary judgment on Mr. Garcia's claims under the California Fair Employment and Housing Act because they did not subject him to any conduct because of his sexual orientation. "California courts have adopted the [Title VII] standard for hostile work environment sexual harassment claims under the FEHA." *Lyle v. Warner Brothers TV Productions*, 38 Cal. 4th 264, 279 (2006). Therefore, under the FEHA, "a hostile work environment sexual harassment claim requires a plaintiff employee to show she was subjected to sexual advances, conduct, or comments that were (1) unwelcome; (2) because of sex; and (3) sufficiently severe or pervasive to alter the conditions of her employment and create an abusive work environment." *Id.* (internal citations omitted) (citing *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 80–81 (1998)).

"The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* at 283 (cleaned up) (quoting *Oncale*, 523 U.S. at 81–82). "That inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target[.]" *Id.* (quoting *Oncale*, 523 U.S. at

81–82). "The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* (quoting *Oncale*, 523 U.S. at 81–82).

No reasonable jury could find any Defendant liable for any of Mr. Garcia's FEHA claims. Mr. Garcia did not address the Pete Defendants' arguments concerning his hostile work environment claim. *See generally* Pete Opp.; Roc Nation Opp. For that reason alone, Mr. Garcia has waived any arguments in opposition to Defendants' motion for summary judgment on that claim. *See Conklin v. U.S. Immigr. & Customs Enf't*, 661 F. Supp. 3d 239, 264 (S.D.N.Y. 2023). Mr. Garcia's hostile work environment claim fails for the independent reason that he cannot show that any actionable conduct was based on his sexual orientation. Mr. Garcia premises his FEHA claim on the fact that the Pete Defendants required him to provide photography services at events in strip clubs in California. *See* SAC ¶ 202. However, it is undisputed that invitations to attend these events were extended to every member of Ms. Pete's entourage. *See* Pete Dep. 154:10–18; Garcia Dep. 116:16–23. There is no evidence that Mr. Garcia was singled out for participation at all, much less that he was singled out based on his sexual orientation. *See Kelley v. The Conco Companies*, 126 Cal. Rptr. 3d 651, 664 (Cal. Ct. App. 2011) ("No evidence . . . was presented from which a reasonable trier of fact could conclude that they were an expression of actual sexual desire or intent by Seaman, or that they resulted from Kelley's actual or perceived sexual orientation."). The social context in which outings took place provides further evidence that Mr. Garcia did not experience disparate treatment on account of his sexual orientation: every member of Ms. Pete's entourage is "bisexual or gay." Pete Dep. 266:4–9.

Because Defendants are entitled to summary judgment on Plaintiff's hostile work environment claim, the Corporate Defendants are entitled to summary judgment on Mr. Garcia's claim for failure to prevent or remedy harassment under the FEHA. *See Tran v. Cnty. of Orange*, No. 8:23-cv-00681, 2024 WL 5440864, at *8 (C.D. Cal. Aug. 1, 2024) ("Because [Plaintiff's racial

harassment claim] fails, Plaintiff has no basis for her failure to prevent and remedy harassment claim, as she cannot show that Defendant failed to prevent harassment where there has been no finding of harassment."); *Carter v. Cal. Dept. of Veterans Affairs*, 38 Cal. 4th 914, 925 n.4 (2006) ("[C]ourts have required a finding of actual discrimination or harassment under FEHA before a plaintiff may prevail under section 12940, subdivision (k)."). Accordingly, Defendants are entitled to summary judgment on both of Mr. Garcia's claims under the FEHA.

## C.    Retaliation Claims

### 1.    New York Law

#### a.  Human Rights Laws

Defendants are entitled to summary judgment on Mr. Garcia's claims of retaliation under the NYCHRL and NYSHRL because Mr. Garcia did not engage in a protected activity. The NYSHRL prohibits retaliation "against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article." N.Y. EXEC. LAW § 296(7). The NYCHRL is materially identical: "Section 8-107(7) of the NYCHRL prohibits employers from 'retaliating or discriminating in any manner against any person because such person has opposed any practice forbidden under this chapter.'" *Mihalik*, 715 F.3d at 112 (quoting N.Y.C. ADMIN. CODE § 8-107(7)) (alterations omitted). After the 2019 amendments to the NYSHRL, "the standard for claims [under the NYSHRL] [is] closer to the standard under the NYCHRL." *Wellner v. Montefiore Med. Ctr.*, No. 17-cv-3479, 2019 WL 4081898, at *5 n.4 (S.D.N.Y. Aug. 29, 2019); *see also Lee v. Riverbay Corp.*, 751 F. Supp. 3d 259, 284 (S.D.N.Y. 2024); *McHenry v. Fox News Network, LLC*, 510 F. Supp. 3d 51, 68 (S.D.N.Y. 2020). Accordingly, Plaintiff must prove that "(1) [he] engaged in a protected activity as that term is defined under the NYCHRL, (2) [his] employer was aware that [he] participated in such activity, (3) [his] employer engaged in conduct which was reasonably likely to deter a person from engaging in that protected

activity, and (4) there is a causal connection between the protected activity and the alleged retaliatory conduct." *Bilitch v. N.Y.C. Health & Hosps. Corp.*, 148 N.Y.S.3d 238, 246 (N.Y. App. Div. 2d Dept. 2021).

"'In assessing retaliation claims that involve neither ultimate actions nor materially adverse changes in terms and conditions of employment, it is important that the assessment be made with a keen sense of workplace realities, of the fact that the "chilling effect" of particular conduct is context-dependent, and of the fact that a jury is generally best suited to evaluate the impact of retaliatory conduct in light of those realities." *Brightman v. Prison Health Serv., Inc.*, 970 N.Y.S.2d 789, 791 (N.Y. App. Div. 2d Dept. 2013) (quoting *Williams v. New York City Hous. Auth.*, 872 N.Y.S.2d 27, 34 (N.Y. App. Div. 1st Dept. 2009)).

Based on the undisputed facts, Mr. Garcia did not engage in a protected activity. "The New York Court of Appeals has held that 'opposing any practice' can include situations where a person, before the retaliatory conduct occurred, merely 'made clear [his] disapproval of the defendant's discrimination by communicating to [her], in substance, that [he] thought [her] treatment of the victim was wrong." *Mihalik*, 715 F.3d at 112 (citing *Albunio v. City of New York*, 16 N.Y.3d at 749). To "constitute protected activity," the actions must be "sufficiently clear to communicate an opposition" to the challenged practice. *Qorrolli v. Metro. Dental Assocs.*, 124 F.4th 115, 124 (2d Cir. 2024). As is relevant to his Human Rights Law claims, Mr. Garcia asserts that he opposed Ms. Pete's allegedly discriminatory conduct by removing himself from the strip club during the New York Outing and by confirming that he was in the vehicle when Ms. Pete asked him about the Ibiza Outing. Pete Opp. at 25.[11] Mr. Garcia did not verbally express his opposition in either instance. His "silence, inaction, and avoidance" were "insufficiently clear, as a matter of law, to constitute a

---

[11] Mr. Garcia also mentions raising issues related to his pay. He does not allege that any issues related to his pay were examples of unlawful discrimination. The Court will address those communications as it relates to his claims under the New York Labor Law and the California Labor Code.

protected activity" within the meaning of the NYCHRL or the NYSHRL. *Qorrolli*, 124 F.4th at 124–25. Accordingly, Defendants are entitled to summary judgment on his retaliation claims under the NYCHRL and the NYSHRL.

### b. New York Labor Law

Neither the Pete Defendants nor Roc Nation are entitled to summary judgment on Mr. Garcia's retaliation claims under the New York Labor Law because a reasonable jury could conclude that each of the Defendants retaliated against him for his complaints concerning his wages. NYLL § 215 provides, in pertinent part, that no employer "shall discharge, threaten, penalize, or in any other manner discriminate or retaliate against any employee (i) because such employee has made a complaint to his or her employer . . . that the employer has engaged in conduct that the employee, reasonably and in good faith, believes violates any provision of [the NYLL]." N.Y. LAB. LAW § 215(1)(a); *see also Schmidt-Sarosi v. Offs. For Fertility & Reprod. Med., P.C.*, 150 N.Y.S.3d 75, 78 (N.Y. App. Div. 1st Dept. 2021). "[T]he elements of FLSA and NYLL retaliation claims overlap in all material respects." *Cortese v. Skanska Koch, Inc.*, 544 F. Supp. 3d 456, 470 (S.D.N.Y. 2021).

Like the FLSA, "NYLL retaliation claims [under Section 215] are evaluated according to the Supreme Court's burden-shifting framework in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)." *Id.* "Under that framework, '[o]nce [a plaintiff] makes a prima facie case of . . . retaliation, the burden shifts to the employer to give a legitimate . . . reason for its actions,' and, '[i]f the employer does so, the burden then shifts back to the plaintiff to show that the employer's explanation is a pretext for . . . retaliation.'" *Wang v. Palmisano*, 157 F. Supp. 3d 306, 328 (S.D.N.Y. 2016) (quoting *Kirkland v. Cablevision Sys.*, 760 F.3d 223, 225 (2d Cir. 2014)). "To establish a prima facie case [of retaliation], the plaintiff must show (1) participation in protected activity known to the defendant . . . ; (2) adverse employment action [a]ffecting the plaintiff; and (3) a causal connection

between the protected activity and the adverse employment action." *Cortese*, 544 F. Supp. 3d at 470 (quoting *Mullins v. City of New York*, 626 F.3d 47, 53 (2d Cir. 2010)).

NYLL § 740, often referred to as New York's 'whistleblower law,' prohibits "[a]n employer" from taking "any retaliatory action against an employee . . . because such employee . . . discloses, or threatens to disclose to a supervisor or to a public body an activity, policy or practice of the employer that the employee reasonably believes is in violation of law, rule or regulation . . . " N.Y. LAB. LAW § 740(2)(a). Under the statute, a plaintiff must first prove that she disclosed or threatened to disclose to a supervisor an activity, policy, or practice of the employer that the employee at least reasonably believed was illegal. *Id.*

"The plain language of Labor Law § 740(2)(a) does not impose any requirement that a plaintiff identify the specific 'law, rule or regulation' violated as part of a section 740 claim." *Webb-Weber v. Cmty. Action for Hum. Servs., Inc.*, 23 N.Y.3d 448, 452 (N.Y. 2014). "[I]n order to recover under a Labor Law § 740 theory, the plaintiff has the burden of proving that an actual violation occurred, as opposed to merely establishing that the plaintiff possessed a reasonable belief that a violation occurred." *Id.*

The plaintiff must then point to a retaliatory, adverse action taken by the employer in response to that complaint. *See* N.Y. LAB. LAW § 740(1)(e). As a result, for an employer "[t]o fall afoul of the [whistleblower] statute," "the adverse action must [have been] taken 'because' the employee engaged in protected activity. In other words, the whistleblower statute . . . requires some causal connection between an adverse personnel action and a report of [illegal] activity." *Duarte v. St. Barnabas Hosp.*, 265 F. Supp. 3d 325, 354 (S.D.N.Y. 2017) (quoting *Varughese v. Mount Sinai Med. Ctr.*, No. 12-cv-8812, 2015 WL 1499618, at *68 (S.D.N.Y. Mar. 27, 2015)). However, unlike NYLL § 215, the "whistleblower cause of action incorporates policies, elements and remedies distinct from those of Title VII, and such claims are not analyzed under the *McDonnell Douglas* burden-shifting framework." *Id.* (internal citations and quotations omitted).

A reasonable jury could conclude that Mr. Garcia engaged in protected activity by lodging complaints about his wages and that Defendants retaliated by terminating him in June 2023. "A complaint giving rise to an [NYLL § 215] retaliation claim may be either written or oral, and may be made directly to the employer rather than a regulatory agency, as long as 'a reasonable, objective person would have understood the employee to have put the employer on notice that the employee is asserting statutory rights under [the NYLL]." *Blackwell v. Actor's Playhouse*, No. 14CV603, 2016 WL 11483834 (S.D.N.Y. Apr. 4, 2016), *report and recommendation adopted*, No. 14 CIV. 00603, 2016 WL 5239623 (S.D.N.Y. Sept. 22, 2016) (quoting *Greathouse v. JHS Sec. Inc.,* 784 F.3d 105, 116 (2d Cir. 2015). As it relates to Section 740, to "disclose" is to "make (something) known or public." *Disclose*, BLACK'S LAW DICTIONARY (12th ed. 2024).

A reasonable jury could conclude that Mr. Garcia's "ma[de] known" Defendants' wage and hour violations to both Roc Nation and the Pete Defendants and that a reasonable person would have understood Mr. Garcia to have put both the Pete Defendants and Roc Nation on notice that he was asserting his statutory rights. Mr. Garcia asserts that all Defendants violated both the New York Labor Law and the California Labor Code because they failed to adequately compensate him for his services.

As it relates to Roc Nation, Mr. Garcia sent emails to the CEO of Roc Nation, Ms. Perez, which stated, in substance, that he had not been paid the wages he was owed. Defs.' Exs. 11–13. He questioned why his invoices for editing had been rejected when he had "always been paid on weeks when [he was] away remotely . . . ." to compensate him for his time "on call." Defs.' Ex. 12 at GAR00000076. He stated that he would not accept work without compensation for his on-call time. *Id.* at GAR00000073. He also included his attorney in these communications. *Id.* The fact that Mr. Garcia's emails included his counsel and that he complained that he was being underpaid is evidence that he was making known to Roc Nation conduct that he reasonably believed to be in violation of labor laws. For similar reasons, there is a triable issue of fact concerning whether s

reasonable person would have understood Mr. Garcia to be putting Roc Nation on notice that he was asserting his statutory rights. Thus, a reasonable jury could conclude that Mr. Garcia engaged in protected activity with Roc Nation.

A reasonable jury could also conclude that he engaged in protected activity with the Pete Defendants. On an email thread that included his attorney, Mr. Garcia asked Ms. Perez to notify Ms. Pete that he would be rejecting remote editing requests if he was not paid at the weekly rate established in the June 2022 Agreement. Defs.' Ex. 12 at GAR00000074. There is circumstantial evidence that Ms. Perez spoke with Ms. Pete about Mr. Garcia's threat to reject editing requests if he was not compensated at the agreed upon rate. Ms. Perez responded to Mr. Garcia's request to notify Ms. Pete by initiating a negotiation for a different rate for editing. Defs.' Ex. 12 at GAR0000073. Thereafter, Mr. Garcia was compensated at a lower, hourly rate for editing. Defs.' Ex. 6 at MTS00000052. Roc Nation was not able to "approve payments or any invoices," and could not "bind [Ms. Pete]" to pay anyone without her explicit approval. Perez Decl. ¶ 7. Thus, the fact that he was paid for editing is circumstantial evidence that Ms. Pete—having had to approve the editing rate—was made aware of Mr. Garcia's complaints about his rate of pay and about his threat to cease editing services. Additionally, Ms. Pete and Ms. Perez communicated about invoices and focused on those that appeared to overcharge Ms. Pete. *See* Pete Dep. 107:16–108:16 (testimony that Ms. Pete would have Ms. Perez double-check invoices to ensure that no one "overcharge[d]" her). Ms. Perez describes Mr. Garcia's July 2022 invoice as one such invoice. Defs.' Ex. 12 at GAR00000073 (email from Ms. Perez characterizing Mr. Garcia as having "over billed" by charging his weekly rate for remote, on call work). The fact that Mr. Garcia's July 2022 invoice was of the type that Ms. Pete would ask Ms. Perez to review is additional circumstantial evidence that Ms. Pete and Ms. Perez discussed the issues regarding Mr. Garcia's July 2022 invoice. Therefore, a reasonable jury could conclude that a reasonable person would have understood his request to inform Ms. Pete of his prospective rejection of editing requests as putting Ms. Pete "on notice that [he was] asserting

[his] statutory rights." *Greathouse,* 784 F.3d at 116.  Similarly, a reasonable jury could conclude that Mr. Garcia was making known to the Pete Defendants conduct that he reasonably believed to be in violation of labor laws.

As is relevant to his claims under both Section 215 and Section 740, there is a genuine dispute of fact concerning whether Mr. Garcia was subjected to an adverse employment action by each of the Pete Defendants and Roc Nation.  A representative from Roc Nation communicated the decision to retract the offer to work at the Essence festival.  Thereafter, Roc Nation did not reach out to Mr. Garcia for future events.  As described above, a reasonable jury could conclude that Roc Nation made the decision to cease using Mr. Garcia's services.  The record contains evidence that Ms. Pete also decided to terminate Mr. Garcia.[12]  Roc Nation "followed Ms. Pete's instructions as to which photographer [she] wanted to use, and did not have the authority to contradict Ms. Pete's instructions."  Perez Decl. ¶ 18.  Thus, a reasonable jury could conclude that, after the June 2023 Facetime Conversation, Ms. Pete directed that Roc Nation reach out to other photographers and not Mr. Garcia.  Ms. Pete could also reach out to Mr. Garcia to provide services directly, Perez Decl. ¶ 10, but did not do so after Roc Nation retracted the Essence New Orleans offer.  Therefore, a reasonable jury could conclude that each of the Pete Defendants and Roc Nation subjected Mr. Garcia to an adverse employment action.

There is also a genuine dispute of fact concerning whether there was a causal relationship between Mr. Garcia's complaints related to his pay and the decision to cease using his services.  "A causal connection may be established by temporal proximity, but can also be established through evidence of retaliatory intent."  *Nunez v. Metro. Learning Inst., Inc.*, No. 1:18-CV-1757, 2019 WL 5457731, at *2 (E.D.N.Y. Oct. 24, 2019) (citing *Gordon v. New York City Bd. Of Educ.*, 232 F.3d 111, 117 (2d Cir. 2000), then *Johnson v. Palma*, 931 F.2d 203, 207 (2d Cir. 1991)) (construing the FLSA's

---

[12] Indeed, Roc Nation argues that the decision to terminate Mr. Garcia was Ms. Pete's alone.

retaliation provision).  "[I]t is well settled that when 'mere temporal proximity' is offered to demonstrate causation, the protected activity and the adverse action must occur 'very close' together." *Galimore v. City Univ. of N.Y. Bronx Cmty. Coll.,* 641 F. Supp. 2d 269, 288 (S.D.N.Y. 2009) (quoting *Clark Cty. Sch. Dist. v. Breeden,* 532 U.S. 273–74 (2001)) (construing Title VII claim). However, the Second Circuit "has not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal relationship."  *Gorman-Bakos v. Cornell Co-op Extension of Schenectady Cty.*, 252 F.3d 545, 554 (2d Cir. 2001);  *see also Santana v. Rent A Throne, Inc.*, No. 2:15-cv-2563, 2018 WL 1027667, at *8 (E.D.N.Y. Feb. 21, 2018) (five-month gap sufficient even at the summary judgment stage); *Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 45–46 (2d Cir. 1980) (eight month gap between EEOC complaint and retaliatory act suggested causal relationship).

The record contains evidence of retaliatory animus on the part of both Roc Nation and the Pete Defendants.  Ms. Perez described Mr. Garcia as "an issue" and a "problem" for complaining about his wages because he was "calling and emailing everyone all the time, calling his lawyer, [having] his lawyer call[] [Roc Nation Chief Financial Officer] Sean [Mulvehill]."  Perez Dep. 93:20–94:4.  There is also circumstantial evidence that Ms. Pete had retaliatory intent.  As described above, a reasonable jury could conclude that Ms. Pete was aware that Mr. Garcia had complained about his wages in August 2022.  In those emails, Mr. Garcia complained that his monthly invoice was not approved as it had been under the terms of the March 2020 Agreement and questioned why he was only being paid his new rate when he staffed an event.  The June 2023 Texts concerned the same subject matter:  Mr. Garcia was complaining that Ms. Pete's mental health break had led to fewer opportunities for him to staff events, leading to a drop in his income.  That fact is circumstantial evidence that Ms. Pete construed the June 2023 Texts as Mr. Garcia's continued dissatisfaction with his rate of pay.  Indeed, Ms. Pete testified that she believed that Mr. Garcia was blaming her for his lack of income in the June 2023 Texts.  In the June 2023 Facetime Conversation, Ms. Pete shouted at him and used explicit language.  Shortly thereafter, Mr. Garcia's offer to staff the Essence event

54

was rescinded.  Ms. Pete's reaction to the June 2023 Texts and the short time between those texts and the alleged retaliatory acts is evidence of Ms. Pete's retaliatory animus towards Mr. Garcia as it related to his prior complaints about his pay.  Thus, there is a genuine dispute of fact concerning whether the Pete Defendants and Roc Nation retaliated against Mr. Garcia in violation of Sections 740 and 215 of the New York Labor Law.  Whether the cause of their break with Mr. Garcia was, instead, Ms. Pete's anger at his mean-spirited personal comments about her is a question for the jury to decide.

As is relevant to Mr. Garcia's claim under NYLL § 215, a reasonable jury could conclude that Defendants' proffered lawful reasons for Mr. Garcia's termination were pretextual.  "A plaintiff may prove that retaliation was a but-for cause of an adverse employment action by demonstrating weaknesses, implausibilities, inconsistencies, or contradictions in the employer's proffered legitimate, nonretaliatory reasons for its action." *Zann Kwan v. Andalex Grp. LLC*, 737 F.3d 834, 846 (2d Cir. 2013) (describing pretext inquiry in Title VII retaliation context).  "At the pretext stage, a plaintiff 'may rely on evidence comprising her prima facie case, including temporal proximity, together with other evidence such as inconsistent employer explanations, to defeat summary judgment.'" *McPartlan-Hurson v. Westchester Cmty. Coll.*, No. 13-CV-2467, 2018 WL 3104094, at *16 (S.D.N.Y. June 21, 2018), *aff'd*, 804 F. App'x 41 (2d Cir. 2020) (quoting *Giscombe v. N.Y.C. Dept. of Educ.*, 39 F. Supp. 3d 396, 403 (S.D.N.Y. 2014)).  Defendants proffered two legitimate, nonretaliatory reasons for their actions:  first, Mr. Garcia's services were no longer sought because the June 2022 Agreement expired; and second, Mr. Garcia was discharged because Ms. Pete felt insulted by the June 2023 Texts.

The record contains evidence that is inconsistent with that explanation that Defendants no longer sought Mr. Garcia's services because the June 2022 Agreement expired.  The June 2022 Agreement identified the "Term" of the agreement as a "renewable one year term" "effective June 1, 2022."  Defs.' Ex. 8.  Mr. Garcia provided services for an event in mid-June 2023, and Roc Nation

asked him to staff an event set to take place on July 2, 2023. *See* Defs.' Exs 6, 20. Thus, a reasonable jury could conclude that the parties' relationship did not end at the end of the one-year period identified in the June 2022 Agreement. *See Andrews v. Sotheby Int'l Realty, Inc.*, No. 12 CIV. 8824, 2014 WL 626968, at *8 (S.D.N.Y. Feb. 18, 2014) ("'the parties' conduct after the expiration of [a] written contract, including [one party's] continued rendition of services, [the other's] acceptance of those services and . . . payment . . . in accordance with the terms of the written contract' can establish 'a contract implied in fact with substantially the same terms and conditions as embodied in the expired written contract.'" (quoting *Watts v. Columbia Artists Mgmt. Inc.*, 591 N.Y.S.2d 234 (N.Y. App. Div. 3rd Dept. 1992)), *aff'd*, 586 F. App'x 76 (2d Cir. 2014); *cf.* Defs.' Ex. 7 at GAR00000019 (clause of March 2020 Agreement providing that "[t]his Agreement shall be deemed to have been made in New York, and its validity, construction, breach, performance and operation shall be governed by the laws and judicial decisions of the State of New York . . . .").

As it relates to Defendants' argument that Mr. Garcia's allegedly hurtful comments towards Ms. Pete in the June 2023 Texts led to his dismissal, there are triable issues of fact concerning whether this reason was pretextual. In particular, Ms. Pete's reaction to Mr. Garcia's complaints about his income in the June 2023 Texts is evidence of the Pete Defendants' retaliatory animus, and Ms. Perez's description of Mr. Garcia as a "problem" for engaging in protected activities is evidence of Roc Nation's animus. Thus, a reasonable jury could conclude that the but-for cause of Mr. Garcia's termination was retaliation for Mr. Garcia's protected activities.

Accordingly, the Pete Defendants and Roc Nation are not entitled to summary judgment on Mr. Garcia's retaliation claims under the New York Labor Law.

### 2. California Law

Neither the Pete Defendants nor Roc Nation are entitled to summary judgment for Mr. Garcia's retaliation claim under California law because there are triable issues of fact concerning

whether Defendants retaliated against him for raising concerns about his wages. "[S]ection 1102.5 prohibits an employer from retaliating against an employee for sharing information the employee 'has reasonable cause to believe . . . discloses a violation of state or federal statute' or of 'a local, state, or federal rule or regulation' with . . . a person with authority over the employee, or with another employee who has authority to investigate or correct the violation." *Lawson v. PPG Architectural Finishes, Inc.*, 12 Cal. 5th 703, 709 (2022) (quoting CAL LAB. CODE. § 1102.5(b)). "[D]ictionary definitions of 'disclose' include 'to make openly known' and to 'open up to general knowledge.'" *People ex rel. Garcia-Brower v. Kolla's, Inc.*, 14 Cal. 5th 719, 725 (2023) (internal citations omitted). "The statute . . . does not protect employees who do not believe or who unreasonably believe that the information they are disclosing shows a violation of the law." *Id.* at 731. The "['reasonable cause to believe'] clause imposes a requirement of objective reasonableness and excludes from whistleblower protection disclosures that involve only disagreements over discretionary decisions, policy choices, interpersonal dynamics, or other nonactionable issues." *Id.* at 734.

"California Labor Code section 98.6 prohibits an employer from retaliating against an employee for engaging in any conduct delineated in Chapter 5 of the Labor Code, which includes section 1102.5." *Wilson v. Wavestream Corp.*, No. 2:24-cv-61, 2024 WL 3914475, at *2 (C.D. Cal. May 13, 2024). "[S]ection 1102.6 . . . supplies the applicable framework for litigating and adjudicating section 1102.5 whistleblower claims." *Lawson*, 12 Cal. 5th at 712. "In a civil action or administrative proceeding brought pursuant to Section 1102.5, once it has been demonstrated by a preponderance of the evidence that an activity proscribed by Section 1102.5 was a contributing factor in the alleged prohibited action against the employee, the employer shall have the burden of proof to demonstrate by clear and convincing evidence that the alleged action would have occurred for legitimate, independent reasons even if the employee had not engaged in activities protected by Section 1102.5." CAL. LAB. CODE § 1102.6. A "contributing factor" is any factor "which alone or in

connection with other factors, tends to affect in any way the outcome of the decision." *Lawson*, 12 Cal. 5th at 714 (quoting *Rookaird v. BNSF Ry. Co.*, 908 F.3d 451, 461 (9th Cir. 2018)). "This means plaintiffs may satisfy their burden of proving unlawful retaliation even when other, legitimate factors also contributed to the adverse action." *Id.* An adverse action is any action that "materially affect[s] the terms, conditions, or privileges of employment." *Yanowitz v. L'Oreal USC, Inc.*, 36 Cal. 4th 1028, 1051 (2005).

Just as Defendants are not entitled to summary judgment on Mr. Garcia's retaliation claims under the New York Labor Law, a reasonable jury could conclude that Defendants retaliated against Mr. Garcia for his protected activities under the California Labor Code. In August 2022 and September 2022, Mr. Garcia complained that he had not been paid on time and had not been paid the wages he was owed. Defs.' Exs. 11–13. He included his lawyer in those communications. A reasonable jury could conclude that he had reasonable cause to believe that he was disclosing conduct that was in violation of state wage and hour laws. As described in connection with Mr. Garcia's NYLL claims, a reasonable jury could find that both the Pete Defendants and Roc Nation were aware of Mr. Garcia's complaints. A reasonable jury could also conclude that Roc Nation and the Pete Defendants each decided to stop using Mr. Garcia's services, and that retaliation was a contributing factor in that decision. And for the same reasons that there is a genuine dispute of fact concerning whether Defendants' proffered legitimate justifications are pretextual, Defendants have not met their burden to show by "clear and convincing" evidence that the alleged retaliatory actions would have occurred even if Mr. Garcia had not engaged in the asserted protected activity. Accordingly, Defendants are not entitled to summary judgment on Mr. Garcia's retaliation claim under California Labor Code Sections 1102.5 and 98.6.

### D.    Unfair Business Practices

Defendants are not entitled to summary judgment on Mr. Garcia's unfair business practices claim under Section 17200 of the California Business and Professions Code because there remain

disputed issues of fact that preclude summary judgment on his other California law claims. "Section 17200 of the Business and Professions Code broadly defines 'unfair competition' as, inter alia, any 'unlawful, unfair or fraudulent business practice . . . .' 'Unlawful business activity' proscribed under section 17200 includes 'anything that can properly be called a business practice and that at the same time is forbidden by law.'" *Farmers Ins. Exch. v. Superior Ct.*, 2 Cal. 4th 377, 383 (1992) (quoting *Barquis v. Merchants Collection Ass'n*, 7 Cal. 3d 94, 113 (1972) (internal quotations omitted)). "[I]n essence, an action based on Business and Professions Code section 17200 to redress an unlawful business practice borrows violations of other laws and treats these violations, when committed pursuant to business activity, as unlawful practices independently actionable under section 17200 *et seq.* and subject to the distinct remedies provided thereunder." *Id.* The conduct at issue concerns Mr. Garcia's work environment, payment, work schedule, and termination. Thus, a reasonable jury could conclude that the conduct giving rise to Mr. Garcia's other California law claims was "committed pursuant to business activity." *Id.* Because summary judgment for any Defendant is improper on several of Mr. Garcia's claims under California law, there are also genuine disputes of material fact that preclude summary judgment on Mr. Garcia's California unfair business practices claim.

E.    **Motion to Seal**

The Pete Defendants' motion to seal is granted in part and denied in part without prejudice. There is a long-established "general presumption in favor of public access to judicial documents." *Collado v. City of New York*, 193 F. Supp. 3d 286, 288 (S.D.N.Y. 2016). The Second Circuit has defined "judicial documents" as documents filed with a court that are "relevant to the performance of the judicial function and useful in the judicial process." *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (quotation omitted); *see also Lytle v. JPMorgan Chase*, 810 F. Supp. 2d 616, 620–621 (S.D.N.Y. 2011). The presumption of access is "based on the need for federal courts

. . . to have a measure of accountability and for the public to have confidence in the administration

of justice." *United States v. Amodeo*, 71 F.3d 1044, 1048 (2d Cir. 1995).

"A qualified First Amendment right of access, 'understood to be stronger than its common

law ancestor and counterpart,' also attaches to certain judicial documents." *United States v. Greenwood*,

145 F.4th 248, 255 (2d Cir. 2025) (citing *United States v. Erie Cnty., N.Y.*, 763 F.3d 235, 239 (2d Cir.

2014)). The Second Circuit has "emphasized that a document filed with the court is a judicial

document if it would reasonably have the *tendency* to influence a district court's ruling . . . without

regard to which way the court ultimately rules or whether the document ultimately in fact influences

the court's decision." *Id.* (emphasis in original) (citing *Olson v. Major League Baseball*, 29 F.4th 59, 89

(2d Cir. 2022)). "To determine whether the First Amendment right of access attaches to a judicial

document, this Court 'considers the extent to which the judicial documents are derived from or are a

necessary corollary of the capacity to attend the relevant proceedings.'" *Id.* (quoting *Lugosch*, 435

F.3d at 120 (cleaned up)). The fact "that a document was produced in discovery pursuant to a

protective order has no bearing on the presumption of access that attaches when it becomes a

judicial document." *Collado v. City of New York*, 193 F. Supp. 3d 286, 289–90 (S.D.N.Y. 2016). "If

the First Amendment right attaches, a court record may still be sealed if 'specific, on the record

findings are made demonstrating that closure is essential to preserve higher values and is narrowly

tailored to serve that interest.'" *Greenwood*, 145 F.4th at 255 (quoting *In re N.Y. Times Co.*, 828 F.2d

110, 116 (2d Cir. 1987) (quotation marks omitted)).

The Pete Defendants have moved to seal portions of several exhibits. Dkt. No. 146

("Sealing Mem."). That motion divides the documents filed under seal into two categories. *Id.* The

first is the set of exhibits that "contain [personally identifiable information] such as phone numbers,

residential addresses, and email addresses . . . " that the Pete Defendants redacted in their public

filings (the "PII Redactions"). *Id.* at 1. The second is the set of exhibits are transcripts of

depositions that contain "information of a personal or intimate nature regarding an individual" that

the Pete Defendants redacted in their public filings (the "Intimate Information Redactions").  *Id.* at 2.  Defendants also filed a redacted version of their Rule 56.1 Statement.  The Pete Defendants also filed a redacted version of their memorandum of law in support of their motion for summary judgment.

All of these documents are ones to which the First Amendment right of access attaches. The Second Circuit has held that, as a necessary corollary to the First Amendment presumption of access to oral arguments, "there exists a qualified First Amendment right of access to documents submitted to the court in connection with a summary judgment motion." *Lugosch*, 435 F.3d at 124. That describes all of these documents.

Although the PII Redactions are justified by higher values, the Pete Defendants have not met their burden to justify the Intimate Information Redactions.  "Higher values that may justify redactions include the privacy interests of innocent third parties as well as those of defendants that may be harmed by disclosure, as well as financial records, family affairs, illnesses, and embarrassing conduct with no public ramifications." *Greenwood*, 145 F.4th at 256 (citing *Amodeo*, 71 F.3d at 1051 (internal quotations, citations, and modifications omitted)).  As is relevant to the PII Redactions, the redacted information consists of emails, residential addresses, and phone numbers associated with individuals.  Redaction of that information is necessary to vindicate those individuals' privacy interests.  The proposed redactions are narrowly tailored to serve those interests:  the public filings only redact the sensitive information.  Thus, the request to redact portions of exhibits 6–9, 11–13, 15–17, 19–20, 25, 29, 34–37, 39–41, 43–47, 49–54, and 56 is granted.

However, the motion to seal with respect to the Intimate Information Redactions is denied because the Pete Defendants have not met their burden to justify these redactions. "'The party opposing disclosure [of a judicial document] must make a particular and specific demonstration of fact showing that disclosure would result in an injury sufficiently serious to warrant protection.'" *In re Tel. Media Grp. Ltd.*, No. 23-MC-215, 2023 WL 5770115, at *6 (S.D.N.Y. Sept. 6, 2023) (quoting *In*

*re Parmalat Sec. Litig.*, 258 F.R.D. 236, 444 (S.D.N.Y. 2009)).  "Broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test."  *Id.* (quotation and alternation omitted).

Here, Defendants have not made a particular or specific demonstration showing that the proposed redactions are warranted.  The Pete Defendants seek to redact portions of deposition transcripts that relate to a broad range of topics, including the conduct of Ms. Pete, the activities of her entourage, and the medical history of third parties.  To justify these redactions, the Pete Defendants cite to the protective order for the blanket statement that the information is "of a personal or intimate nature regarding any individual."  Sealing Mem. at 2.  Such a "broad citation[] to the Protective order" is "insufficient to overcome the presumption of access as the 'mere existence of a confidentiality order says nothing about whether complete reliance on the order to avoid disclosure is reasonable.'"  *In re Tel. Media Grp. Ltd.*, 2023 WL 5770115, at *6 (quoting *Tromblee v. New York*, No. 19-CV-638, 2022 WL 17266979, at *4 (N.D.N.Y. Nov. 29, 2022) (quoting *Lugosch*, 435 F.3d at 126)).  Additionally, the protective order entered by the Court states in explicit terms that "[t]he parties should be aware that the Court will unseal documents *if it is unable to make 'specific, on the record findings . . . demonstrating that closure is essential to preserve higher values and is narrowly tailored to serve that interest.'"  Dkt. No. 104 ¶ 10 (emphasis added) (quoting *Lugosch*, 435 F.3d at 120).  The Pete Defendants have not provided a sufficient factual basis for the Court to grant the motion to seal in full.  Accordingly, the motion to seal the Intimate Information Redactions is denied without prejudice.

Should the Pete Defendants seek to renew their motion to seal with respect to the Intimate Information Redactions, such a motion must be filed no later than one week following the entry of this order.[13]  If the Pete Defendants do not renew their motion to seal the Intimate Information

---

[13] The Court observes that the subject matter of most of the proposed redactions is highly relevant to resolve the claims that remain in this case.  The parties' briefs reference the testimony in question, and the Court has referenced several

Redactions, they must file unredacted copies of the relevant exhibits, Defendants' Rule 56.1 Statement, and the Pete Defendants' memorandum in support of their motion for summary judgment. Their deadline to do so is also one week following the entry of this order.

Plaintiff also filed several exhibits under seal. *See* Dkt. Nos. 159, 160. However, Plaintiff did not file redacted versions of those exhibits, nor did he move to seal the exhibits filed under seal. *See* Dkt. Nos. 161, 162. Federal Rule of Civil Procedure 5.2 identifies the categories of information that must be redacted from public filings without seeking prior leave of court. *See* Fed. R. Civ. P. 5.2(a). Upon review of several of Plaintiff's exhibits filed under seal, the proposed redactions encompass material beyond that which must be sealed. No later than one week following the entry of this order, Plaintiff is ordered to file a letter motion to seal as specified in the Court's Individual Rules of Practice in Civil Cases. *See* Individual Rule 4(A)(ii).

### F.      Motion to Exclude

The Pete Defendants have also moved to exclude the report and testimony of Dr. Jessica Rowe, a psychologist who proposes to offer testimony concerning Mr. Garcia's psychological state based on psychiatric examinations of Mr. Garcia and review of other materials. *See generally* Dkt. No. 142-1. Because the Court's rulings on Defendants' motions on summary judgment are not premised on the report and proposed testimony of Dr. Rowe, the Court will address admissibility of Dr. Rowe's testimony in advance of trial.

## IV.      CONCLUSION

For the forgoing reasons, Defendants' motions for summary judgment are GRANTED as to Mr. Garcia's claims of retaliation under the NYCHRL and the NYSHRL and Mr. Garcia's claims under the FEHA. Defendants' motions for summary judgment are otherwise DENIED. The Pete

---

details described in the testimony in resolving Defendants' motions for summary judgment. Many of those details have already been disclosed in public, unredacted filings. *See* Dkt. No. 157-2. And should this case proceed to a trial, the subject matter of most of these redactions may enter the trial record through the testimony of the witnesses whose deposition transcripts the Pete Defendants seek to seal.

Defendants' motion to seal is GRANTED with respect to the PII Redactions and DENIED WITHOUT PREJUDICE with respect to the Intimate Information Redactions.

No later than one week following the date of this order, the Pete Defendants are directed to either file a renewed motion to seal or to file unredacted copies of the relevant documents. By that same date, Plaintiff is ordered to file a motion to seal in full compliance with the Court's Individual Rules. Finally, no later than one week following the date of this order, the parties are directed to file a joint letter describing their expectation for the length of trial in this case and their respective availabilities for trial. The Clerk of Court is directed to terminate the motions pending at Dkt. Nos. 140, 143, 146, and 147.

SO ORDERED.

Dated: August 7, 2026

_____
GREGORY H. WOODS
United States District Judge